**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE CROTTY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>                         **Plaintiff,** <br><br>       v. <br><br> PHILIP A. FALCONE, <br> HARBINGER CAPITAL PARTNERS <br> OFFSHORE MANAGER, L.L.C., and <br> HARBINGER CAPITAL PARTNERS <br> SPECIAL SITUATIONS GP, L.L.C., <br><br>                            **Defendants.** | **12 CIV 5027** <br><br> 12 Civ. _____ ( ) <br><br><br> **COMPLAINT** <br><br>  |

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Phillip A. Falcone, Harbinger Capital Partners Offshore Manager, L.L.C., and Harbinger Capital Partners Special Situations GP, L.L.C., alleges as follows:

**SUMMARY**

1.       This case stems from an illegal "short squeeze"—a form of market manipulation that occurs when a trader constricts the available supply of a security with the intention of forcing settlement from short sellers at the trader's arbitrary and inflated prices. Defendant Philip A. Falcone ("Falcone"), a prominent hedge fund manager, engineered and carried out a squeeze in a series of distressed high-yield bonds issued by MAAX Holdings, Inc. ("MAAX"), through two unregistered investment managers he controls, co-Defendants Harbinger Capital Partners Offshore Manager, L.L.C. ("HCP Offshore Manager") and Harbinger Capital Partners Special Situations GP, L.L.C. ("HCP Special Situations GP").

2.      Between April and June 2006, Falcone and the other Defendants purchased 108 million MAAX's junior discount bonds (the "MAAX zips"), which constituted about 63% of the issue, for Harbinger Capital Partners Master Fund I ("Master Fund").

3.      During the summer of 2006, Falcone heard rumors that a Wall Street financial services firm that provided prime brokerage services to the Master Fund ("the Wall Street firm") was shorting the bonds and encouraging its customers to do the same.  Prime brokers provide a special group of services to certain clients, often hedge funds, including services such as securities lending, leveraged trade execution, cash management, and margin arrangements.

4.      In September and October 2006, Falcone retaliated against the Wall Street firm for shorting the MAAX Zips by causing the Master Fund and the newly created Harbinger Capital Partners Special Situations Fund ("Special Situations Fund") to purchase all of the remaining outstanding MAAX zips in the open market. (The Master Fund and the Special Situations Fund are collectively referred to hereinafter as the "Harbinger funds" or "Harbinger.")

5.      By October 24, 2006, Harbinger had purchased more than the available supply of bonds—its position stood at 174 million notes in a 170 million note issue.

6.      Contemporaneously with these purchases, Falcone and the other Defendants arranged for the transfer of Harbinger's MAAX positions from its prime brokerage accounts to a custodial account in a bank in Georgia.  The principal purpose and effect of this was that it prevented the bonds from being lent out or used to cover short positions.

7.      Falcone and the other Defendants then demanded that the Wall Street firm settle its outstanding MAAX transactions and deliver the securities it owed.  Defendants did not disclose at the time that it would be virtually impossible for the Wall Street firm to acquire any

2

bonds to deliver, as nearly the entire supply was locked up in the Harbinger funds' custodial account and it was not offering them for sale.

8.      Even though he had already purchased more than the available supply of bonds, Falcone and the other Defendants continued to cause the Harbinger funds to purchase the MAAX zips from apparent short sellers—taking the long side of short sales in the open market. By late January 2007, the Harbinger funds had acquired another 18 million MAAX notes, increasing their holdings to 113% of the issue.  By this point, the Harbinger funds had purchased 22 million more bonds than had ever been issued.  The total cost of the MAAX position was approximately $90.7 million.

9.      Due in large part to Harbinger's control of the supply and its continued demands for delivery, the bonds more than doubled in price during this period.

10.     In the spring of 2007, Falcone and the other Defendants ratcheted up the pressure on the Wall Street firm by paying off Harbinger's margin debt to the firm and demanding the return of any securities, including the MAAX zips, which it had borrowed.  In an effort to meet its obligations to Harbinger, the Wall Street firm bid daily for the bonds, but could not find any to purchase.

11.     In May 2007 the Wall Street firm approached Harbinger and asked if it had any MAAX zips to sell.  Defendants replied that Harbinger had such bonds and that the Wall Street firm could have them at the price of 100, or par, despite the fact that the bonds had been issued and had been selling at a deep discount to par.  At the time of the offer, MAAX was in dire financial condition, and Harbinger was carrying the notes on its books at a price of 65.

12.     On July 31, 2007, Defendants sold a block of Harbinger's MAAX zips in the open market, effecting settlement from a short seller at 95—an inflated price that was a reflection of

the Defendants' manipulation of the market for the MAAX zip bonds.  The same day, Falcone directed that the price of Harbinger's MAAX zip bonds be marked down from 55 so that they were carried on the funds' books at a price of 40.

