**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                                        Plaintiff,

v.

HARBINGER CAPITAL PARTNERS OFFSHORE
MANAGER, L.L.C., et al.,

                                        Defendants.

ECF Case

No. 12-CV-5027 (PAC)

**ORAL ARGUMENT**
**REQUESTED**

_____

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

_____

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................... iii

I.      PRELIMINARY STATEMENT...................................................................................1

II.     FACTUAL BACKGROUND.......................................................................................4

    A.  Defendants Invest In The MAAX Zips For Admittedly Lawful Reasons .........................4

    B.  Defendants Learn That Goldman Is Engaged In And Encouraging Short Selling Of
        The MAAX Zips ............................................................................................5

    C.  Defendants "Retaliate" Against Goldman By Buying More MAAX Zips And
        Simultaneously Refusing To Allow Their Bonds To Be Lent To Short Sellers ...............6

    D.  Defendants Allegedly Form The Intent To Manipulate The Market For MAAX Zips
        By Buying The Remaining Bonds And Forcing Naked Short Sellers To Pay Inflated
        Prices At Settlement .......................................................................................7

    E.  Goldman And The Other Naked Short Sellers Knowingly Assume The Obligation
        To Deliver Bonds That They Do Not Own In The Pursuit Of Enormous Trading
        Profits .........................................................................................................7

    F.  Defendants Allegedly Spend Over $36 Million Of Their Investors' Funds In Pursuit
        Of The Claimed Market Manipulation Scheme .....................................................9

    G.  Defendants' Acquisition Of Over 100% Of The Issue Is The Result Of Naked Short
        Sellers' Selling Bonds That Did Not Exist............................................................9

    H.  Defendants Demand That Goldman Deliver The Bonds That Its Naked Short
        Sellers Contractually Had Obligated Themselves To Deliver And For Which The
        Funds Had Paid Goldman Millions Of Dollars .....................................................10

    I.  The FINRA Rule Ensures That Short Sellers Cannot Be Forced To Pay Anything
        Other Than "An Economically Defensible Price" .................................................11

    J.  As Late As December 2007 Defendants Pursue A Restructuring Of MAAX That
        Would Have Triggered The Issue's Acquisition Provision—And Thus The Bonds'
        "Greater Upside Potential"..............................................................................12

    K.  The Complaint Alleges No Losses By Short Sellers And No Profits—Or Even The
        *Possibility* Of Any Profits—By Defendants .......................................................12

    L.  The SEC Files Suit In June 2012 And Elects Not To Amend Its Complaint.................12

III.      LEGAL STANDARD...................................................................................13

IV.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE ANY MISREPRESENTATION OR ACTIONABLE OMISSION...............14

      A. Defendants Had No Duty To Disclose Information About Their Bond Holdings To The Market....................................................................................................14

      B. The Complaint Fails To Allege Facts That Establish That Defendants' Failure To Disclose Information About Their Bond Holdings Constituted Any Sort Of Half-Truth..................................................................................................15

V.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE ANY MARKET ACTIVITY AIMED AT DECEIVING INVESTORS........16

      A. Manipulative Conduct Must Be Aimed At Deceiving Investors About Market Forces......................................................................................................16

      B. Defendants' Conduct Is Not Alleged To Be Manipulative *Per Se* .................16

      C. Defendants Are Not Alleged To Have Deceived Or Even Intended To Deceive Anyone .....................................................................................................17

VI.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO PLAUSIBLY ALLEGE THAT DEFENDANTS' MARKET CONDUCT WAS THE RESULT OF THEIR MANIPULATIVE INTENT ................................18

      A. The Complaint Fails To Plausibly Allege That Defendants Intended To Manipulate The Market....................................................................................................18

      B. The "Short Squeeze" Scheme Alleged In The Complaint Makes No Economic Sense........................................................................................................20

      C. The Complaint Fails To Plausibly Allege That Defendants Could Have "Forced" Short Sellers To Settle At Inflated Prices Or That They Even Believed They Could Do So...........................................................................................................21

      D. Judge Stein's Dismissal Of The SEC's Implausible Claim About The Short Sales At Issue In *Lyon* Is Instructive Here.............................................................22

VII.   CONCLUSION.......................................................................................23

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................2, 13

*Atlantic Gypsum Co. v. Lloyds International Corp.,*
    753 F.Supp. 505 (S.D.N.Y.1990) .................................................................................21

*ATSI Communications Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ...........................................................2, 8, 13, 16, 17, 18

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..............................................................................2, 4, 13, 22, 23

*DiFolco v. MSNBC Cable L.L.C.,*
    622 F.3d 104, 111 (2d Cir. 2010) ................................................................................5

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
    553 F.3d 187 (2d Cir. 2009) .......................................................................................19

*Finn v. Barney,*
    471 Fed.Appx. 30 (2d Cir. 2012)................................................................................14

*GFL Advantage Fund, Ltd. v. Colkitt,*
    272 F.3d 189 (3d Cir. 2001) .......................................................................................16

*Gould v. Winstar Communications, Inc.,*
    692 F.3d 148 (2d Cir. 2012) .......................................................................................20

*Hayden v. Paterson,*
    594 F.3d 150 (2d Cir. 2010) .......................................................................................13

*In re Bayou Hedge Fund Litig.,*
    534 F.Supp.2d 405 (S.D.N.Y.2007) ...........................................................................20

*In re FoxHollow Technologies, Inc., Securities Litigation,*
    2008 WL 2220600 (N.D.Cal. May 27, 2008)..............................................................19

*In re Olympia Brewing Co. Sec. Litig.,*
    613 F.Supp. 1286 (N.D. Ill. 1985)..............................................................................16

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006) .......................................................................................19

*Nanopierce Technologies v. Southridge Capital Management LLC,*
    2003 WL 21507294 (S.D.N.Y. June 30, 2003) ..........................................................16

*Rombach v. Chang,*
    355 F.3d 164 (2d. Cir. 2004) ......................................................................................19

*SEC v. Dunn,*
    587 F.Supp.2d 486 (S.D.N.Y. 2008) ..........................................................................18

*SEC v. Espuelas*,
   579 F.Supp.2d 461 (S.D.N.Y. 2008) ........................................................................13

*SEC v. Lee*,
   720 F.Supp.2d 305 (S.D.N.Y. 2010) ........................................................................18

*SEC v. Lyon*,
   529 F.Supp.2d 444 (S.D.N.Y. 2008) ...................................................................1, 8, 22