13.     In late September 2007, the Wall Street firm called Falcone to try to resolve the MAAX situation.  During that conversation, Falcone claimed that a price at or above par for the MAAX bonds was reasonable and tried to induce the Wall Street firm to buy-in the outstanding MAAX short positions at an arbitrary and inflated price of 105.  At the end of the conversation, Falcone informed the Wall Street firm—for the first time—that he had acquired more than the whole issue of the MAAX zips. This was the first time anyone outside of Harbinger knew the size of the funds' MAAX position.  Several days later, the Wall Street firm informed Falcone that the firm could make no further bids for the MAAX zips as long as Harbinger's position in the MAAX zips was larger than the number of bonds issued.  Realizing that Harbinger was engaging in a short squeeze, the Wall Street firm refused to pay prices that were likely the result of manipulation.

14.     On December 24, 2007, to convince the Wall Street firm that Harbinger no longer owned the entire issue of MAAX zips, at Falcone's and the other Defendants' direction, the Harbinger funds sold 25 million face amount MAAX zips for $0.01 per $100 face amount (for a total of $2,500) to an off-shore retail account at a brokerage firm through a trader at an inter-dealer broker.  The trader, who had a longstanding relationship with Falcone, executed the trade using trading discretion he had over the off-shore account.  The brokerage firms involved in the transaction did not report it.  For the next year, the trader made no effort to sell the bonds in the open market.  Thus, the 25 million in MAAX zips were effectively unavailable to cover short positions in the bonds.  As a result, while Harbinger's sale of the 25 million in MAAX zips

allowed Defendants to argue that they had reduced Harbinger's ownership position below the total issue of MAAX zips, the sale did not diminish the impact of their manipulation of the market for MAAX zips.

15.    At the end of the month, Falcone directed the Harbinger funds' investment adviser to write off the MAAX position as worthless. Falcone and the other Defendants, however, continued to press the Wall Street firm to deliver the securities it owed.

16.    In the first week of January 2008, Falcone informed the Wall Street firm that the Harbinger funds had sold some of the MAAX notes and that their Harbinger's ownership position was below the total issue size. Falcone refused to identify the party to whom Harbinger had sold the 25 million notes or give the Wall Street firm any details of the transaction. The Wall Street firm resumed bidding for the notes, but again could find none to deliver.

17.    On January 11, 2008, the Wall Street firm learned of two transactions in the MAAX zips at prices in the $60 range. In order to cover outstanding short positions, the Wall Street firm purchased one million MAAX zips in the $60 range. When the Wall Street firm subsequently learned that it had purchased the notes from Harbinger, it became concerned that the $60 price was the product of Harbinger's short squeeze and again suspended the firm's trading in the security.

18.    Between March and November 2008, Harbinger adjusted or cancelled all of its unsettled MAAX trades.

19.    By engaging in the conduct described herein, Defendants Falcone, HCP Offshore Manager, and HCP Special Situations GP illegally manipulated the market for MAAX zips and thereby violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §

77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §
78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

20.     The Commission brings this action pursuant to the authority conferred upon it by

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act

[15 U.S.C. § 78u(d)], seeking to permanently restrain and enjoin Defendants from engaging in

the acts, practices and courses of business alleged herein.

21.     In addition to the relief recited above, the Commission seeks: (a) a final judgment

ordering Defendants to disgorge their ill-gotten gains with prejudgment interest thereon on a

joint and several basis; (b) a final judgment ordering Defendants to pay civil penalties pursuant

to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)]; and (c) such other relief as the Court deems just and appropriate.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction under Section 22(a) of the Securities Act [15 U.S.C. §

77v(a)] and under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d),

78u(e) and 78aa].  Defendants Falcone, HCP Offshore Manager and HCP Special Situations GP

directly or indirectly, made use of the means or instrumentalities of interstate commerce,

including electronic mail, of the mails, or of the facilities of a national securities exchange in

connection with the transactions, acts, practices, and courses of business alleged in this

Complaint.

23.     Venue is appropriate in this Court under Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] or 28 U.S.C. § 1391(d)

because, among other reasons, certain acts or transactions constituting the violations by Defendants occurred in this district.

## DEFENDANTS

24.     **Philip A. Falcone**, age 49, is a co-founder of the Harbinger Master Fund and Harbinger Special Situations Fund.  At all relevant times, Falcone was the senior managing director of Defendants Harbinger Capital Partners Offshore Manager, L.L.C. and  Harbinger Capital Partners Special Situations GP, L.L.C., which were nominally the investment managers of the Master Fund and the Special Situations fund, respectively.  By virtue of his position as senior managing director, Falcone in essence functioned as the funds' investment manager and exercised authority over the investment decisions for the funds and other investment-related activities described herein.  In March 2009, Falcone purchased his co-founder's interest in the Harbinger funds and changed the name of his investment management group to Harbinger Capital Partners LLC.  Falcone is a resident of New York, New York.