*SEC v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ..............................................................4, 16, 20

*SEC v. Pentagon Capital Management PLC*,
   612 F.Supp.2d 241 (S.D.N.Y. 2009) ........................................................................18

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir.1994) ......................................................................................19

*Staffin v. Greenberg*,
   672 F.2d 1196 (3d Cir. 1982) ..................................................................................14

*Sullivan & Long, Inc.* v. *Scattered Corp.*,
   47 F.3d 857 (7th Cir. 1995) ................................................................................8, 14, 17

*U.S. v. Cassese*,
   428 F.3d 92 (2d. Cir. 2005) ......................................................................................19

*United States v. Finnerty*,
   533 F.3d 143 (2d Cir. 2008) ...............................................................................16, 17

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) ...............................................................................4, 18

*Wilson v. Merrill Lynch & Co., Inc.*,
   671 F.3d 120 (2d Cir. 2011) ................................................................................2, 14, 15

**Statutes**

Securities Exchange Act of 1934, §78, 15 U.S.C.A. § 78o(e) ........................................15

**Rules**

17 CFR § 242.203. ..........................................................................................................15

FINRA Rule 11810 ...................................................................................................11, 21, 23

Defendants Harbinger Capital Partners Offshore Manager, L.L.C. ("Offshore Manager"), Harbinger Capital Partners Special Situations GP, L.L.C. ("Special Situations") and Philip A. Falcone ("Falcone") respectfully submit this memorandum of law in support of their motion to dismiss the complaint (the "Complaint" or "Compl.") of Plaintiff Securities and Exchange Commission (the "SEC") pursuant to Rule 12(b)(6).

## I.     PRELIMINARY STATEMENT

This is a purported market manipulation case.  Plaintiff alleges that Defendants engaged in an "illegal 'short squeeze,'" which Plaintiff defines as "a form of market manipulation that occurs when a trader [1] *constricts* the available supply of a security [2] with the *intention* of forcing settlement from short sellers at the trader's arbitrary and inflated prices."  Compl. ¶ 1.[1]  Plaintiff claims that Defendants' alleged conduct violated both (i) Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder and (ii) Section 17(a) of the Securities Act of 1933.

Although "short squeezes" have existed for centuries, no court ever has held that the conduct alleged here constitutes market manipulation, and for good reason: the Complaint alleges no misrepresentations;  no omissions, apart from Defendants' withholding "from the market…information about their holdings" (*id.* ¶ 102); no profits made by Defendants; no losses suffered by the short sellers who were Defendants' only alleged intended victims; and no deception of or intent to deceive any short sellers.  Plaintiff believes that perfectly lawful market conduct— here, buying bonds that Defendants admittedly believed "would rally" (*id.* ¶ 39), and simultaneously refusing to lend those bonds to short sellers—can be transformed into illegal market manipulation merely by alleging that Defendants had manipulative intent, *no matter how implausible that alleged intent might be*.  *See* Plaintiff's Pre-Motion Conference Letter at 3 (stating that "Defendants Cannot Base a Rule 12(b)(6) Motion on…Whether The Complaint's Allegations Are 'Plausible'").  Plaintiff is wrong.  *See, e.g.*, *SEC v. Lyon*, 529 F.Supp.2d 444 (S.D.N.Y. 2008)

---

[1] Unless otherwise noted, all emphasis in quotations was added by Defendants.

(dismissing one of the SEC's securities fraud claims because of, *inter alia*, its "logical implausibility"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  And Plaintiff's implausible and ill-pled Complaint should be dismissed for three reasons.

First, "for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure."  *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011).  The Complaint does not allege any misrepresentation by Defendants.   And the only information Defendants allegedly failed to disclose was "information about their holdings of the bonds" (Compl. ¶ 102)—information they had no duty to disclose to anyone, much less to short sellers.   The Complaint should be dismissed for this reason alone.

Second, market manipulation claims also "require a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security."  *ATSI Communications Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 100 (2d Cir. 2007).  The Complaint fails to allege that the market activity at issue here—buying the distressed high-yield bonds (the "MAAX zips") of MAAX Holdings, Inc. ("MAAX"), and refusing to allow short sellers to borrow those bonds—was aimed at deceiving anyone.   Defendants bought the MAAX zips, putting over $90 million of their investors' money at risk, because they believed the "bonds would rally with the U.S. and Canadian housing markets."  Compl. ¶ 39.  They refused to lend their bonds to short sellers—a decision Defendants made in August 2006, a month *before* they are alleged to have formed any manipulative intent—because they believed short sellers "were trying to drive their price down." *Id.* ¶ 45.  The Complaint does not allege that anyone was deceived by the Defendants' purchases of the MAAX zips or their refusal to lend those bonds to short sellers. Nor does the Complaint allege that Defendants intended to deceive anyone by these entirely lawful market actions.  The Complaint should be dismissed for this second, independent reason.

Rather than alleging an intent to deceive short sellers, the Complaint merely alleges an intent to frustrate Goldman Sachs ("Goldman")—referred to in the Complaint as "the Wall Street firm" (*id.* ¶ 3)—in retaliation for what Defendants believed was unethical conduct on the part of its proprietary traders.   As the Complaint alleges, Defendants learned that Goldman "was shorting the bonds and encouraging its customers to do the same," while simultaneously serving as Defendants' prime broker in connection with the bonds.  *Id.* ¶¶ 3-4.  Goldman's conduct "angered" Defendants because they felt that Goldman "was putting its proprietary trading interest ahead of [their] own." *Id.* ¶ 46.  Defendants allegedly "*retaliated* against" Goldman by refusing to allow Goldman's traders to borrow their bonds.  *Id.* ¶ 4.  But the Complaint does not allege that the Defendants had any duty to lend their bonds (they did not), or that Defendants intended to *deceive* Goldman or its traders in any way.  To the contrary, the Complaint alleges that, a month before they allegedly formed any manipulative intent, Defendants *told* Goldman that they did not want their bonds lent to anyone.  *Id.* ¶ 45.  Because the Complaint alleges no deception, Plaintiff's market manipulation claims fail.