25.     **Harbinger Capital Partners Offshore Manager, L.L.C.** ("HCP Offshore Manager") is a U.S. limited liability company with its principal place of business in the State of Alabama that held the position of investment manager of the Master Fund and had the authority to buy and sell securities on behalf of the Master Fund, and to make other investment-related decisions.  Falcone was the senior managing director of HCP Offshore Manager and he exercised authority over and directed the activities of HCP Offshore Manager that are described herein.

26.     **Harbinger Capital Partners Special Situations GP, L.L.C.** ("HCP Special Situations GP") is a limited liability company organized under the laws of the State of Delaware that held the position of investment manager of the Special Situations Fund and had the authority to buy and sell securities on behalf the Special Situations Fund and to make other investment-

7

related decisions. Falcone was the senior managing director of HCP Special Situations GP and he exercised authority over and directed the activities of HCP Special Situations GP that are described herein.

## OTHER RELEVANT ENTITIES

27.    **Harbinger Capital Partners Master Fund I** ("Master Fund") is a hedge fund, founded in 2001, which invests principally in distressed companies.

28.    **Harbinger Capital Partners Special Situations Fund** ("Special Situations Fund") is a hedge fund created in 2006. Like the Master Fund, the Special Situations Fund invests principally in distressed companies. In mid-2008 the combined assets of the Master Fund and the Special Situations Fund totaled approximately $26 billion.

29.    **MAAX Holdings, Inc.** ("MAAX") is a Delaware corporation headquartered outside of Minneapolis, Minnesota, which, through its subsidiaries, manufactures and distributes mid- to high-end bathroom fixtures and spas. In its heyday in the late 1990's and early 2000's, MAAX (then doing business as MAAX, Inc.) was the leading manufacturer and distributor of bathtubs and showers in Canada and the third largest in the United States. In June 2004, MAAX issued $150 million of 9.75% senior subordinated notes due 2012 and secured them with the assets of the operating company, MAAX Corporation ("MAAX senior notes"). In December of that year MAAX issued $170.7 million principal amount at maturity of 11.25% senior discount notes due 2012 ("MAAX junior notes" or "MAAX zips"). These MAAX junior notes were issued against the asset-less holding company. It was the market in this latter series of bonds that the Commission alleges was manipulated. Both the MAAX senior and junior notes traded over-the-counter. In July 2008, MAAX filed for Chapter 15 bankruptcy protection in the U.S.

Bankruptcy Court in Delaware.  MAAX remains in business, but its earnings are a small fraction of those it made in the past.

## FACTUAL ALLEGATIONS

*A.    The Operation of the Funds*

30.    At all relevant times, the Harbinger funds' business operations, including its administrative, compliance, legal, risk and various other functions, were run by a registered investment adviser in Alabama.  All of the funds' trading and related activities, however, were conducted by Defendants from offices in New York, New York.

31.    Defendant HCP Offshore Manager held the position of investment manager of the Master Fund.  Falcone was the senior managing director of HCP Offshore Manager, and he made all of the decisions for HCP Offshore Manager with regard to what securities would be bought and sold for the Master Fund and with regard to the other investment-related decisions that are described herein.

32.    Defendant HCP Special Situations GP held the position of investment manager of the Special Situations Fund.  Falcone was the senior managing director of HCP Special Situations GP and he made all of the decisions for HCP Special Situations GP with regard to what securities would be bought and sold for the Special Situations Fund and with regard to the other investment-related decisions that are described herein.

33.    From January 2006 through 2009, Falcone ran his trading operation with 10 to 12 employees, roughly evenly split between traders and analysts. All of the employees worked in one large room located in New York City.

34.    The traders' job was to monitor the market and to execute Falcone's orders for the purchase or sale of securities and other trading-related activities, which he gave them each

morning prior to the opening of the market. The traders could work on anywhere from one to thirty positions daily.  If the price or volume term Falcone had set for a trade was not met, Falcone alone would make the decision as to whether to adjust the terms or drop out of the bidding.  Falcone seldom discussed his trading strategy with the traders.

35.     The job of the analysts was to do research and generate ideas, which they provided to Falcone.  Falcone was solely responsible for deciding what trading strategies to employ and what trades to make.  As with the traders, Falcone seldom revealed his thinking to the analysts.

36.     At all relevant times, Falcone, acting on behalf of HCP Offshore Manager and HCP Special Situations GP made all of the investment and investment-management decisions for the Harbinger funds, including with regard to the actions described herein.  He did not answer to any investment committee or other third party.  Falcone alone decided where to commit the capital of the funds.