Third, the Complaint should be dismissed because the "short squeeze" scheme alleged here is implausible.  The Complaint admits that, between April and June 2006, Defendants purchased $54.5 million worth of MAAX zips for perfectly lawful reasons—specifically, because their analyst had concluded that "the bonds would rally with the U.S. and Canadian housing markets."  *Id.* ¶¶ 39, 40.  The Complaint then baldly asserts that, "by early September 2006," Defendants suddenly had formed the intent to manipulate the market for the MAAX zips.  *Id.* ¶ 50.  Defendants allegedly carried out their manipulative intent by purchasing another $36.2 million worth of the bonds and refusing to lend their bonds to short sellers.  *Id.* ¶¶ 51-52, 56-58, 60, 69.  But this alleged scheme makes no sense.  Does Plaintiff claim that, between June 2006 and September 2006, Defendants suddenly changed their minds about the bonds' potential to "rally with the U.S. and Canadian housing markets"?  *Id.* ¶ 39.  If not, there can be no market manipulation here.  *See United States v.*

*Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991); *SEC v. Masri*, 523 F. Supp. 2d 361, 373 (S.D.N.Y. 2007).  If so, the Complaint contains no plausible factual allegations to support that claim, including any facts to establish how Defendants could have made any profits—or even how they *expected* to make any profits—by risking over $90 million of their investors' money on "distressed high-yield bonds" that they no longer believed to be a good investment, all for nothing more than the hope of "squeezing" some unspecified amount of money out of some unknown number of short sellers. Compl. ¶ 64.

Compounding the scheme's implausibility, the Complaint's own allegations establish that, in light of a FINRA rule that governs the settlement of short sales, Defendants **could not** "forc[e] settlement from short sellers at … inflated prices"—instead, brokers "must buy-in the securities at an economically defensible price."  *Id.* ¶¶ 1, 63.  That is exactly what happened here (*id.* ¶¶ 74, 85), and the Complaint fails to allege a single instance in which Defendants forced any short seller to pay inflated prices for the bonds.  The economically irrational scheme alleged here is precisely the type of implausible claim that *Twombly* and its progeny hold should be dismissed at the Rule 12(b)(6) stage.

## II.     FACTUAL BACKGROUND

Though Defendants dispute many of Plaintiff's allegations, for purposes of this motion the well-pleaded allegations in the Complaint must be assumed to be true.  Even under that assumption, the "short squeeze" scheme alleged here strains reason and lacks elements essential to Plaintiff's Section 10(b) and 17(a) claims.

### A.     Defendants Invest In The MAAX Zips For Admittedly Lawful Reasons

Defendants are hedge fund managers.  Compl. ¶¶ 24 - 26.  In April 2006, Defendants caused Harbinger Capital Partners Master Fund I (the "Master Fund") to begin investing in the MAAX zips by purchasing 5 million of the bonds at a cost of approximately $2.25 million.  *Id.* ¶ 39.  Defendants invested in the MAAX zips based on "the recommendation of an analyst with whom [Falcone] had

consulted for years and whom he had hired a month earlier to work at Harbinger." *Id.*  Defendants'

analyst, whose name is David Maura ("Maura"), believed the bonds had significant upside

potential:

> [Maura] opined that the MAAX bonds would rally with the U.S. and Canadian
> housing markets.  [Maura] recommended to Falcone that he purchase both series of
> MAAX notes, but opined that the more depressed MAAX zips had greater upside
> potential.

*Id.*  One of the reasons the more depressed MAAX zips had greater upside potential was because

the terms of the issue required that the bonds be repurchased at 101% of their accreted value in the

event of an acquisition of MAAX (the "Acquisition Provision").[2]

Based on Maura's analysis, Defendants directed the Master Fund to purchase another 103

million bonds between April and June 2006.  *Id.* ¶ 40.  In total, Defendants spent $54.5 million of

their investors' money to acquire "108 million notes, or approximately 63% of the issue (i.e., the

outstanding face amount of the MAAX zips that had been issued)"—all for the admittedly lawful

reason that they believed that the bonds would rally with the U.S. and Canadian housing markets.

*Id.*

## B.  Defendants Learn That Goldman Is Engaged In And Encouraging Short Selling Of The MAAX Zips

"Sometime during the summer of 2006, [Maura] began hearing rumors that there was

aggressive short selling in the MAAX zips."  *Id.* ¶ 45.  Specifically, he heard that Goldman's

proprietary trading desk and its customers "were shorting the MAAX zips and trying to drive their

---

[2] *See* MAAX Holdings, Inc., Prospectus (Form 424B3) (Sep. 13, 2005) (the "Prospectus") at 11, 25, 103-105 (page citations in original).  The Prospectus is attached as Exhibit 1 to the accompanying Declaration of Tibor L. Nagy, Jr.  Because the Complaint relies heavily upon the terms of the Prospectus, for example by referring to the bonds' issue size and Defendants' admitted belief in the MAAX zips' greater upside potential compared to the senior issue (Compl. ¶¶ 2, 8, 11, 29, 39–40, 87–88), this Court may consider the Prospectus in connection with this motion.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

price down." *Id.* Goldman "and some of its prime brokerage clients were, in fact, short the MAAX zips at this time." *Id.* According to the Complaint:

> One of [Goldman's] proprietary traders had taken a short position because he believed that the MAAX junior notes (the zips) were trading too high relative to the senior notes. He was of the opinion that MAAX's senior debt was sufficiently impaired that there was no residual value at the junior level.

*Id.* This proprietary trader "had discussed his analysis with [Goldman's] customers, including Harbinger." *Id.*

## C.   Defendants "Retaliate" Against Goldman By Buying More MAAX Zips And Simultaneously Refusing To Allow Their Bonds To Be Lent To Short Sellers

Throughout the relevant time period, Goldman served as one of Defendants' "prime brokers." *Id.* ¶ 3.  Prime brokers "provide a special group of services to certain clients, often hedge funds, including services such as securities lending, leveraged trade execution, cash management, and margin arrangements." *Id.* Prime brokers owe certain fiduciary duties to their clients. *See United States v. Wolfson*, 642 F.3d 293, 295 (2d Cir. 2011) (noting that "a relationship of trust and confidence . . . exist[s] between a broker and a customer with respect to those matters that have been entrusted to the broker" and that "particular factual circumstances may serve to create a fiduciary duty between a broker and his customer even in the absence of a discretionary account") (citing *United States v. Szur*, 289 F.3d 200, 211 (2d Cir. 2002) and *United States v. Skelly*, 442 F.3d 94, 98 (2d Cir. 2006)).