37.     Falcone knew the position size and percentage of ownership the Harbinger funds held in any particular issue every day and at various times during each trading day.  Harbinger's trading assistants prepared "position sheets" at the end of every trading day for him that aggregated the day's trading activity with the positions already held in the funds.  In addition to the position sheets, the trading assistants made intra-day calculations of position concentrations and provided that data to Falcone.

38.     As set out in detail below, between April 2006 and January 2007, Falcone directed Defendants HCP Offshore Manager and HCP Special Situations GP, the two investment managers he controlled, and their representatives to purchase more than the entire issue of the MAAX zips on behalf of the Harbinger funds.  All of the allegations described herein regarding

10

actions taken by Falcone were actions that he took in his capacity as senior managing director of HCP Offshore Manager and HCP Special Situations GP, thus establishing personal liability on the part of Falcone as well as liability on the part of HCP Offshore Manager and HCP Special Situations GP.

B.    *The Initial Accumulation*

39.    Falcone and HCP Offshore Manager directed and caused the first purchase of the MAAX zips for the Master Fund on April 11, 2006— a purchase of 5 million bonds at a cost of approximately $2.25 million. Falcone directed this purchase, at least in part, on the recommendation of an analyst with whom he had consulted for years and whom he had hired a month earlier to work at Harbinger (the "Harbinger analyst"). The Harbinger analyst opined that the MAAX bonds would rally with the U.S. and Canadian housing markets. The analyst recommended to Falcone that he purchase both series of MAAX notes, but opined that the more depressed MAAX zips had greater upside potential.

40.    Between April 13 and June 6, 2006, Falcone and HCP Offshore Manager directed and caused the Master Fund to purchase an additional 103 million MAAX zips. As of June 6, 2006, the fund's position in the MAAX zips stood at 108 million notes, or approximately 63% of the issue (i.e., the outstanding face amount of the MAAX zips that had been issued). The total cost of this position was about $54.5 million.

41.    Between April 11 and June 6, 2006, Harbinger's purchases of the MAAX zips represented about 40% of the purchases made during that period and accounted for 63% of the volume of trading in those bonds. During this period, the average monthly volume, which was approximately 30 million in the first quarter of 2006, rose to 85 million.

42.     Similarly, the price of the MAAX zips, which had been trading in the mid-30's range in the first quarter of 2006, traded in the range of 45-1/4 to 56-1/4 during the period April 11 through June 6, 2006.

43.     During a three month period after June 6, 2006, Harbinger made only one further purchase of MAAX zips.

44.     Pursuant to the rules and regulations of the Financial Industry Regulatory Authority ("FINRA"), transactions in over-the-counter fixed income securities, such as the MAAX zips, were required to be reported on FINRA's Trade Reporting and Compliance Engine, or TRACE, by the executing brokers on each side of the transaction. The TRACE system allows third parties to see the material terms of the transactions, such as their date, price and volume, but does not disclose the identity of the traders.

C.     *The Wall Street Firm Shorts the MAAX Zips.*

45.     Sometime during the summer of 2006, the Harbinger analyst began hearing rumors that there was aggressive short selling in the MAAX zips. The analyst's sources on the street speculated that one of Harbinger's prime brokers—the Wall Street firm—and its customers were shorting the MAAX zips and trying to drive their price down. The analyst informed Falcone.

46.     Falcone was angered by this. He speculated that the Wall Street firm was putting its proprietary trading interest ahead of his own—that it was undercutting the value of his MAAX position and possibly borrowing his own notes to cover its short position.

47.     The Wall Street firm and some of its prime brokerage clients were, in fact, short the MAAX zips at this time. One of the Wall Street firm's proprietary traders had taken a short position because he believed that the MAAX junior notes (the zips) were trading too high

relative to the senior notes.  He was of the opinion that MAAX's senior debt was sufficiently impaired that there was no residual value at the junior level.  Shorting the zips thus operated as a hedge to a long position in the senior notes.  The proprietary trader claimed that he had discussed his analysis with the Wall Street firm's customers, including Harbinger, and that he had no knowledge of the size of Harbinger's position in the zips.

48.     On Falcone's instruction, a senior Harbinger trader asked the Wall Street firm's prime brokerage division not to lend out Harbinger's MAAX notes and to move them from its margin to a cash account, a step that would make it more difficult for the Wall Street firm to loan Harbinger's MAAX notes to other customers.

49.     In early August 2006, Falcone and the other Defendants directed that all 108 million MAAX zips owned by Harbinger be moved from the Wall Street firm to another prime broker.  Falcone and the other Defendants ordered this transfer, because they did not trust the Wall Street firm to honor their request that it not borrow any more of Harbinger's bonds to support short positions.