Given Goldman's prime brokerage relationship with Defendants, Falcone "was angered by" Goldman's "shorting the bonds and encouraging its customers to do the same."  Compl. ¶ 3, 46.  As the Complaint puts it:

> [Falcone] speculated that the Wall Street firm was putting its proprietary trading interest ahead of his own—that it was undercutting the value of his MAAX position and *possibly borrowing his own notes to cover its short position*….On Falcone's instruction, a senior Harbinger trader asked [Goldman] not to lend out Harbinger's MAAX notes and to move them from its margin to a cash account, a step that would make it more difficult for the Wall Street firm to loan Harbinger's MAAX notes to other customers.

*Id.* ¶¶ 46, 48.  Shortly thereafter, in early August 2006, "Falcone and the other Defendants directed that all 108 million MAAX zips owned by Harbinger be moved from [Goldman] to another prime broker…because they did not trust [Goldman] to honor their request that it not borrow any more of Harbinger's bonds to support short positions." *Id.* ¶ 49.

**D.    Defendants Allegedly Form The Intent To Manipulate The Market For MAAX Zips By Buying The Remaining Bonds And Forcing Naked Short Sellers To Pay Inflated Prices At Settlement**

The following month Defendants allegedly formed the intent to manipulate the market:

By early September 2006, Falcone, and thus Defendants HCP Offshore Manager and HCP Special Situations GP, formed the intent to manipulate the market in the MAAX zips by [1] buying up all of the available bonds and restricting their supply in the market, and then [2] *pressuring the holders of short positions in the MAAX zips to buy the bonds at artificially inflated prices*, when Falcone and the other Defendants knew that Harbinger was virtually the only source.

*Id.* ¶ 50.  Had Defendants, between June 2006 (when they invested in the bonds for admittedly lawful reasons) and September 2006 (when they allegedly developed the intent to manipulate the market), suddenly abandoned their belief "that the MAAX bonds would rally with the U.S. and Canadian housing markets"?  *Id.* ¶ 26.  The Complaint does not answer this question.  And how exactly could Defendants force short sellers to buy the bonds at artificially inflated prices?  The Complaint does not answer this question, either.  Instead, as discussed below in Part II.I, the Complaint's allegations establish that Defendants had *no ability* to force Goldman or any other naked short sellers to pay inflated prices for the MAAX zips.  The Complaint does not and cannot allege any facts that establish a rational economic basis for the "short squeeze" scheme alleged here.

**E.    Goldman And The Other Naked Short Sellers Knowingly Assume The Obligation To Deliver Bonds That They Do Not Own In The Pursuit Of Enormous Trading Profits**

To understand the manipulation scheme alleged in the Complaint, one must understand why short sellers would need to *buy* MAAX zips—or otherwise settle their obligations to deliver the zips —at all.  The answer lies in the mechanics of short selling.  In the traditional short-selling scenario, the short seller borrows the security from a lender (the "Lender") and sells it to someone else (the

7

"Buyer"). The short seller hopes that the price of the security will fall so that he can satisfy his obligation to return the security to the Lender by purchasing the security in the open market for less than what he received when he sold the security to the Buyer. The difference between those two amounts is the short seller's profit—or, if the price of the security rises, his loss. *See, e.g.*, *ATSI Communications Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 96 n.1 (2d Cir. 2007) (describing the mechanics of a short sale).

Naked short selling, the type of short selling at issue here, is different because the naked short seller does not actually borrow or otherwise obtain the security that he sells to the Buyer. Compl. ¶ 54. Instead, he enters into an agreement to deliver the security to the Buyer by a certain date (the "Settlement Date") for a certain price. The naked short seller then hopes that the security's price will fall before the Settlement Date so that he can satisfy his obligation to deliver the security on that date at a lower price, thereby making a profit. Because of the leverage involved, naked short sellers like Goldman's proprietary traders can make enormous profits. *See, e.g.*, *SEC v. Lyon*, 529 F.Supp.2d 444, 448 (S.D.N.Y. 2008) (describing the mechanics of a naked short sale).

But those enormous profits are not without risk. In another case involving naked short selling, Judge Posner observed that "the short seller's potential loss is unlimited." *Sullivan & Long, Inc.* v. *Scattered Corp.*, 47 F.3d 857, 859 (7th Cir. 1995). As in *Sullivan & Long*, the naked short sellers here knowingly "ran the risk that the people on the other side of the short sale transactions ... would go into the market and buy [bonds] when the price rose during the ... period [before] delivery, and that they would force [the short seller] to reimburse them for these purchases." *Id.* at 860-61. Their "risk was enormous, precisely because [they] had sold short ... more [bonds] than existed." *Id.* at 861.

**F.      Defendants Allegedly Spend Over $36 Million Of Their Investors' Funds In Pursuit Of The Claimed Market Manipulation Scheme**

Between September 6, 2006 and January 31, 2007, purportedly as part of their market manipulation scheme, Defendants increased their already large holdings in the MAAX zips.  As noted above, between April and June 2006, Defendants had invested $54.5 million to purchase 108 million bonds (63% of the issue) based on their belief that the MAAX zips "would rally with the U.S. and Canadian housing markets."  Compl. ¶ 39.  To make that initial lawful investment, Defendants paid prices for the bonds "in the range of 45-1/4 to 56-1/4."  *Id.* ¶ 42.

From September 2006 to January 2007, when they allegedly were acting to manipulate the market, Defendants spent $36.2 million to acquire another 84 million bonds, bringing their total holding to 192 million bonds, or 113% of the issue.  *Id.* ¶¶ 40, 51-52, 69.  Defendants paid "prices as high as 86" to do this.  *Id.* ¶ 66.

**G.      Defendants' Acquisition Of Over 100% Of The Issue Is The Result Of Naked Short Sellers' Selling Bonds That Did Not Exist**

While the fact that Defendants owned more than 100% of the issue may seem strange, it is not uncommon in the bond market.  As the Complaint itself notes, when naked short sellers choose to sell bonds that they do not actually own, their sales increase the total long position in the bonds beyond 100% of the issue size:

> Harbinger was able to acquire more than the entire issue of the MAAX zips because there is no "locate" requirement when short-selling debt instruments. Under rules applicable to the equities market, a broker or dealer that is not engaged in bona fide market making cannot accept a short sale order in a stock unless it has borrowed or has arranged to borrow that stock, or has reasonable grounds to believe that it can borrow the stock and deliver on the delivery date. There is no similar rule applicable to bond trading. Thus, "naked" short selling of bonds is legal, which can lead to "long" positions far in excess of the issue size.

*Id.* ¶ 54.