D.     *Harbinger Re-Enters the Market.*

50.     By early September 2006, Falcone, and thus Defendants HCP Offshore Manager and HCP Special Situations GP, formed the intent to manipulate the market in the MAAX zips by buying up all of the available bonds and restricting their supply in the market, and then pressuring the holders of short positions in the MAAX zips to buy the bonds at artificially inflated prices, when Falcone and the other Defendants knew that Harbinger was virtually the only source.

51.     On September 6, 2006, at Falcone's and HCP Special Situation GP's direction, Harbinger re-entered the market and purchased five million MAAX zips for the Special Situations Fund at 36-1/2 for a total cost of $1,825,000.

52.     Over the next seven weeks, at Falcone's and the other Defendants' direction, Harbinger acquired an additional 64.5 million MAAX zips for both funds at a total cost of approximately $23 million.  Harbinger's purchases accounted for 69% of the total purchases made during this period and 84.9 % of the share volume of trading in the bonds.  Stated another way, Harbinger purchased 64.5 million MAAX notes during this period, and the rest of the buyers combined, a little over 11.4 million. During the three summer months that Harbinger was not trading the MAAX zips, the monthly volume was only 3.7 million.  This climbed back to 40 million in September and October, when Harbinger resumed buying.  The prices Harbinger paid for the notes ranged from 36-1/2 to 41-1/2.

53.     By October 24, 2006, the Harbinger funds had purchased more than the entire issue of the MAAX zips—its position now stood at 174 million in face value in a 170 million bond issue.

54.     Harbinger was able to acquire more than the entire issue of the MAAX zips because there is no "locate" requirement when short-selling debt instruments.  Under rules applicable to the equities market, a broker or dealer that is not engaged in bona fide market making cannot accept a short sale order in a stock unless it has borrowed or has arranged to borrow that stock, or has reasonable grounds to believe that it can borrow the stock and deliver on the delivery date.  There is no similar rule applicable to bond trading.  Thus, "naked" short selling of bonds is legal, which can lead to "long" positions far in excess of the issue size.

55.     As the MAAX zips became more difficult to acquire in the fall of 2006, rumors of a short squeeze began drifting through the marketplace, both in bond market publications and by word of mouth.  The bond publication *DebtWire* explicitly attributed the rise in the price of the MAAX zips to a rumored accumulation of the bonds at Harbinger.  Harbinger refused to comment on these articles and otherwise did not disclose the size of Harbinger's MAAX position to the market.

E.     *Harbinger Locks Up the Bonds.*

56.     In October 2006 Falcone and the other Defendants directed a junior Harbinger trader to arrange with the funds' investment adviser for the transfer of the funds' position in the MAAX zips from its brokerage accounts to a bank account.  Between October 17 and November 1, 2006, the junior trader oversaw the delivery of the funds' entire MAAX position to a Harbinger account at a bank in Georgia.

57.     Falcone and the other Defendants directed the transfer of the MAAX zips to the Georgia bank in order to lock them up and make them unavailable to short sellers trying to cover their positions.

58.     Harbinger, at Falcone's and the other Defendants' direction, took further steps to tighten the supply of the MAAX notes.  Contemporaneously with its transfer of the notes to the Georgia bank, Harbinger entered into a series of three reverse repurchase, or "repo," transactions of five million notes each with a Wall Street prime broker, which had the effect of taking the notes off the market.

F.     *Harbinger Purchases 113% of the Issue.*

59.     Even after acquiring the entire issue, Falcone and the other Defendants continued to direct and cause the Harbinger funds to acquire MAAX zips in order to continue to manipulate the market in the bonds.

60.     Between October 25, 2006, and January 26, 2007, the Harbinger funds, at Falcone's and the other Defendants' direction, purchased a little over 17 million of the notes at a total cost of $9.8 million. The Harbinger funds were involved in 55.3% of the transactions in MAAX during this period, and the funds' purchases accounted for 71.8% of the volume.

61.     Harbinger's continued accumulation of the MAAX zips, in conjunction with the lock-up of the entire issue at the Georgia bank, caused the price of the bonds to skyrocket. By November 9, the notes, which had been trading between 36-1/2 and 41 during the fall, jumped to 52-1/2. Falcone and the other Defendants continued to demand that the short sellers deliver the bonds at settlement.

62.     The short sellers were unable to find bonds to deliver at settlement, and the failures to deliver ("fails") began mounting.

63.     When a seller fails to deliver a security at settlement, FINRA rules authorize a broker-dealer to "buy in" the securities in the open market. The broker-dealer, however, must buy in the securities at an economically defensible price.

64.     By November 2006, the Wall Street firm had an aggregate short position in the MAAX zips of approximately 26.7 million bonds—21.5 million of which was owed directly to Harbinger and 5.2 million of which were recalls from firms at which the Wall Street firm had borrowed the notes. Roughly one-half of the Wall Street firm's 21.5 million note debt to Harbinger stemmed from third parties' failures to deliver the notes that they had sold to the Wall Street firm, and the other half from customer and proprietary short sales. The Wall Street firm's

proprietary desk was short 4.35 million in notes, and three hedge fund customers were short a total of 9 million in notes.