The MAAX zips "traded 'over-the-counter.'"  *Id.* ¶ 29.  In other words, the market for the MAAX zips was a bid-offer market.  *Id.* ¶¶ 29, 44.  The Complaint does not allege that Defendants

solicited any of the purchases they made during September 2006 through January 2007—instead, Defendants are alleged only to have purchased bonds that were being offered.  Approximately "21.5 million" of the bonds Harbinger purchased during this time period were bonds that did not actually exist and that had been sold by naked short sellers working for or through Goldman.  *Id.* ¶ 64.

**H.    Defendants Demand That Goldman Deliver The Bonds That Its Naked Short Sellers Contractually Had Obligated Themselves To Deliver And For Which The Funds Had Paid Goldman Millions Of Dollars**

According to the Complaint, by November 2006 Goldman and its naked short sellers began to fail to deliver bonds they contractually had obligated themselves to deliver to the Funds.  *Id.* ¶ 65. This failure to deliver remained unresolved for *over a year*, until the "spring of 2008," when Defendants and Goldman "resolved their differences and negotiated a resolution of the outstanding short positions in the MAAX zips."  *Id.* ¶ 101.  Because Defendants had been required to pay the purchase price before the contractual settlement dates, Goldman had the Funds' cash this entire time, and it paid the Funds no interest—whereas the Funds had given up the cash but had not been given the promised bonds.  *Id.* ¶ 48.  Using the average purchase price alleged in the Complaint, the Funds had paid Goldman approximately $10 million of its investors' cash for bonds that Goldman and its naked short sellers failed to deliver on the contractual settlement date.  *Id.* ¶¶ 60-69.

Having paid Goldman millions of dollars of their investors' money, Defendants "press[ed] [Goldman] for delivery of the MAAX zips it had failed to deliver at settlement."  *Id.* ¶ 70.  Because Goldman and its naked short sellers sold bonds that they did not actually own (and that did not even exist), they had to go into the market and attempt to buy or borrow MAAX zips to deliver to the Funds.  But, because the Funds owned virtually all of the bonds, Goldman could not find any bonds to meet its contractual obligation to deliver.  *Id.* ¶¶ 71-72, 79, 98.

In May 2007, as part of its effort to meet its and its clients' delivery obligations, Goldman asked Defendants whether the Funds would sell any of their own bonds.  *Id.* ¶ 74.  Defendants told

Goldman they would sell their bonds at a price of 100.  *Id.*  Goldman "believed that the price was too high and declined the offer."  *Id.*

In September 2007, Goldman again communicated with Defendants, who still were demanding that Goldman deliver the bonds that the Funds had paid for months earlier.  *Id.* ¶ 82. Goldman again asked whether the Funds would sell any of their bonds, and Defendants stated that they "would be willing to settle with the shorts now at 105."  *Id.*  Goldman again declined this offer, still believing the price was too high.  *Id.*  In the course of this conversation, Defendants voluntarily informed Goldman that the Funds had purchased contracts for delivery of more than 100% of the issue size.  *Id.* ¶ 84.

## I.   The FINRA Rule Ensures That Short Sellers Cannot Be Forced To Pay Anything Other Than "An Economically Defensible Price"

Goldman was able to ignore its and its clients' contractual obligations to deliver the bonds to Defendants because of FINRA Rule 11810, which the Complaint describes as follows:

> When a seller fails to deliver a security at settlement, FINRA rules authorize a broker-dealer to "buy in" the securities in the open market. The broker-dealer, however, ***must*** buy in the securities at an ***economically defensible price***.

*Id.* ¶ 63.  Invoking the FINRA Rule, Goldman repeatedly rejected the prices Defendants allegedly demanded as too high, and "the failures to deliver ('fails') began mounting."  *Id.* ¶¶ 62, 74, 82.  The fails continued to pile up until "the spring of 2008," when Defendants were forced to work out a settlement with Goldman that resolved all of the outstanding trades.  *Id.* ¶ 101.  The Complaint does not allege any instance in which Defendants forced a single short seller to buy a MAAX zip at an inflated price.  Instead, in the two instances in the Complaint in which Defendants communicated with short sellers about bond prices at all (*i.e.*, the May and September 2007 communications with Goldman), Goldman simply told Defendants their prices were too high, and rejected those prices— just as the FINRA Rule allowed it to do.  *Id.* ¶¶ 74, 82.

**J.**   **As Late As December 2007 Defendants Pursue A Restructuring Of MAAX That Would Have Triggered The Issue's Acquisition Provision—And Thus The Bonds' "Greater Upside Potential"**

In September 2007, Maura "began discussing refinancing options with MAAX's owners." *Id.* ¶ 88.  In October 2007, Defendants "hired Credit Suisse to look at MAAX's credit agreements and devise a way to infuse new capital into the company in exchange for upgrading the zips."  *Id.* In December 2007, Defendants "entertained a proposal for a possible restructuring or recapitalization of MAAX from the company's senior management."  *Id.*   The Complaint characterizes all of these efforts as Defendants' searching for "ways to salvage the funds' investment."  *Id.* ¶ 87.  Even accepting that characterization as true, these alleged efforts were unrelated to the alleged "short squeeze" scheme, and they involved contemplated corporate transactions that would have triggered the bond issue's Acquisition Provision.

**K.**   **The Complaint Alleges No Losses By Short Sellers And No Profits—Or Even The *Possibility* Of Any Profits—By Defendants**

Defendants are not alleged to have made any money on their alleged scheme, nor are any short sellers alleged to have suffered any losses.  The MAAX zips are alleged to have been "distressed high yield bonds" whose price fluctuated greatly even before the alleged scheme.  *Id.* ¶ 42.  The Complaint fails to identify what potential profit Defendants could have made from the alleged "short squeeze" or to establish that making a profit was even *possible* at all, given the FINRA Rule and the admitted costs of the scheme, such as risking over $90 million of their investors' money to maintain their long position in the "distressed" and admittedly volatile bonds. *Id.* ¶ 1.

**L.**   **The SEC Files Suit In June 2012 And Elects Not To Amend Its Complaint**

The SEC filed this suit in June 2012.  On September 28, 2012, Defendants filed their pre-motion conference letter (the "PMC Letter") stating their intention to file the present motion. Pursuant to the Pilot Project Rules applicable to this action, once a Defendant serves a pre-motion

conference letter announcing its intention to file a Rule 12(b)(6) motion and a conference is held on that anticipated motion:

> If plaintiff does not choose to amend, the plaintiff shall be given no further opportunity to amend the complaint to address the issues raised by the pending motion.