65.     In mid-November 2006, the Wall Street firm attempted to buy in the MAAX zips, but was unable to locate any bonds that could be delivered to Harbinger.

66.     By the end of November 2006, the MAAX zips were selling at 75-1/4.  At Falcone's and the other Defendants' direction, Harbinger continued to acquire the MAAX zips through January 2007 at prices as high as 86—an arbitrary and artificially inflated price greater than the accreted value of the bond.

67.     On January 16, 2007, the MAAX zips began trading higher than the more senior MAAX notes.  Historically, the senior notes, which were backed by the assets of the operating company, traded 300 basis points (or three percentage points) in yield ahead of the zips, which were backed by the asset-less holding company.  This market was now upside-down.

68.     Falcone and the other Defendants recognized the inflationary effect of its accumulation of the notes, as it carried them on its books at the end of January at 55—a 36% discount to market price.

69.     On January 31, 2007, Harbinger's position in the MAAX notes reached its high water mark—192,609,000 face value bonds, or 113% of the issue—acquired at a total purchase price of $90.7 million.  Falcone and the other Defendants directed the purchase of the entire position and knew or were reckless in not knowing that Harbinger held well over 100% of the issue.

G.     *Harbinger Continues to Demand Delivery.*

70.     During the winter and spring of 2007, Falcone directed his traders to continue to press the Wall Street firm for delivery of the MAAX zips it had failed to deliver at settlement.

17

The traders periodically called the Wall Street firm's securities lending desk to demand that it buy in the notes. Neither trader informed the Wall Street firm that Harbinger was the only source of the notes—that it had purchased more than the entire issue and had locked up the bonds at the Georgia bank.

71.    The Wall Street firm's lending desk, in turn, pressured the Wall Street firm's proprietary trading desk to acquire the bonds. The salesmen on the proprietary trading desk bid on the MAAX zips up to three times per day, but were unable to find any bonds that could be purchased and delivered to Harbinger.

72.    The securities lending desk simultaneously tried to borrow MAAX notes from the lending desks of other brokerage firms, but it too was unable to do so. This situation continued throughout the spring of 2007.

73.    Sometime in the spring of 2007, Harbinger, at Falcone's direction, paid off the debt in its margin account and demanded that the Wall Street firm return any securities it had borrowed, including MAAX zips.

74.    On May 23, 2007, one of the salesmen on the Wall Street firm's proprietary trading desk contacted Harbinger and inquired whether it had any MAAX zips to sell. Falcone directed one of the Harbinger traders to respond that the funds would sell MAAX zips "guaranteed delivery at 100" to the firm. The Wall Street firm believed that the price was too high and declined the offer. Again, no one associated with Harbinger informed the Wall Street firm that the funds owned more than the entire issue of the MAAX zips, that they had locked up their entire position in a bank in Georgia and that they were, for all practical purposes, the only source of the notes.

75.     Throughout the summer of 2007, the securities lending desk at the Wall Street firm continued to press customers to cover their short positions and the proprietary desk to effect a buy-in of the MAAX zips. The proprietary desk attempted to do so, but again was unable to find deliverable securities.

76.     On July 31, 2007, an arbitrage fund located in New York City, purchased 700,000 MAAX zips at 95 in the open market from Harbinger. The price of 95 was an arbitrary and inflated price resulting from Defendants' manipulation of the market.

77.     On the morning of the trade, the Harbinger analyst directed the funds' investment adviser to mark the MAAX zips down from 55 to 40 on the funds' books due to the current market in the senior debt and the deteriorating state of the company's finances.

78.     At this time, Standard & Poors rated the MAAX zips at CC, down from a CCC at the beginning of 2006. This downgrading was based on concerns about MAAX's liquidity and its ability to meet its debt obligations. In the beginning of 2008, the MAAX zips fell to a D rating.

79.     In or about September 2007, at Falcone's and the other Defendants' direction, Harbinger's traders upped the pressure on the Wall Street firm to deliver the bonds it owed. The Wall Street firm bid for the bonds at prices as high as $60, but could not find the bonds. The head of the firm's lending desk again instructed that the bonds be bought in from customers who were delinquent in their settlements.

80.     By at least mid-September, the Harbinger/MAAX situation had been brought to the attention of the senior management of the Wall Street firm, and they held several meetings with the firm's traders and compliance and legal departments to determine what to do.