Pilot Project Rule III.A.4(b).

On October 9, 2012, Plaintiff filed its response to Defendants' PMC Letter, indicating its decision not to amend its complaint.

## III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   To determine plausibility, courts follow a "two-pronged approach." *Id.* at 679.   "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (citation omitted).   Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

A market manipulation claim also must be pled with particularity under Rule 9(b).   *See, e.g.*, *ATSI Communications Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007).   The complaint must state "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id.* at 102.   In the Second Circuit, the SEC also must allege facts that give rise to a "strong inference" of fraudulent intent.   *SEC v. Espuelas*, 579 F.Supp.2d 461, 469 (S.D.N.Y. 2008).

13

IV.  **THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE ANY MISREPRESENTATION OR ACTIONABLE OMISSION**

For "market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure." *In re Fannie Mae 2008 Securities Litig.*, 2012 WL 3758537 at *4 (S.D.N.Y. Aug. 30, 2012), *quoting Wilson*, 671 F.3d at 130; *see also Finn v. Barney*, 471 Fed.Appx. 30, 33 (2d Cir. 2012).  The Complaint does not allege any misrepresentation by Defendants.  And the only nondisclosure alleged—that "Defendants at various times withheld from the market the information about their holdings of the bonds" (Compl. ¶ 102)—is not actionable as a matter of law.  The Complaint can and should be dismissed for this reason alone.

A.  **Defendants Had No Duty To Disclose Information About Their Bond Holdings To The Market**

Where, as here, the conduct alleged is not *per se* manipulative, there can be no liability under Sections 10(b) or 17(a) for failing to disclose information unless there was a *duty* to disclose it.  *Wilson*, 671 F.3d at 130.  Here, the only information Defendants are alleged to have failed to disclose was "information about their holdings of the bonds," information which the Complaint alleges Defendants "withheld from the market" at large.  Compl. ¶ 102.  Specifically, Plaintiff alleges that Defendants failed to disclose the size of their position and that they were not allowing their bonds to be lent to short sellers.  *Id.* ¶¶ 55, 70.  But Defendants had no duty to disclose that or any other information about their bond holdings to the market.  *Cf. Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995) (defendant "was not required to disclose the number [of shares it was selling]"); *Staffin v. Greenberg*, 672 F.2d 1196, 1202 (3d Cir. 1982) ("one who purchases stock on the open market who is neither an insider nor a fiduciary, nor a 'tippee' of such a person, need not disclose the reasons for his purchase, even if the purchase is based on knowledge of material facts.").  The Complaint contains no non-conclusory allegations to the contrary.

**B.      The Complaint Fails To Allege Facts That Establish That Defendants' Failure To Disclose Information About Their Bond Holdings Constituted Any Sort Of Half-Truth**

Although Defendants had no duty to disclose their bond holdings to the market, Plaintiff apparently believes that it was nonetheless somehow misleading for Defendants not to do so. Plaintiff is wrong.  The Complaint fails to allege any facts that establish that Defendants' failure to disclose their bond holdings to the market was misleading.  The Complaint itself acknowledges that naked short selling can and does result in investors owning more than 100% of a bond's issue. Compl. ¶ 54.  That fact is particularly well known to naked short sellers, who are keenly aware that they are obligating themselves to deliver securities that they may not be able to obtain.  That risk is one of the reasons why naked short selling is illegal in the equity markets.  *See* 17 CFR § 242.203.

It is also well known that investors—particularly long-side investors—can and do refuse to lend their securities to short sellers.  Indeed, to make this longstanding policy clear to the public, Congress recently amended the Exchange Act to require that:

> Every registered broker or dealer shall provide notice to its customers that they may elect not to allow their fully paid securities to be used in connection with short sales.

15 U.S.C.A. § 78o(e).  Here, apart from Defendants' right to "elect not to allow their fully paid securities to be used in connection with short sales," Defendants' decision to make that election cannot form the basis for any securities fraud claims because Defendants *voluntarily told Goldman* as early as August 2006 that they did not want their bonds lent to short sellers.  Compl. ¶¶ 48-49.

Having alleged no misrepresentations, and no actionable omissions, the Complaint fails to state a claim for market manipulation.  *Wilson*, 671 F.3d at 130; *In re Fannie Mae 2008 Securities Litig.*, 2012 WL 3758537 at *18.

## V.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE ANY MARKET ACTIVITY AIMED AT DECEIVING INVESTORS

Plaintiff's Complaint not only fails to allege any misrepresentation or actionable omission, it also fails to allege any deception or even an intent to deceive.  The Complaint fails to state a market manipulation claim for this second, independent reason.

### A.   Manipulative Conduct Must Be Aimed At Deceiving Investors About Market Forces

Market manipulation claims "require a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security."  *ATSI*, 493 F.3d at 100; *see also GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001) ("[A] section 10(b) plaintiff [must] establish that the alleged manipulator injected 'inaccurate information' into the market or created a false impression of market activity."); *In re Olympia Brewing Co. Sec. Litig.*, 613 F.Supp. 1286, 1292 (N.D. Ill. 1985) ("[T]he essential element of the claim is that *inaccurate* information is being injected into the marketplace.") (emphasis in original). This element of deception is particularly critical where, as here, there is no misrepresentation or actionable omission alleged.  *See, e.g.*, *Nanopierce Technologies v. Southridge Capital Management LLC*, No. 02 Civ. 0767 LBS, 2003 WL 21507294, at *9-10 (S.D.N.Y. June 30, 2003) (dismissing market manipulation claims for failure to allege "some other deceptive practice beyond mere sales"). "Broad as the concept of 'deception' may be, it irreducibly entails some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008).

### B.   Defendants' Conduct Is Not Alleged To Be Manipulative *Per Se*

Certain practices such as "wash sales, matched orders, or rigged prices" are "patently manipulative, serving no purpose other than to transmit false information to the market and artificially affect prices."  *SEC v. Masri*, 523 F.Supp.2d 361, 367 (S.D.N.Y. 2007).  No such "patently manipulative" conduct is alleged here.  Defendants are alleged to have (i) purchased

16

MAAX zips and (ii) refused to allow their bonds to be lent to naked short sellers.  Both of those actions are perfectly lawful, and no court ever has held either action (or both in concert) to be manipulative *per se*.  Nor does Plaintiff—either in its Complaint or in its pre-motion conference letter—claim that any conduct alleged here is manipulative *per se*.