H.      *Falcone Tells the Wall Street Firm to Keep Bidding.*

19

81.    On September 27, 2007, a senior officer of the Wall Street firm (the "senior officer") and a group of others comprised of trading, compliance and legal personnel called Falcone to discuss the situation with the MAAX zips and its possible resolution.  The senior officer's principal goal was to find out if there were facts and circumstances that would justify a price of par, or 100, for the zips (which Harbinger had offered in May).  The senior officer did not want the Wall Street firm in the situation of possibly aiding and abetting a market manipulation.

82.    During the conversation, Falcone insisted that the Wall Street firm buy in the MAAX zips.  Falcone stated that he would be willing to settle with the shorts now at 105.  Falcone attempted to justify this price by explaining MAAX's debt structure and the circumstances under which the subordinated debt might be paid off before the senior and put back to the company at par or above.

83.    At some point, the conversation turned to the trading in the MAAX bonds.  The senior officer asked Falcone how the Wall Street firm might satisfy its obligation to Harbinger.  Falcone stated that the Wall Street firm should just keep bidding for the bonds.  Falcone acknowledged that the Wall Street firm would suffer some losses doing so, but told the senior officer and the others that sometimes you are just on the wrong side of a trade.

84.    In the course of this discussion, Falcone stated that he knew that the short position in the MAAX zips had created a "long" position in excess of the issue size.  When the senior officer asked how he could possibly know this, Falcone stated that he was working the position himself and that he (i.e., Harbinger) had acquired approximately 190 million bonds.  The senior officer and the other the Wall Street firm personnel were stunned.

85.    Soon thereafter, the senior officer reported the substance of his conversation with Falcone to other senior officers at the Wall Street firm. The senior officer who had spoken with Falcone informed the others that he could not support Falcone's request for a buy-in at 105 because the price was clearly being affected by a short squeeze and the price made no sense in relation to the price of the MAAX senior note, which was selling at 50.

86.    In early to mid-October 2007, the senior officer of the Wall Street firm called Falcone back and informed him that the firm could not bid for the MAAX zips while Harbinger controlled the entire issue.

I.    *Harbinger Tries to Salvage its Investment in MAAX.*

87.    During the late summer and fall of 2007, MAAX's financial condition continued to deteriorate. Internally, Harbinger marked the MAAX zips down to 25 at the end of September, 15 at the end of October, and 10 at the end of November. Falcone and the Harbinger analyst began to explore ways to salvage the funds' investment.

88.    In September, the Harbinger analyst began discussing refinancing options with MAAX's owners. In October, Harbinger hired Credit Suisse to look at MAAX's credit agreements and devise a way to infuse new capital into the company in exchange for upgrading the zips. In December, Harbinger entertained a proposal for a possible restructuring or recapitalization of MAAX from the company's senior management. Ultimately, Falcone rejected all of the proposals.

J.    *The Christmas Eve Transaction*

89.    On December 24, 2007, the Harbinger funds, acting at Falcone's and the other Defendants' direction, sold 25 million MAAX zips at $0.01 per $100 face amount (for a total of $2,500) from one of their prime brokerage accounts to a retail account at a different firm.

Falcone and the other Defendants ordered this trade because they wanted to reduce the position below the issue size—one of the conditions the Wall Street firm had set for buying in its customer and proprietary short positions.

90.      Initially, the 25 million note transaction was structured as a sale between two Harbinger fund accounts at different brokerage firms.  This initial sale was cancelled sometime on December 24.  The trade was then re-executed as a sale by Harbinger to an account of a Cayman Islands corporation at a different firm.

91.      The trade of 25 million MAAX zips described above was made through the head of a high yield trading desk at an inter-dealer broker (the "Inter-Dealer Broker") with whom Falcone and the other Defendants had a longstanding relationship. The head of the Inter-Dealer Broker's high yield trading desk executed the trade, using the discretionary authority he had over the Cayman Islands customer's account.  The customer himself was unaware of the trade until many months later.

92.      None of the brokers involved reported the sale of the 25 million notes at a penny on FINRA's Trade Reporting and Compliance Engine, or TRACE, system, as required by FINRA rule.  As a result, the market was not informed that a substantial block of MAAX zips had been sold, and even those who later learned of the transaction did not know the volume or price of the notes sold or the identity of the brokers involved.

93.      Despite an ongoing buy-in and a rumored short squeeze, the head of the Inter-Dealer Broker's desk made no attempt to sell any of the notes that he had acquired for his client's account (and over which he had trading authority) into the market for more than a full year.

94.     In June 2008, the head of the Inter-Dealer Broker's desk sold all 25 million notes in the customer account to a nominee account he controlled for himself and his family. The sale was at $0.19 per bond and netted a $40,000 profit to the original customer account. Again, the head of the desk used his trading discretion in the transaction. And, again, the Inter-Dealer Broker did not report this transaction on TRACE.

95.     By virtue of the circumstances described above, the 25 million in MAAX zips sold to the offshore Cayman account were functionally unavailable in the open market.