### C.   Defendants Are Not Alleged To Have Deceived Or Even Intended To Deceive Anyone

The Complaint not only fails to allege conduct that is manipulative *per se*, it also fails to allege conduct that was deceptive or even *intended* to deceive investors at all.  Nowhere in the Complaint are there any factual allegations that suggest that Defendants intended to deceive Goldman or anyone else "as to how other market participants have valued [the MAAX zips]." *ATSI*, 493 F.3d at 100.  At most, the Complaint alleges that Defendants intended to frustrate Goldman's desire to make short-selling profits by (1) buying more than 100% of the issue size and (2) refusing to allow their bonds to be lent to Goldman or other short sellers.

*Frustrating* short sellers and *deceiving* them are two very different things.  Long-side investors routinely frustrate short sellers, both by refusing to allow their securities to be lent to the market and by purchasing securities when there is a large short interest in them. Those are well known facts about the "enormous" risk that short sellers routinely take in the pursuit of their potentially enormous profits.  *Sullivan & Long*, 47 F.3d at 860-61.

*Deceiving* short sellers in a manner that is actionable under Sections 10(b) and 17(a), on the other hand, "irreducibly entails some act that gives the victim a ***false impression***."  *Finnerty*, 533 F.3d 143 at 148.  Defendants are not alleged to have done that here.  The Complaint does not allege that Defendants' purchases of the bonds were intended to deceive anyone about anything.  Instead, the market in general and Goldman in particular already knew Defendants were amassing a large holding in the bonds (Compl. ¶ 55), and Defendants were aware of this common knowledge (*id.*). Plaintiff also fails to allege that Defendants' steps to ensure that their bonds were "locked up" were

intended to deceive anyone—nor could Plaintiff make that allegation, since Defendants *voluntarily told Goldman* that it had decided not to lend its bonds to anyone.  *Id.* ¶ 48.

Having failed to allege any "market activity aimed at deceiving investors as to how other market participants have valued a security," Plaintiff fails to state a claim for market manipulation. *ATSI*, 493 F.3d at 100.

## VI.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE IT FAILS TO PLAUSIBLY ALLEGE THAT DEFENDANTS' MARKET CONDUCT WAS THE RESULT OF THEIR MANIPULATIVE INTENT

Unable to allege any misrepresentation, actionable omission, or even any market activity aimed at deceiving investors, Plaintiff apparently believes that it can state a viable market manipulation claim merely by alleging that Defendants' otherwise lawful market conduct was coupled with manipulative *intent*.  The viability of a market manipulation claim based on such a theory is questionable at best.  *See United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991). But even if Plaintiff were permitted to plead market manipulation in such fashion, its Complaint still is defective because it fails to *plausibly* allege that (i) Defendants intended to manipulate the market and (ii) Defendants' manipulative intent was the cause of their alleged conduct.

### A.   The Complaint Fails To Plausibly Allege That Defendants Intended To Manipulate The Market

To adequately allege manipulative intent, Plaintiff must allege facts that give rise to a "strong inference" of such intent.[3]  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d

---

[3] "This area of the law has become somewhat muddled, due largely to the fact that the [Private Securities Litigation Reform Act] uses the Second Circuit's 'strong inference' language but requires a different showing."  *SEC v. Pentagon Capital Management PLC*, 612 F.Supp.2d 241, 263 (S.D.N.Y. 2009).  The Second Circuit has yet to decide whether the SEC must satisfy the PSLRA's heightened standard, *see SEC v. Dunn*, 587 F.Supp.2d 486, 501 (S.D.N.Y. 2008), and district courts have differed in their approach, *compare SEC v. Lee*, 720 F.Supp.2d 305, 335 (S.D.N.Y. 2010) (applying the PSLRA standard to the SEC) *with Pentagon Capital Management PLC*, 612 F.Supp.2d at 264 (declining to apply the PSLRA standard to the SEC).  Regardless, it is clear that − at a minimum − the SEC still must satisfy the Second Circuit's "strong inference" requirement.  *See, e.g.*, *id.* (applying the Second Circuit's "strong inference" requirement to the SEC); *SEC v. Dunn*, 587 F.Supp.2d at 502 (same).

Cir.1994).   The SEC may satisfy this requirement "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).   The SEC's allegations must be non-conclusory and plausible.  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 176 (2d. Cir. 2004) (a "pleading technique that couples a factual statement with a conclusory allegation of fraudulent intent is insufficient" to survive a motion to dismiss) (internal citation and punctuation omitted).

The SEC has not sufficiently alleged manipulative intent under the "motive and opportunity" prong.  To satisfy this prong, the SEC must allege that Defendants "*benefitted* in some *concrete* and personal way from the purported fraud." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).   The allegations that Falcone was "angered" by and wanted to "retaliate" against Goldman, without a plausible allegation of any profit motive, does not satisfy this standard.  *See In re FoxHollow Technologies, Inc., Securities Litigation*, No. C-06-4595 PJH, 2008 WL 2220600, at *31 (N.D.Cal. May 27, 2008) ("if [defendant] had no motive to keep the price of the stock high, ***but wanted only to retaliate*** against certain executives, he had no intent to defraud shareholders and plaintiff can't state a claim for securities fraud [under Section 10(b)]"); *cf. U.S. v. Cassese*, 428 F.3d 92, 102 (2d Cir. 2005) ("even had the Government proved that [defendant] was motivated by anger, [t]he securities laws do not prohibit people from purchasing stock when they are angry…[p]urchasing as a consequence of anger does not equate to willful violation of the securities laws") (internal citation and quotation marks omitted) (second modification in original).

Plaintiff also has failed to plausibly allege manipulative intent under the "strong circumstantial evidence" prong.  The Second Circuit has stated that the absence of improper motive means that the "strength of the circumstantial allegations must be correspondingly greater." *ECA, Local 134*, 553 F.3d at 199.  "*Scienter* based on conscious misbehavior . . . requires a showing of

deliberate illegal behavior . . . a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *Gould v. Winstar Communications, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (citations and quotation marks omitted).   "*Scienter* based on recklessness may be demonstrated where a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.  Recklessness may be established where a defendant failed to review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud." *Id.* at 158-59 (citations and quotation marks omitted; alteration in original). *See also In re Fannie Mae 2008 Securities Litig.*, 2012 WL 3758537 at *4 (S.D.N.Y. Aug. 30, 2012) ("[A] plaintiff pleading a § 10(b) violation based on defendant's recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, and the inference of recklessness must be at least as compelling as any opposing inferences."), *quoting In re Bayou Hedge Fund Litig.*, 534 F.Supp.2d 405, 415 (S.D.N.Y. 2007).