K.     *The Wall Street Firm Capitulates.*

96.     On January 4, 2008, Falcone sent an email to the Wall Street firm stating that he wanted the MAAX buy-in completed. In the email, he informed the firm that the Harbinger funds had sold a block of MAAX zips and no longer owned the entire issue, thus ostensibly removing a principal obstacle to the firm's continued bidding in the market.

97.     In an effort to locate the owner of the bonds, the Wall Street firm asked Falcone for the details of the trade. Falcone refused to provide any.

98.     Soon thereafter, the Wall Street firm began bidding again in the open market for the MAAX bonds, but it was unable to acquire any.

99.     On January 11, 2008, two transactions in the MAAX zips were reported on TRACE: the first involving the sale of one million MAAX zips at 60-1/2, and the second, 150,000 MAAX zips at 60-1/16. Although unknown to the market, Harbinger was the seller in both transactions, and the buyers were hedge funds covering short positions.

100.    The Wall Street firm saw the transactions in the MAAX zips on TRACE and subsequently purchased one million zips at or about 60.

101.    In the winter and early spring of 2008, Harbinger and the Wall Street firm resolved their differences and negotiated a resolution of the outstanding short positions in the MAAX zips.

102.    As described above, Defendants Falcone, HCP Offshore Manager, and HCP Special Situations GP, acting knowingly, illegally manipulated the market for the MAAX zips bonds by taking a series of steps intended to disrupt the normal functioning of the market. The Defendants acquired more than 100 percent of the outstanding issue of such bonds at a time when they knew or were reckless in not knowing that market participants held significant short positions in the bonds. The Defendants at various times withheld from the market the information about their holdings of the bonds. The Defendants prevented their holdings in the bonds from being used to cover the short positions, and Defendants demanded that holders of the short positions cover those positions at highly inflated prices demanded by Defendants, knowing that the market participants had no other source from which to obtain the bonds. The Defendants took these actions for the purpose of, and which had the effect of, disrupting or manipulating the market.

## TOLLING AGREEMENTS

103.    Defendants entered into three tolling agreements with the Commission, dated on or about August 25, 2011, December 15, 2011 and April 2012. These tolling agreements tolled the running of any limitations period or any other time-related defenses for the conduct alleged in this Complaint for the period from August 25, 2011 through June 4, 2012, inclusive. As a result, that period of time is not to be included in calculating any limitations period or the period of any other time-related defenses.

24

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]
### and Rule 10b-5 [17 C.F.R. § 240.10b-5]
### (Exchange Act Antifraud violations, against Defendants Falcone, HCP Offshore
### Manager, and HCP Special Situations GP)

104.     The Commission realleges and incorporates paragraphs 1 through 103 above as if fully set forth herein.

105.     As a result of the conduct described above, Defendants Falcone, HCP Offshore Manager, and HCP Special Situations GP, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud or deceit upon other persons.

106.     By reason of the foregoing, Defendants Falcone, HCP Offshore Manager, and HCP Special Situations GP, directly or indirectly violated, and unless enjoined and restrained will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

### (Securities Act Antifraud violations, against Defendants Falcone, HCP Offshore Manager,
### and HCP Special Situations GP)

107.     The Commission realleges and incorporates by reference ¶¶ 1 through 103 above as if fully set forth herein.

108.    As a result of the conduct described above, Defendants Falcone, HCP Offshore Manager, and HCP Special Situations GP, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, with the requisite degree of scienter: (a) employed devices, schemes, or artifices to defraud; or (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

109.    By reason of the foregoing, Defendants Falcone, HCP Offshore Manager, and HCP Special Situations GP violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act.

## **PRAYER FOR RELIEF**

**WHEREFORE,** the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining and restraining Defendants Falcone, HCP Offshore Manager and HCP Special Situations GP from future violations of the federal securities laws as alleged in this Complaint.

### II.

Ordering Defendants Falcone, HCP Offshore Manager and HCP Special Situations GP to disgorge all ill-gotten gains that they obtained from their  violative conduct alleged in this Complaint, plus prejudgment interest thereon, on a joint and several basis.

## III.

Ordering Defendants Falcone, HCP Offshore Manager and HCP Special Situations GP to

pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t].

## IV.

Granting such other and further relief as this Court deems just and appropriate.

Dated:   June 27, 2012
         New York, New York

SECURITIES AND EXCHANGE COMMISSION

By: _____
         David P. Stoelting
         Senior Trial Counsel
         New York Regional Office
         3 World Financial Center, Room 400
         New York, NY 10281
         Telephone: (212) 336-0174
         E-mail: stoeltingd@sec.gov

*Of Counsel:*

David J. Gottesman
Conway T. Dodge, Jr.
Robert C. Besse
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington DC 20549-5985