### B.   The "Short Squeeze" Scheme Alleged In The Complaint Makes No Economic Sense

Underlying Plaintiff's failure to plausibly allege manipulative intent is the inescapable reality that Plaintiff's alleged market manipulation scheme makes no economic sense. When Defendants invested another $36.2 million in the bonds between September 2006 and January 2007 there were only two possibilities with respect to their intent:

> (1) Defendants continued to hold the belief that "the bonds would rally with the U.S. and Canadian housing markets" (Compl. ¶ 39), in which case there can have been no manipulation here.  *See SEC v. Masri*, 523 F. Supp. 2d 361, 367 (S.D.N.Y. 2007).

> -or-

> (2) Defendants suddenly had dropped their belief about the bonds' investment prospects, in which case Defendants' alleged intent is implausible because they would have been risking their investors' entire $90.7 million investment in distressed and admittedly volatile bonds for no economically rational reason.

Tellingly, the Complaint not only fails to articulate what profits Defendants hoped to make from their alleged "short squeeze," it does not even *try* to explain how Defendants, given the facts here, *could* have made any profit at all.  Such a scheme hardly can be said to be plausible.  *See, e.g.*, *Atlantic Gypsum Co. v. Lloyds International Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y. 1990) (dismissing fraud claim because "[p]laintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.").

**C.    The Complaint Fails To Plausibly Allege That Defendants Could Have "Forced" Short Sellers To Settle At Inflated Prices Or That They Even Believed They Could Do So**

As discussed above in Part II.I, the Complaint acknowledges that, in the context of settling short sales, the FINRA Rule requires that brokers "must buy-in the securities at an economically defensible price."  *Id.* ¶ 63.  While "forcing settlement from short sellers at the trader's arbitrary and inflated prices" is the scheme alleged in this case, the Complaint never actually alleges that Defendants ever forced any short sellers to settle at inflated prices, or—given the FINRA Rule— that they even *believed* they could do so.  In the midst of the purported scheme, Defendants voluntarily disclosed to Goldman (their principal intended victim) that they owned more than 100% of the issue size (the principal fact Defendants allegedly were keeping secret)—and the Complaint is devoid of any explanation for why that occurred.  *Id.* ¶ 84.  Ultimately, after over a year of failures to deliver that Defendants could do nothing about, Defendants and their intended victims privately "resolved their differences and negotiated a resolution of the outstanding short positions." *Id.* ¶ 101.

The Complaint's own allegations make clear that there was no plausible way for Defendants to "forc[e] settlement from short sellers at … inflated prices," and it fails to plausibly allege that Defendants ever believed they could do so.  If Defendants did not *believe* they could force inflated prices from short sellers, they could not have *intended* to do so.  And the failure to plausibly allege such intent is fatal to Plaintiff's Complaint.

**D.    Judge Stein's Dismissal Of The SEC's Implausible Claim About The Short Sales At Issue In *Lyon* Is Instructive Here**

The SEC's mistaken assumption that "Defendants Cannot Base a Rule 12(b)(6) Motion on…Whether The Complaint's Allegations Are 'Plausible'" highlights the importance of *Twombly's* plausibility requirement here.   Plaintiff's Pre-Motion Conference Letter at 3.   Judge Stein's dismissal of some of the SEC's securities fraud claims in *SEC v. Lyon*, 529 F.Supp.2d 444 (S.D.N.Y. 2008), is instructive in that regard.   There, the SEC alleged that the defendants violated Section 5 of the Securities Act of 1933, which prohibits the sale of securities for which no registration statement has been filed, and that defendants also violated Section 10(b) of the Exchange Act when they falsely represented that their securities were in compliance with Section 5. *Lyon*, 529 F.Supp.2d 444 at 455-456.   The SEC's claims were premised on its characterization of certain short sales as constituting sales of convertible bonds rather than sales of the stock into which those bonds had been converted.   *Id.*   The court rejected the SEC's view of the short sales: "The Court finds this characterization of a short sale inaccurate and not reflective of what occurs in the market."   *Id.* at 455.   Here, given the admitted existence of the FINRA Rule, the SEC's assertion that long-side investors like Defendants can "forc[e] settlement from short sellers at…inflated prices" is similarly inaccurate and not reflective of what occurs in the market.   Compl. ¶ 1.

The SEC's implausible view of the short sales at issue in *Lyon* also led the Court to conclude that the SEC had failed to allege a claim that served the purpose of the Securities Act:

> In addition to its inherent logical implausibility, the SEC's characterization of a short sale does not advance the purposes that animate Section 5's registration requirement. The Supreme Court has observed that the primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce….The SEC has not alleged that the buyers on the other side of defendants' short sales lacked the information required by the Securities Act with respect to the securities that they purchased.

*Id.* (internal quotation and citation omitted).   The same is true here: in addition to its economic implausibility, the SEC's characterization of Defendants' alleged conduct as market manipulation

22

does not advance the purposes that animate Section 17 (or Section 10(b)) because none of Defendants' intended victims were deceived or deprived of any information required by the Securities Act (or the Exchange Act).

## VII.   CONCLUSION

The market manipulation scheme alleged in the Complaint involved no *per se* manipulative acts, no misrepresentations, no actionable omissions, no actual or potential profits to Defendants, and no losses to Goldman and the sophisticated naked short sellers who were the scheme's only alleged intended victims.  The decision to attempt to make a case against the high-profile Harbinger Defendants in these circumstances rests with Plaintiff.  But even Plaintiff must comply with Rule 12(b)(6), including *Twombly's* plausibility requirement.  It has failed to do so here.  The rule of law that should—and, in fact, did—apply here is the FINRA Rule, not Sections 10(b) and 17(a).  The Complaint should be dismissed.

Dated:  New York, New York
        November 30, 2012

**THE DONTZIN LAW FIRM LLP**


 /s/ Matthew S. Dontzin_____
Matthew S. Dontzin
David A. Fleissig
Tibor L. Nagy, Jr.
Rachel K. Clapp
6 East 81st Street
New York, New York 10028
Tel: (212) 717-2900
Fax: (212) 717-8088

*Attorneys for Defendant Philip A. Falcone*


**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

Leslie Gordon Fagen
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for Defendants Harbinger Capital Partners
Offshore Manager, L.L.C. and Harbinger Capital
Partners Special Situations GP, L.L.C.*