D2S5secA                        argument

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

             v.                          12 Civ. 5027 (PAC)

PHILIP A. FALCONE, HARBINGER
CAPITAL PARTNERS, LLC and
HARBINGER CAPITAL PARTNERS
SPECIAL SITUATIONS GP, LLC,

                    Defendants.

------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

             v.                          12 Civ. 5028 (PAC)

HARBINGER CAPITAL PARTNERS,
LLC, PHILIP A. FALCONE and
PETER A. JENSON,

                    Defendants.

------------------------------x

                                         February 28, 2013
                                         2:45 p.m.
Before:

                    HON. PAUL A. CROTTY,

                                              District Judge

D2S5secA                          argument

APPEARANCES

SECURITIES AND EXCHANGE COMMISSION (12 Civ. 5027)
BY:  DAVID STOELTING
     KEVIN P. MCGRATH
     MARK D. SALZBERG

SECURITIES AND EXCHANGE COMMISSION (12 Civ. 5028)
BY:  DAVID J. GOTTESMAN
     BRIDGET FITZPATRICK

THE DONTZIN LAW FIRM
     Attorneys for Defendant Falcone
BY:  MATTHEW S. DONTZIN
     DAVID A. FLEISSIG
     TIBOR L. NAGY, Jr.

KIRKLAND & ELLIS, LLP
     Attorneys for Defendant Jenson
BY:  ROBERT W. POMMER, III
     BRIAN D. SIEVE

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
     Attorneys for Defendant Harbinger Capital Partners, LLC
and Harbinger Capital Partners Special Situations GP, LLC
BY:  ERIC S. GOLDSTEIN
     WALTER RIEMAN

D2S5secA                           argument

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel for the SEC, please state
 3    your appearances for the record.
 4              MR. GOTTESMAN:  David Gottesman and Bridget
 5    Fitzpatrick on behalf of the plaintiff SEC for case 5027.
 6              THE COURT:  Okay.
 7              MR. GOTTESMAN:  Good afternoon.
 8              THE COURT:  Mr. Gottesman and Ms. Fitzpatrick.
 9              M.S FITZPATRICK:  Good afternoon.
10              MR. STOELTING:  Good afternoon.  For the 5028 case on
11    behalf of plaintiff SEC, David Stoelting, Kevin McGrath and
12    Mark Salzberg.
13              THE DEPUTY CLERK:  Counsel for defendants?
14              MR. DONTZIN:  Yes, your Honor.  The Dontzin Law firm
15    on 5028 and 5027 for Philip Falcone.  I am here with David
16    Fleissig and Tibor Nagy from my firm.
17              THE COURT:  Mr. Dontzin, how are you.
18              MR. GOLDSTEIN:  Good afternoon, your Honor.  Eric
19    Goldstein from Paul Weiss for Harbinger defendants on 5027 and
20    5028, and with me is Mr. Walter Rieman.
21              MR. SIEVE:  Good afternoon, your Honor.  Brian Sieve
22    along with Robert Pommer on behalf of Peter Jenson.
23              THE COURT:  Okay, gentlemen.
24              Do you want to take up the letters of February 20 and
25    25 dealing with the confidentiality of the documents to be
```

D2S5secA                               argument

1      produced?

2              MR. McGRATH:  That's fine, your Honor.

3              THE COURT:  I don't need an awful lot of argument on

4      this.  Do you want to argue?  Do you want to say anything?

5              MR. McGRATH:  No, your Honor.  We are content to rest

6      on the letters.

7              MR. NAGY:  Your Honor, as are we, only to the extent

8      someone wants to see examples of the personal documents we

9      brought a couple with us just as examples, your Honor.  But,

10     beyond that, we are happy to rest.

11             THE COURT:  I take it there is no doubt that the

12     defendants are going to produce the personally sensitive

13     communications and personal financial information, correct?

14             MR. NAGY:  That's correct, your Honor.

15             THE COURT:  The question is how it will be handled

16     from a procedural standpoint.

17             MR. NAGY:  Exactly, Judge.

18             THE COURT:  I think -- I don't think, I'm going to

19     rule in favor of the defendants.  I think the SEC procedure is

20     not warranted and so I'm going to deny the SEC's application.

21     And I gather that means the defendants' version of paragraph 1B

22     will be in the protective order.  Is that correct?

23             MR. NAGY:  Yes, your Honor.

24             THE COURT:  All right.

25             Now, how do you want to proceed -- let's go and do

1  5027 First.  So, who wants to be heard on that?

2          MR. NAGY:  Your Honor, Tibor Nagy for Falcone and the

3  Harbinger defendants.

4          As we indicated, your Honor, in our letter, we have a

5  few slides that I would like to refer to during the argument.

6  May I approach to hand you a copy?

7          THE COURT:  Yes, please.

8          MR. NAGY:  Your Honor, I will call out numbers,

9  they're numbered on the bottom right.

10          Judge, I would like to focus on three issues and those

11  are the complaint's failure to allege a manipulative act, its

12  failure to allege facts that establish the plausibility of the

13  scheme that's alleged in this case, and finally, your Honor,

14  the complaint's failure to allege omissions of fact as to which

15  there was a duty to state.  I will start, your Honor, with what

16  the parties agree on in this case.

17          The parties agree that there is a well-established

18  body of law governing market manipulation claims and both

19  sides, your Honor, cite cases to you that are largely the same

20  and say largely the same things.  There are many of the same

21  things in passages and one of the those passages bears

22  repeating here.  In ATSI the Second Circuit stated:

23  Manipulation is virtually a term of art when used in connection

24  with securities markets.  The term refers, generally, to

25  practices such as wash sales, manufactured orders or rigged

1   prices that are intended to mislead investors by artificially

2   affecting market activity.  What we have here, your Honor, is

3   nothing of the sort.  There are no washed sales, no rig prices.

4   What we have here, your Honor, is something that is not at

5   issue in any other case in which no Court has ever held to be

6   manipulative.  The plaintiff calls it a short squeeze and the

7   plaintiff defines it as a form of market manipulation that

8   occurs when a trader constricts the available supply of a

9   security with the intention of forcing settlement from short

10  sellers at the trader's arbitrary and inflated prices.  And so,

11  on its face, your Honor, this scheme does not involve

12  deception, it involves forcing parties who already committed to

13  deliver securities who are already betting against a company to

14  pay what the complaint calls arbitrary prices.

15          Now, what the plaintiff claims is deceptive here is

16  principally the fact that the defendants acquired more than 100

17  percent of the float and didn't tell anyone that they did.

18  They made that allegation repeatedly in the complaint, they

19  refer to it repeatedly in their briefs.

20          Your Honor, I won't repeat what we have briefed

21  already.  We have discussed the issue, there is something worth

22  citing today, Judge, and that is what does the law say on that

23  issue?  The plaintiff doesn't point you to any case that says

24  buying or selling more than a hundred percent of the float in a

25  security is somehow deceptive and, Judge, there actually is a

D2S5secA                          argument

1    case which we believe addresses exactly that point, that's the

2    Sullivan & Long case from the Second Circuit which both sides

3    point you to.  That case, your Honor, is the mirror image of

4    what is alleged to have happened here.

5           Here the defendants, of course, are alleged to have

6    purchased more than a hundred percent of the float.  In the

7    Sullivan & Long case, which is a market manipulation case, the

8    plaintiff complained -- the plaintiff was a long investor, the

9    plaintiff there complained that a short seller sold short more

10   than the entire supply of a security.  There that short seller

11   was alleged to have sold 170 million shares when a float only

12   had 122 million shares all together.  And what Judge Posner

13   said, writing for a unanimous Seventh Circuit panel:  So what?

14   That's not deceptive.  In his own words, your Honor, this is

15   slide 2, the first slide after the cover, Judge Posner wrote,

16   "Defendant was not required to disclose the number and the

17   plaintiffs were not entitled to assume that defendant would not

18   sell more shares than were outstanding."

19           And that, your Honor, is precisely what the plaintiff

20   here is complaining about.

21           There is another passage from the ATSI case that bears

22   repeating here, the Second Circuit said -- this is on the same

23   page I quoted last time, "In essence, taking a short position

24   is no different than taking a long position.  To be actionable

25   as a manipulative act short selling must be willfully combined

1    with something more to create the false impression of how

2    market participants value a security."

3            And here, your Honor, the only something more that

4    this plaintiff complains about is this idea that the defendants

5    also didn't lend their bonds out to short sellers, and they say

6    in their brief the combination of those two things, that's what

7    makes this especially deceptive.  But again, your Honor, where

8    is the law here to back that up?  If you can't assume -- if you

9    are not entitled to assume that an investor like the defendants

10   here are not going to buy more than 100 percent of the float,

11   you absolutely are not entitled to assume that a long investor

12   with a large position might not lend its bonds to you.  It is a

13   perfectly reasonable thing for it to do.  There is no

14   obligation to lend to short sellers and there is no authority,

15   your Honor, that even remotely says otherwise.

16           For that reason, your Honor, the failure to allege a

17   manipulative act, you can and should dismiss this complaint.

18           THE COURT:  So, your position is there is nothing in

19   the law that requires you can't take a short position.  You can

20   take a short position, it is perfectly legal.

21           MR. NAGY:  Yes, your Honor.

22           THE COURT:  You can take a short position and not lend

23   out the stock to enable others and then you can charge whatever

24   price that you want.

25           MR. NAGY:  Yes, Your Honor.

D2S5secA                              argument

1          THE COURT:  If they come to you.

2          So, you say that this is a perfectly normal

3     transaction.

4          MR. NAGY:  Absolutely, your Honor.  It is a perfectly

5     lawful transaction.  Whether it happens every day, your

6     Honor --

7          THE COURT:  Well, I should have said lawful, not

8     normal.

9          MR. NAGY:  Yes, your Honor, it is absolutely lawful.

10    In fact, Sullivan & Long says precisely that you cannot only go

11    short but go short more than a hundred percent in that

12    investors are not entitled to assume you won't do that.

13          Second, your Honor, this complaint doesn't have any

14    facts, doesn't allege anything that would allow you to conclude

15    that this scheme is plausible.  Every single market

16    manipulation claim that has survived a motion to dismiss,

17    Judge, has one thing in common:  They all have allegations that

18    made their schemes plausible.  You look at cases about painting

19    the tape like the Crane case, you can read in that complaint

20    how that works, what it is the defendant hoped to do, how

21    painting the tape drives up prices and the defendant cashes in

22    on profits.  You read cases like Martino or any other cases of

23    wash sales and matched orders.  You can read in the compliant

24    how the end game is how the prices go up and defendant makes a

25    profit.  They all have those allegations.  This complaint

D2S5secA                          argument

1  absolutely does not.  And this is an issue, your Honor, that

2  these parties have been discussing for years.  It is nothing

3  new.  It is just not there.

4          In their pre-motion conference letter to you, your

5  Honor, the plaintiff took a very unique position.  They said we

6  don't have to give you a plausible scheme and they've since

7  backed off of that a little bit.  They now acknowledge that

8  they are obligated to satisfy Twombly's plausibility

9  requirement and yet they don't, your Honor.  In their brief

10  what they do, again, it is something unique, they don't say

11  well, here is the answer.  What they say instead, Judge, this

12  is page 22 of their brief:  One need not speculate about

13  whether defendant's scheme could be economically rational

14  because in fact defendants did sell mass zips at exorbitant

15  prices resulting from their squeeze.

16          THE COURT:  Where is that reference?

17          MR. NAGY:  Your Honor, it is the bottom of page 22 and

18  goes on to page 23.

19          THE COURT:  All right.

20          MR. NAGY:  And it continues on, your Honor, on page 23

21  on the top to say that establishes the plausibility of the

22  SEC's charge.  And there is a reference you will see, your

23  Honor, in the brief there, to certain paragraphs in the

24  complaint.  Those are paragraphs referring to four sales.  And

25  so, the plaintiff relies on the fact of these four sales which

D2S5secA                        argument

they say establishes the plausibility of their complaint.  That

is a critical admission, your Honor, that answer in that brief,

and the reason it is so critical is because it is absolutely

clear those four sales cannot and do not establish the

plausibility of this alleged scheme.  Instead, your Honor, it

is a dodge and the reason it is a dodge is if you look at slide

3, your Honor, there is a 500-pound gorilla in the room which

the plaintiff does not want to confront and cannot confront.

And let me start by telling your Honor what this is.

        Slide 3 is a visual graph showing the allegations in

the complaint plotted along time and by amount invested by the

defendants.  And it shows you, the complaint here alleges that

the defendants start to invest in these bonds for perfectly

legitimate reasons.  Their analyst thinks this is a real upside

to the bonds.  They begin investing in April 2006, they make an

initial investment of $2.25 million.  They then put in a total

of about $5.5 million of their investors' money in these bonds

and these are not any bonds, your Honor, they are bonds that

this complaint calls volatile and distressed so they had better

have done their homework.  And then, your Honor, the complaint

alleges something really curious.  On a dime in September 2006

all of a sudden there is no longer real belief in these bonds

being a good investment.  Instead, there is what the plaintiffs

brief calls a darker purpose and that darker purpose, your

Honor, is to manipulate the market and to make money by

1   squeezing some unspecified number of shorts for some

2   unspecified potential benefit.  And then, your Honor, we simply

3   plot the numbers from the complaint and you can see that whole

4   big red block, that is for over a year a $90 million risk that

5   these defendants are taking for some unspecified potential

6   upside.  I'm not talking about an attempt to manipulate a

7   market and a failure, I'm talking about what could have

8   happened on their best day.

9           THE COURT:  Well, according to the allegations in the

10  complaint when, in January of 2007, am I correct, that that's

11  when you had an investment of $90 million and you had all the

12  zips then?

13          MR. NAGY:  Yes, your Honor.

14          THE COURT:  Okay.

15          MR. NAGY:  Yes.  And so, from that time period

16  forward, January 2008, and as you move forward, your Honor, you

17  have a $90 million risk that entire time and there is a little

18  white line you see beginning in July 2007 and what that is is

19  the four sales that the plaintiff is relying on as establishing

20  the plausibility of its scheme here, that tiny little white

21  line, and then there is an additional three sales in January of

22  '08, that white line doesn't even reflect profits, it just

23  reflects the amounts sold.  And the next slide, your Honor, is

24  slide 4, you will see the four sales that the plaintiff here

25  tells you establish the plausibility of its scheme.  And what

1   is really notable about them, your Honor, is (A) there is four

2   of them; but (B) is the prices.  The prices at which these

3   happen, three of them occur in January 2008, they're all at

4   about $60.  This complaint tells you in order to get up to the

5   $90 million total investment to buy more than a hundred percent

6   of the float, the defendants here paid prices as high as $86.

7   So, selling at $60 doesn't establish plausibility.

8           And again, your Honor, what we thought might be

9   helpful to you was to find a case that addresses a similar

10  scenario because we were surprised when we saw the answer in

11  the plaintiff's brief and so we looked and we found something

12  that we believe says something similar and that's slide 5, this

13  is the *Feely* case, it is one of three similar cases in which a

14  plaintiff says something quite similar to what the plaintiff

15  here is saying.

16          The plaintiff in that case says:  The plaintiffs

17  there, they were property owners whose properties had been

18  foreclosed upon, they said that the banks who made them the

19  loans purposefully made undercollaterallized loans because they

20  were engaged in a scheme to drum up some unspecified amount of

21  loan origination fees.

22          All three cases, your Honor, came out the same way and

23  in the interest of disclosure, Judge, two of them were by the

24  same Judge.  There is two judges, three cases; but they all

25  came out the same way.  They all come out and say this is

D2S5secA                          argument

1    completely implausible under Twombly because, and I will quote

2    the Feely case:  The motion is granted in light of the

3    complaint's utter failure to allege how the banks entering into

4    a scheme to make undercollaterallized loans would be in their

5    self-interest.

6            The explanation that was missing, your Honor, is how

7    do you address the huge risk of the principal.

8            THE COURT:  I think I can answer the question that you

9    say is unresolved, but.

10           MR. NAGY:  Please, your Honor.

11           THE COURT:  I'm not going to, but go ahead.

12           MR. NAGY:  Well, Judge, here you have a risk that is

13   just like the risk in Feely.  You have this large $90 million

14   risk just like the banks there had the risk of their principal

15   and there is nothing factual that's alleged in this complaint

16   that would make this scheme plausible and for that reason, your

17   Honor, that second reason, you can and should dismiss the

18   complaint.

19           Finally, your Honor, we have been talking about the

20   scheme liability largely.  I would like to talk for a moment

21   about the omission liability, the allegations that there were

22   omissions or misleading; they're interrelated but they bear

23   mentioning here separately.

24           The plaintiff claims in addition to having a

25   manipulative act there were omissions made by the defendants.

D2S5secA                          argument

1   On page 12 of their brief they say:  Defendants, at a minimum,

2   omitted to state material facts necessary to make their

3   statements non-misleading, and the question that arises is,

4   your Honor, well, what are the statements that were misleading

5   around what are the omitted facts?  And so, what we have done,

6   your Honor, is we tried to summarize them for you, the

7   statements we put on slide 6, and there are essentially four

8   statements, these are all from the complaint, and the first

9   thing that strikes me about them, your Honor, is they're all

10  statements made to Goldman Sachs.

11          THE COURT:  Do you find any irony in the fact that the

12  SEC is trying to help out Goldman Sachs?

13          MR. NAGY:  Excuse me, your Honor?

14          THE COURT:  Do you find any irony in the fact that the

15  SEC is trying to help out Goldman Sachs?

16          MR. NAGY:  Just a little, your Honor.

17          THE COURT:  Just a little.  Okay.

18          MR. NAGY:  The first statement is made in the winter

19  and spring of 2007.  The defendants here say, they're alleged

20  to have said:  Defendants press Goldman for delivery of the

21  bonds it had failed to deliver at settlement.  That's the

22  deceptive statement.  Goldman had been paid for bonds it had

23  been contractually committed to deliver them; it didn't; the

24  defendant said please deliver the bonds.

25          Statement 2, May 2007, in response to Goldman asking

D2S5secA                             argument

1   whether it had any bonds to sell the defendants say:  They will

2   sell at 100.

3            3.  September 2007 the defendants:  Insisted that

4   Goldman buy in the bonds.  They still hadn't been given the

5   bonds they paid for and they said they would:  Be willing to

6   settle with the shorts now at 105 and said that they had

7   acquired approximately 190 million bonds.  They just tell

8   Goldman we own more than the entire float.

9            And finally, your Honor, the last misleading statement

10  alleged is that the defendants told Goldman that they had sold

11  a block of bonds and no longer owned the entire issue and still

12  would like delivery of the bonds they paid for a year ago.

13           On the next slide, Judge, what we did is we tried to

14  summarize what are the facts the plaintiff claims should have

15  been disclosed to Goldman.

16           THE COURT:  Let me ask you a question about paragraph

17  101 of the complaint.

18           In the winter and early spring of 2008 Harbinger and

19  the Wall Street firm -- we now know what it is -- resolved

20  their differences in a negotiated resolution.

21           MR. NAGY:  Yes, your Honor.

22           THE COURT:  What was the resolution?

23           MR. NAGY:  They entered into a deal, your Honor, by

24  which most of the sales were cancelled.

25           THE COURT:  Okay.

D2S5secA                          argument

          MR. NAGY:  And so, Judge, what we have done is we've

summarized the omitted facts; they're here on slide 7.  The

first is the plaintiff claims the defendant should have

disclosed the fact that they held more than a hundred percent

of the float.  We believe the Sullivan & Long case touched on

that directly, there is no such duty.  Second, the defendants

should disclose their decision not to lend to short sellers.

Third, they should have disclosed their internal analysis about

what the bonds were really worth.  And finally, your Honor, the

plaintiff claims that they should -- the defendants should have

disclosed certain facts about what the complaint calls the

Christmas Eve transaction.

          There is one key step, your Honor, that the plaintiff

simply fails to do, it is an essential step, and that step is

to ask and to look at whether there is a duty to disclose these

facts and we believe, your Honor, they just didn't do that,

they didn't confront, for example, the holding in the Sullivan

& Long case that there is no duty to disclose whether you own

more than a hundred percent.

          Similarly, your Honor, there is no authority that says

a hedge fund that's got its own duty to its investors has to

disclose to someone on the other side of the table what they

think is security they're trying to sell is really worth.  No

court has ever said there is such a duty and it would be

strikingly counterintuitive to settled expectations, your

D2S5secA                          argument

1    Honor, in this industry.

2            Similarly, your Honor, there is no authority anywhere

3    that says you have a duty to tell a short seller that you are

4    not going to lend your bonds.  No Court has ever said that.  In

5    fact, there is a statute that says it is perfectly proper not

6    only to not lend to short seller but that brokers and dealers

7    are required to tell you you are not required to lend to short

8    sellers.

9            Finally, Judge, this Christmas Eve transaction, we

10   think this is simply a distraction, your Honor, and the reason

11   it is a distraction is a follows:

12           The plaintiff here claims that what is deceptive about

13   the Christmas Eve transaction which is the sale at the end of

14   2007 of several of the bonds for a penny, what was deceptive

15   about it, according to the plaintiff, is that the defendants

16   purportedly didn't tell them -- didn't tell Goldman that the

17   broker didn't report the trade on trace and that the broker

18   then didn't make the bonds available in the market.

19           Now, what is -- why this is a distraction, the reason

20   this is not relevant is the plaintiff didn't allege and

21   couldn't, your Honor, in good faith allege, that the defendants

22   were even aware of those facts.  The plaintiff could have came

23   in and alleged that the defendants told the broker don't report

24   this.  They could have alleged that the defendants told the

25   broker don't make the bonds available.  They could have done

D2S5secA                         argument

1   that, your Honor, but they didn't because they could not, in

2   good faith, make those allegations because they don't have a

3   factual basis for them.

4          THE COURT:  Okay.  So I have your point here,

5   Mr. Nagy.  You say the scheme here is not manipulative because

6   there is no deception.

7          MR. NAGY:  Yes, your Honor.

8          THE COURT:  The alligations are not plausible.

9          MR. NAGY:  Yes, your Honor.

10          THE COURT:  And there is no duty to disclose the

11   omitted facts.

12          MR. NAGY:  Yes, your Honor.

13          THE COURT:  Let me hear from Mr. Gottesman.

14          Thank you very much.

15          MR. NAGY:  Thank you, your Honor.

16          MR. GOTTESMAN:  Good afternoon, your Honor.

17          THE COURT:  Mr. Gottesman.

18          MR. GOTTESMAN:  The SEC is bringing this case not to

19   protect the interests of any particular investor, but to

20   protect the integrity of the capital markets of this country.

21          The defendant's first point about there not being

22   deception is mistaken.  Manipulation can include any number of

23   tactics to interfere with the natural forces of supply and

24   demand in the marketplace, that's what we're really talking

25   about here.  A manipulation and interference with natural

D2S5secA                              argument

1     forces of supply and demand that cause prices to be rigged so

2     we do have rigged prices here, the prices that defendant was

3     demanding, prices that defendant received when it was selling

4     the bonds after its manipulation began.

5           The defendants rely upon the Sullivan case, it's

6     totally unlike this case.  Sullivan involved a short seller who

7     was purporting to sell more than the entire issue.  We are not

8     talking about a short seller selling more than the entire issue

9     in this case, that's not the issue.  This case involves

10    somebody in the long position who is actually holding the bonds

11    acquiring more than a hundred percent, making them unavailable

12    for anybody --

13          THE COURT:  Wait a minute.  Wait a minute.  Wait a

14    minute.

15          MR. GOTTESMAN:  Yes.

16          THE COURT:  What is wrong with being long?

17          MR. GOTTESMAN:  There is nothing wrong with being

18    long.  Nothing wrong with buying all the bonds you can find if

19    that's all --

20          THE COURT:  Given the way the market operates there is

21    nothing wrong with buying more than the market has, right?

22          MR. GOTTESMAN:  In this particular situation with

23    corporate bonds where there is no recover requirement, right,

24    that can happen.

25          THE COURT:  So, that step is all right.  You can go

D2S5secA                          argument

1   long and you can go long more than the market has.

2          MR. GOTTESMAN:  Yes.  I believe so.

3          THE COURT:  Okay.

4          MR. GOTTESMAN:  Right.  What is important in this

5   case --

6          THE COURT:  Where do we get off the tracks now?

7          MR. GOTTESMAN:  It is the combination of events and

8   the non-disclosure of what was going on.  You have to look at

9   the combination of events; acquiring more than a hundred

10  percent.

11         THE COURT:  Okay.  You can do that, right?

12         MR. GOTTESMAN:  You can do that.

13         Making them unavailable by locking them up in a bank

14  and then also --

15         THE COURT:  Making them unavailable.  You mean you can

16  be long and you have to sell because you're long?

17         MR. GOTTESMAN:  No.  No, you don't have to sell

18  because you're long.

19         THE COURT:  Where is the requirement that you have to

20  sell?

21         MR. GOTTESMAN:  You don't have to sell.

22         THE COURT:  Okay.

23         MR. GOTTESMAN:  Again, it is the combination of these

24  things combined with the non-disclosure of them -- let me

25  finish.

D2S5secA                          argument

1              So, it is getting more in addition a hundred percent,

2      making them unavailable by refusing to let them be lent out for

3      shorts to cover.

4              THE COURT:  I thought you said you didn't have to let

5      them out.

6              You keep on saying this.  You can go long and you

7      don't have to tell.

8              MR. GOTTESMAN:  Right.

9              THE COURT:  So what is the combination?

10             MR. GOTTESMAN:  The continuing on, they continue to

11     make them unavailable they went out and purposefully exercised

12     reverse repo transactions to take any other bonds that were in

13     the marketplace out of circulation so short holders also could

14     not get those, again to make it impossible for shorts to cover

15     their positions.  Then, again, it is a combination of these

16     events --

17             THE COURT:  Well, what is wrong with the shorts going

18     out in the same market that Harbinger was participating in to

19     buy the max zips?

20             MR. GOTTESMAN:  The shorts could do that.

21             I'm saying the defendants went out, they took any

22     bonds that were out there possibly available for borrowing,

23     used reverse repo transactions to take those out of the market

24     so the shorts had no way to get the bonds except buying them

25     from defendants.  Then the defendants pressured the shorts to

1    cover their positions.  The defendants demanded exorbitant

2    prices.

3              THE COURT:  Shouldn't somebody in a short position

4    cover their position?  Isn't that what the law requires?

5              MR. GOTTESMAN:  Normally they should cover their

6    positions.  They shouldn't have to pay rigged prices that exist

7    only because somebody has manipulated.

8              THE COURT:  What is the rigged price here?

9              MR. GOTTESMAN:  The rigged price is a price that the

10   defendants unilaterally set at exorbitantly high levels.

11             THE COURT:  Those are conclusory terms.

12             MR. GOTTESMAN:  Yes.  It is our conclusion of what

13   they were.  They were prices that bore no relation to what

14   these bonds would be worth in the marketplace.

15             If you look at the --

16             THE COURT:  We don't deal in conclusory allegations.

17   I mean, you have to be plausible, right?  You have to show

18   facts that support the claim.

19             MR. GOTTESMAN:  Well, we do.  In a complaint, for

20   example, we allege that there was a class of senior bonds to

21   the bonds that we are talking about in this case --

22             THE COURT:  Right.

23             MR. GOTTESMAN:  -- which are called the zips.  There

24   was a senior class of bonds that because of the structure of

25   the bonds and the structure of the company the senior bonds

D2S5secA                                argument

1    would be worth more and would command a higher price than the

2    zips.

3             THE COURT:  Yes; and they flip.

4             MR. GOTTESMAN:  Here they flipped and they flipped

5    only because of the manipulation; the only reason anybody was

6    paying more for these junior bonds which were not backed by any

7    assets unlike the senior bonds which were backed by assets.

8    There is no democratic, financial reason why these junior zips

9    would trade for more money than the senior bonds.  It makes no

10   economic sense.  The only reason it would happen is because

11   somebody was manipulating the market and causing it and that's

12   what we allege in the complaint.  It is a specific fact.

13            THE COURT:  Tell me, Mr. Gottesman, what is the danger

14   to the capital markets from this conduct that Harbinger engaged

15   in?

16            MR. GOTTESMAN:  The danger is that you don't have

17   natural force of supply and demand dictating the price.  You

18   have somebody who went out and cornered the market.

19            THE COURT:  What do you mean you don't have supply and

20   demand?  You have restricted supply and unlimited demand.  I

21   mean, I'm having difficulty seeing exactly where the wrong

22   occurred here.

23            MR. GOTTESMAN:  Because the normal functioning of the

24   market doesn't involve one person acquiring all of the supply

25   of something, locking it up so it can't be used, going out and

1    demanding excess prices when he doesn't tell anybody that

2    that's going on and that's the key here.  It was the deception

3    of what he did -- what the defendants did.  Acquiring the

4    bonds, making them unavailable, demanding exorbitant prices and

5    then not disclosing that's what they were doing at the same

6    time that they were going out and affirmatively pressuring the

7    shorts to cover the positions.

8         When the defendants went out and spoke to the shorts

9    and said you must cover this position, I demand that you cover

10   this position and didn't at the same time disclose the

11   manipulation that they had caused, that's where the deception

12   was.

13        THE COURT:  The deception it may have caused is buying

14   up all the zips.

15        MR. GOTTESMAN:  Buying up all the zips, making them

16   unavailable and causing exorbitant prices.

17        THE COURT:  These are the component parts.  I mean, I

18   have been asking you about the component parts and you say each

19   one by itself is all right, it is only when you get them all

20   together.

21        MR. GOTTESMAN:  When you get them all together and

22   don't disclose them at the same time you go out and make a

23   demand.

24        THE COURT:  How should disclosure have taken place?

25   Announce to the world we have all the zips now?

D2S5secA                          argument

1          MR. GOTTESMAN:  At a minimum, when they went to any

2     short holder and made a demand of cover or made a demand for

3     price, they should have disclosed.  When they went to a short

4     holder --

5          THE COURT:  What use is that information?

6          MR. GOTTESMAN:  Because then the short holder would

7     know, wait a minute, they have all of the bonds and they're

8     demanding a price that's above the seniors.  They're

9     manipulating the market and dictating a rigged price.  That's

10    what's going on.  That's what the short would have known.

11    Because it didn't disclose that to the shorts the shorts had no

12    way to know that the only reason that these prices were so high

13    was because of the defendants' manipulation.  That's why, for

14    example, when Goldman, the largest short holder, saw reports

15    that some people had purchased these bonds at 60 in January

16    2008 but didn't know that the defendants were the seller,

17    Goldman was willing to go out and buy them also at about 60

18    because they didn't know.

19          The defendants never told them the defendants had been

20    pressuring them to cover but the defendants didn't say:  But,

21    by the way, in fairness you should know, we're the only people

22    who are selling these.  We're dictating the price.  Nobody can

23    buy them except from us and we're going to say what the price

24    is.

25          THE COURT:  Armed with this information what would

D2S5secA                          argument

1    they have done then?

2              MR. GOTTESMAN:  They would have refused to cover as

3    they had done previously because until they saw some trades in

4    the marketplace there is a public report called Trace that

5    shows trades in the market.  Until they saw trades actually

6    happening at 60, Goldman was not willing to pay that price

7    because they had learned by then that the defendants had more

8    than a hundred percent.

9              And so, once they learned that they said, well, we

10   can't participate in the market manipulation so we are not

11   going to cover this, we're not going to buy.  Then the

12   defendant claimed that he had released some into the market.

13   He didn't tell them it was to a long-time associate for a penny

14   at the same time that the defendant was demanding a price that

15   was 600,000 percent higher.  The defendants disclosed that and

16   then Goldman said, well, if you hold more than a hundred

17   percent of this you control the market, you're manipulating

18   this, we're not participating, we're not buying.

19             A few weeks later Goldman saw that a couple of trades

20   took place in the market at $60 and in light of all that

21   information it appeared that the market had freed up, the

22   defendant was no longer the sole seller and in fact somebody

23   from the defendant told Goldman they were not the seller of

24   those bonds at 60 so Goldman went out and itself bought.  So,

25   there is an instance where because they did not have full

D2S5secA                        argument

1    disclosure of what the defendants had done --

2              THE COURT:  You say Goldman itself went out and

3    bought.  Where did they buy?

4              MR. GOTTESMAN:  They bought through an intermediate

5    broker and they came from the defendants -- the bonds

6    themselves came from the defendants, were sold to Goldman

7    through the intermediate broker.  So, they didn't know the

8    identity of the seller and that's the way bond transactions

9    often take place over the counter.  It is done through

10   intermediate brokers and you don't have visibility into who the

11   seller is.  That's just the way the market works with these.

12             Anyway, so it is the combination of events together

13   with their non-disclosure that led to a manipulation and a

14   manipulation of the market causing short sellers to in fact go

15   out and actually buy bonds and at prices that had no economic

16   justification based on the financials of the company.  But,

17   because defendants hadn't disclosed their role in manipulating

18   the market, the market reflected some transactions that caused

19   people to not understand the extent of the defendant's

20   manipulation.

21             Now let me talk about the plausibility issues.

22             We only have to allege a scheme that's plausible on

23   its face and what is important in an SEC enforcement action

24   such as this is that a manipulation doesn't have to be

25   financially profitable for it to be actionable.  If somebody

1    wanted to manipulate the market not to make a profit but

2    because they hated capitalism, they hated the free market, they

3    wanted to mess it up, would anybody seriously contend that the

4    SEC doesn't have the ability to bring an enforcement action

5    against that person?

6              If somebody went in and manipulated the market just

7    out of pure spite to get even with market participants, would

8    anybody seriously contend that the SEC could bring an action

9    against them regardless of whether they could make money?

10             THE COURT:  So, it doesn't have to be profitable to

11   be --

12             MR. GOTTESMAN:  It doesn't have to be profitable to be

13   plausible.

14             THE COURT:  Why is it plausible here?

15             MR. GOTTESMAN:  It is plausible here because the law

16   says that we can show a plausible scheme through a number of

17   means.  You know, this gets into the scienter element where we

18   show the motive and opportunity that we have, we have facts

19   showing that.  We show that what the defendants were trying to

20   do here, in part, was to get even, to act out on their anger

21   against Goldman for having short positions that they were not

22   covering.  We allege facts in the complaint establishing that.

23   We allege facts in the complaint establishing that defendants

24   decided they wanted to control the market in these bonds and

25   manipulate the market in these bonds and we allege specific

1    facts showing their knowledge of that.  And, in fact, this

2    doesn't need to be but it could have been economically

3    profitable if defendants had been able to sell enough bonds at

4    a high enough price.  We see allegations in the complaint that

5    the defendants were out there demanding extraordinarily high

6    prices and at the same time that the defendants were demanding

7    prices of not only 60 but a hundred and over a hundred, at that

8    same time the defendants, within a very short period

9    thereafter, were selling to a long-time associate for a penny.

10          THE COURT:  Do you allege, Mr. Gottesman, that

11   Mr. Falcone and Harbinger in fact did make money on this?

12          MR. GOTTESMAN:  Ultimately they had a net loss on

13   this.

14          THE COURT:  So, they had a net loss because Goldman

15   Sachs refused to do the deal and they cancelled the

16   transaction?

17          MR. GOTTESMAN:  Well, not enough short holders or

18   others actually went in and succumbed to the manipulation.  If

19   more had -- if enough had maybe they could have made money.  If

20   enough short holders had gone into the market and bought these

21   bonds at a high enough price -- and defense were trying to get

22   people to buy at a hundred, even 105 as we allege in the

23   complaint, if they had sold enough bonds at that price --

24          THE COURT:  Did they sell any at that price?

25          MR. GOTTESMAN:  I don't think they sold any at that

D2S5secA                          argument

1    price.  At that price they sold some as high as $95 on July 30,

2    2007.  As we allege in paragraph 76 they sold some bonds at

3    $95.  At the same time they were marking them down on their

4    books as low as $40.

5             So, yes, they he were able to sell a number of the

6    bonds at a high price, not enough to make a net profit but they

7    didn't need to.  And we allege in our complaint, or at least we

8    cite some cases to the effect that --

9             THE COURT:  You mean they didn't need to as a matter

10   of law.

11            MR. GOTTESMAN:  As a matter of law.

12            One of the cases we cited essentially stated that a

13   defendant is not relieved of liability simply because he is

14   unable to unload all of the securities at a high enough price.

15   And that is certainly true here.

16            So, certainly it was plausible, both in terms of a

17   scheme just to go out there and control and manipulate out of

18   anger, spite, whatever, which is certainly something the SEC is

19   entitled to enforce; and secondly, it was a potentially

20   financially profitable deal.  Ultimately they didn't succeed

21   enough at their fraud so they didn't make the profit, but that

22   doesn't excuse them and doesn't get them off the hook.

23            THE COURT:  Do you want to say a few more words about

24   the duty to disclose?

25            MR. GOTTESMAN:  Sure.

1        There were two failures to disclose here.  One, the

2   failure to disclose the overall scheme.  We cited a number of

3   cases in our brief establishing that somebody who engages in

4   market manipulation has a legal duty to disclose the fact that

5   he is doing that.  And the failure to disclose it itself

6   triggers liability, we cited the Crane case which was a Second

7   Circuit case from 1969 establishing that fact.  We cited

8   several other cases.

9        The defendants argue --

10        THE COURT:  So in your view, Mr. Gottesman, what

11   should they have disclosed?

12        MR. GOTTESMAN:  They should have disclosed all the

13   facts surrounding their manipulation.

14        THE COURT:  Don't use the word manipulation.

15        MR. GOTTESMAN:  Okay.  Factually.

16        THE COURT:  What are the facts that should have been

17   disclosed?

18        MR. GOTTESMAN:  They should have disclosed we hold

19   more than a hundred percent of these.  We are not allowing them

20   to be borrowed by anybody, the only way to get these is by

21   buying them directly from us.  The prices we're demanding have

22   no relationship to the economics at all, we're just setting as

23   high a price as we can possibly set, and --

24        THE COURT:  And each one of those steps, now, we have

25   agreed, are lawful in themselves?  A holder of a product of a

1    stock can say I want a hundred for it.  You can say it is not

2    worth a hundred.  That's my price; if you want it, you have to

3    give me a hundred.

4         MR. GOTTESMAN:  Yes.  I would say that's correct, each

5    of those things standing in isolation, but the law has a lot of

6    things in which isolated acts, standing by themselves maybe are

7    okay, but when you put them together, maybe they're not,

8    because all together they form a scheme and a plan and

9    something that is deceptive and that's what we have here.

10        So, all of those acts together, the failure to

11   disclose those, that's one type of deception that the law

12   recognizes.  The second are the specific misleading omissions.

13   Again, even if it had been all right -- even if it had been all

14   right, just for the sake of argument, to not disclose what they

15   were doing overall when they affirmatively went out and made

16   statements to the short sellers, that triggered an obligation

17   to tell the full and complete truth of the facts surrounding

18   the events and not leave anything out and we cite the case law

19   to that effect.  When you choose to speak you have to speak

20   truthfully about the material issues.  Your speech must be both

21   accurate and complete and we cited the Caiola v. Citibank case,

22   Second Circuit 2002 for that principle.

23        So, when the defendant went out and made demands upon

24   the shorts that they covered their short positions, they should

25   have disclosed, to be honest with the shorts, that the

1    defendants held all the bonds and the shorts wouldn't be able

2    to cover them to cover the short positions without buying at

3    the defendant's high prices.

4            When the defendants went out and demanded prices that

5    bore no relation to the economic realities, the defendants had

6    an obligation to tell the full truth about the prices they were

7    demanding, that these bore no relation to the finances of the

8    company --

9            THE COURT:  They had an obligation to say I'm sticking

10   you?

11           MR. GOTTESMAN:  Pretty much.  They had an obligation

12   to say these prices are things we're unilaterally setting

13   because we can.  You can't get these anywhere else, we have

14   made sure of that, and we're going to stick it to you and we're

15   going to demand these prices.

16           THE COURT:  Thank you, Mr. Gottesman.

17           Mr. Nagy, do you want to take two minutes to reply?

18           MR. NAGY:  Yes, your Honor.  Thank you.

19           THE COURT:  Thank you, Mr. Gottesman.

20           MR. NAGY:  Your Honor, very briefly on the sales

21   because these four sales are the thing the plaintiff is relying

22   on to establish plausibility.  I want to clarify something

23   Mr. Gottesman said.  He mentioned at one point defendants were

24   out there trying to get higher prices.  I want to clarify here

25   the defendants never went out and solicited prices from

D2S5secA                          argument

anybody.  The sale at 95 in July 2007, that was an open market

transaction.  The defendants here don't even know who that

purchaser was.  They certainly didn't go out and say:  Hey, buy

at 95.  It just didn't happen.

          THE COURT:  What paragraph is that again?

          MR. NAGY:  Paragraph 76, your Honor.

          THE COURT:  So that is an open market transaction?

          MR. NAGY:  Absolutely, your Honor.

          THE COURT:  It is alleged to be an open market

transaction.

          MR. NAGY:  That's correct.  There is no solicitation

by defendant at that price.

          The other three sales, of course, all happen after the

defendants told Goldman that they own a hundred percent of the

float.  We contend Goldman has no entitlement to assume that is

never going to happen but even if they did those three sales

all happen after that fact and those three sales, your Honor,

all happen at 60, prices lower than these defendants paid to

acquire the bonds here.

          Mr. Gottesman mentioned that there is a duty to

disclose and he kept saying that, your Honor, but he couldn't

point you to any cases.  No Court has ever held there is a duty

to disclose something like your price analysis internally.

They just don't have the authority for that, your Honor.  You

would be the first Judge ever to hold --

D2S5secA                          argument

1              THE COURT:  What is the value in being first?

2              MR. NAGY:  Very little in this case, Mr. Nagy.

3              THE COURT:  All right.

4              MR. NAGY:  Only if you're right, your Honor.  Only if

5      you're right.

6              Finally, your Honor, only as to plausibility I didn't

7      understand the answer you got other than to say if the motive

8      here was to get even with Goldman, then that's perfectly okay,

9      they can still come after the defendants.  But, your Honor,

10     they can't have it both ways, it is one way or the other.  Was

11     that the motive or was it the motive to make a profit?  Their

12     complaint seems to say there was a motive to do both but now I

13     think what we hear Mr. Gottesman saying is there wasn't a

14     profit motive, this was purely in spite of Goldman because

15     Goldman had been acting contrary to the defendants' interests

16     and the defendants, of course, were Goldman's client.

17             THE COURT:  Thank you very much, Mr. Nagy.

18             MR. NAGY:  Thank you, Judge.

19             THE COURT:  Mr. Dontzin, do you want to be heard on

20     the loan in the preferential treatment?

21             MR. DONTZIN:  Yes, your Honor; if we haven't

22     completely worn out our welcome already.

23             Your Honor, with the Court's permission, I would like

24     to hand up a couple of slides.

25             Your Honor, I am here on behalf of Mr. Falcone and the

D2S5secA                          argument

Harbinger Funds, collectively the Harbinger defendants.  This

case, 5028, is unique in that it alleges two entirely distinct

sets of facts.  Actually, sort of two cases within one.

             THE COURT:  You have your own statement of facts here.

             MR. DONTZIN:  And I'm not going to go through any of

the facts.

             THE COURT:  Because we can take the facts as alleged

in the complaint as true, correct?

             MR. DONTZIN:  We have to, your Honor.  Absolutely.

             THE COURT:  And all the inferences that can be

favorably drawn from that as well.

             MR. DONTZIN:  All those that are plausible, yes, your

Honor.

             THE COURT:  Why don't you tell me why a loan, made

without disclosure to when there is a lockup going on, is not

the kind of thing -- it is a kind of self-dealing that at a

bare minimum has to be disclosed.

             MR. DONTZIN:  Sure, your Honor.

             My only argument today, and it will address that

precisely, is the question of whether the plaintiffs have

satisfied the in-connection-with requirement that is required

for both 17a and 10b and 10b-5.

             With respect to the loan, they cannot make out the

in-connection-with requirement for either --

             THE COURT:  So it is okay for somebody like

1    Mr. Falcone to borrow a hundred million dollars from Harbinger?

2              MR. DONTZIN:  Yes, your Honor.

3              THE COURT:  Really?  It is not a sale within the

4    meaning of?

5              MR. DONTZIN:  No, your Honor.

6              THE COURT:  The pledge isn't?

7              MR. DONTZIN:  The fund itself was a lockup so there

8    was no sale of securities with respect to the fund itself.  The

9    only --

10             THE COURT:  You keep on saying that in the papers,

11   about the value of the lockup, but the fact of the matter is

12   the lockup makes it worse because Mr. Harbinger got and

13   Mr. Falcone got his money out and nobody else could.

14             MR. DONTZIN:  No, your Honor, he didn't get it out; he

15   borrowed it and then he paid it back with interest.

16             THE COURT:  Was that available to anybody else?

17             MR. DONTZIN:  Was it available to other investors in

18   the fund?  No, your Honor.

19             THE COURT:  Okay.

20             MR. DONTZIN:  It was not.

21             THE COURT:  Isn't there something wrong with that?

22             MR. DONTZIN:  No, your Honor.  There isn't.

23             THE COURT:  Why not?

24             MR. DONTZIN:  Because there has to be an

25   in-connection-with requirement.  You have to have a fraud, you

D2S5secA                              argument

1   have to have a sale in the security which they've argued,

2   principally, is the pledge or the loan.

3          THE COURT:  Yes.

4          MR. DONTZIN:  Beyond you have to have

5   in-connection-with the two, and they don't make that out.

6   There are cases with respect to a loan, your Honor, are

7   governed by the United States Supreme Court case in Reeves.

8   There are four factors that would determine whether or not the

9   loan qualifies as a security.  We have gone through the four

10  factors in our papers, I'm happy to tick them off now, your

11  Honor, they're at slide 3 of your packet and the plaintiffs

12  don't make out any of the four requirements.

13         THE COURT:  That's for the loan.

14         MR. DONTZIN:  That's correct.

15         THE COURT:  What about the pledge?

16         MR. DONTZIN:  I think the road is much tougher with

17  respect to the pledge.

18         THE COURT:  Really?

19         MR. DONTZIN:  It is some dense reading, your Honor, to

20  fully understand why that's the case, but it certainly is the

21  case that the pledge does not qualify.  And I'm happy to take

22  your Honor through that argument.

23         THE COURT:  Take me through it, please.

24         MR. DONTZIN:  Thank you, your Honor.

25         First, your Honor, you have to ask whether the pledge

D2S5secA                          argument

1   is in fact a security.  That's one of the requirements.  So our

2   position, your Honor, is that while the pledge is indeed a

3   security under the Ruben case -- and we have no quarrel with

4   that -- Ruben only gets them halfway.  So, now we have an

5   alleged fraud, we have got a security, but the plaintiff still

6   needs to demonstrate that the security and the fraud were in

7   connection with one another and they can't make that showing

8   and they rely on Zandford to get them across the line.  That

9   doesn't do it.  The case here is Chemical Bank, Second

10  Circuit --

11          THE COURT:  And not Zandford?

12          MR. DONTZIN:  Not Zandford, your Honor.

13          THE COURT:  Why not Zandford?  It is certainly more

14  recent than Chemical Bank.  It is in the Supreme Court but not

15  in the Second Circuit.

16          MR. DONTZIN:  I certainly understand.

17          THE COURT:  Yes.

18          MR. DONTZIN:  Zandford doesn't get them there.  I'm

19  happy to address Zandford.  Zandford was a scum ball broker

20  who --

21          THE COURT:  Who robbed --

22          MR. DONTZIN:  Who robbed an elderly man who had a

23  mentally disabled daughter, took $412,000 --

24          THE COURT:  Right.

25          MR. DONTZIN:  -- entered into -- had a power of

D2S5secA                          argument

1    attorney, full discretion over the account --

2              THE COURT:  Yes.

3              MR. DONTZIN:  -- bought securities.  Immediately upon

4    selling the securities what does Zandford do?  He pocketed all

5    the proceeds.

6              THE COURT:  That's right.

7              MR. DONTZIN:  After four years, no money left.  But,

8    the Court in Zandford which I think, your Honor, frankly helps

9    us here, said specifically, and I will quote, your Honor, in

10   that case the court held the scheme satisfied the

11   in-connection-with requirement because the security sales and

12   respondent's fraudulent practices were not independent events.

13   Rather, respondent's fraud coincided with the sales themselves

14   at 820, your Honor.

15             Here, in sharp contrast, the alleged fraud, the

16   misrepresentations and omissions about the loan, they're not

17   about the pledge, your Honor.  There is no allegation that

18   there was misrepresentations and omissions about the pledge, it

19   is about the loan.  Those don't coincide with the sale.  That's

20   what makes it fatal.  In fact, the complaint does not allege

21   that anyone was defrauded in connection with the pledge.  All

22   of the misrepresentations and omissions to investors alleged in

23   the complaint occurred -- very importantly, your Honor -- after

24   the pledge was made.  So, how could the pledge have induced the

25   fraud or vice versa?  How can the fraud --

D2S5secA                          argument

1              THE COURT:  Under Zandford they coincided.

2              MR. DONTZIN:  That's right, but here they didn't, your

3      Honor.  No temporal relationship.  And the pledge had nothing

4      to do with what the misrepresentations were made with respect

5      to the loan.  These are completely distinct and that's why,

6      your Honor, we think that Chemical Bank does in fact control.

7              THE COURT:  This is what I'm really having trouble

8      with, Mr. Dontzin.

9              MR. DONTZIN:  Yes, sir.

10             THE COURT:  Tell me why, during the period of lockup,

11     Mr. Falcone can get a loan from Harbinger when nobody else can

12     and he doesn't disclose it.

13             MR. DONTZIN:  Your Honor, he does disclose it.

14             THE COURT:  No.  No.  No.  No.  He doesn't disclose it

15     at the time.

16             MR. DONTZIN:  He doesn't disclose it at that time.

17             THE COURT:  He disclosed it after it is done.

18             MR. DONTZIN:  That is certainly true, your Honor.

19             THE COURT:  After he has been told you shouldn't do

20     this by his outside counsel and he gets another law firm in to

21     give the blessing.

22             MR. DONTZIN:  Your Honor, I know I'm bound by the

23     facts alleged in the complaint --

24             THE COURT:  Yes.

25             MR. DONTZIN:  -- obviously, and if we have to have a

D2S5secA                          argument

1   day in court, that would be hotly disputed, but I understand

2   your Honor's position, you have to accept the facts as alleged.

3          THE COURT:  I should be very clear about this.  I'm

4   accepting the facts as alleged in the complaint as true.

5          MR. DONTZIN:  I understand that.

6          THE COURT:  I don't know whether they're true or not.

7   You say they're not but that's not what we are here for today.

8          MR. DONTZIN:  I totally understand, your Honor.

9          THE COURT:  You have to accept them as true.

10          MR. DONTZIN:  Yes, your Honor.  I understand.

11          Our position is that the loan was absolutely lawful.

12   The question is whether or not the failure to disclose for five

13   months was in connection with the pledge because the loan won't

14   qualify as a security for the in-connection-with requirement

15   under either Ruben or Zandford or Chemical Bank and Chemical

16   Bank is good law.  They say it isn't.  They say it is not after

17   Zandford but that case has been cited after -- Zandford was

18   decided in 2004 by this Second Circuit and 2010 by the Ninth

19   Circuit so that's still good law and Chemical, your Honor --

20          THE COURT:  Are you familiar with the Latin maxim of

21   *nemo iudex sui causia*?

22          MR. DONTZIN:  I don't, your Honor.

23          THE COURT:  Did you go to Harvard?  I will translate

24   for the Harvard guys here.

25          MR. DONTZIN:  Thank you.

D2S5secA                        argument

1        THE COURT:  It says no man can sit in judgment of

2   himself.  So, I am having very grave difficulty saying how

3   could Mr. Falcone make a loan to himself at what the SEC

4   alleged to be preferential rates without disclosing it.

5        MR. DONTZIN:  Your Honor, again, there were lawyers

6   all over this.  This was disclosed five months later in the

7   year end audited financial state.

8        THE COURT:  In a footnote.

9        MR. DONTZIN:  It was absolutely lawful.  The taking of

10  the loan was lawful.  There is no an allegation in the

11  complaint that says the loan itself was unlawful.

12        THE COURT:  No, the pledge.

13        MR. DONTZIN:  Yes.  The allegation is that they're not

14  saying that the pledge was unlawful.  They're not saying that

15  the loan was unlawful.  They're saying that the conduct, the

16  disclosure in connection with the pledge and the loan were

17  unlawful and the difficulty, your Honor, and I know they can't

18  get around it, there may be a cause of action by investors that

19  want to complain who were here with the SEC, for a 10b or a

20  17a, they've got to allege that the fraud and the sale were in

21  connection with one another.  They can't make it out on the

22  loan based on Reeves and, respectfully, they can't make it out

23  on the pledge based on Zandford, Ruben and Chemical Bank.  The

24  pledge was but the part of a larger transaction says Chemical

25  Bank, and under those circumstances it is not a qualifying

1    security for in-connection-with.  That's the law, your Honor.

2    And it is the law after Zandford in a case in the Second

3    Circuit in 2004 and in the Ninth Circuit in 2010.

4            THE COURT:  After the loan was disclosed on March 10th

5    of 2010 there were representations made as to which the SEC

6    says were inaccurate and misleading.

7            MR. DONTZIN:  I understand that.

8            THE COURT:  What about those?

9            MR. DONTZIN:  Respectfully, your Honor, same

10   procedural difficulty.  We're not sitting here arguing whether

11   there was a fraud, your Honor.  We're arguing whether there is

12   a violation of a securities laws under 10b, 10b-5 and 17a.  And

13   all those representations dealt with the loan, they didn't deal

14   with the pledge and, again, they're stuck under Reeves because

15   the loan was not a security no matter how much they hope it to

16   be.  That's exactly the teaching of Reeves, your Honor.  They

17   can't make those tests.  The best they do is hang their hat on

18   the fourth prong of the Reeves test saying, well, there is no

19   other regulatory regime that would regulate this particular

20   loan.

21           THE COURT:  I view them as saying they satisfy 1 and

22   3.

23           MR. DONTZIN:  Your Honor, again, I'm happy, very

24   quickly, to take your Honor through the Reeves factors.

25           Let's take 1, for example, the motivations that would

 1    prompt a reasonable seller and buyer to enter into the

 2    transaction.

 3            THE COURT:  Slide 3.

 4            MR. DONTZIN:  Thank you, your Honor.  Yes.

 5            So, the Supreme Court gives guidance itself in Reeves

 6    on that factor.  It says, and I'm quoting, your Honor:  If the

 7    note is exchanged to correct for the seller's cash flow

 8    difficulties, the note is less sensibly described as a

 9    security.

10            That's this case, your Honor.  There can be no dispute

11    that the purpose of the loan was to address Falcone's cash flow

12    difficulties and the plaintiff says so in paragraph 2 of the

13    complaint.

14            THE COURT:  So, a man who has an obligation to look

15    out for the interest of Harbinger and put those interests

16    first, because he is having cash flow difficulties can take the

17    money?

18            MR. DONTZIN:  Absolutely, your Honor.

19            You know, your Honor, I understand we have to accept

20    the complaint as pleaded and we can, but what do we know about

21    this?  We know that nobody got hurt on this loan, the investors

22    got paid back.

23            THE COURT:  Well, listen.  You can't take money from

24    your escrow account.  I couldn't when I was in private

25    practice, even if we paid it back.  And the defense is not that

1   nobody got hurt because I paid it back before I got caught.

2   You can't do it.

3          MR. DONTZIN:  Well, respectfully, your Honor, nobody

4   got caught (A) and (B) an escrow account isn't the Harbinger

5   fund where it was carefully documented by a world-class law

6   firm.

7          THE COURT:  It was an analogy.

8          MR. DONTZIN:  That part I understand, your Honor.

9          THE COURT:  All right.

10          MR. DONTZIN:  I'm happy to deal with the second prong

11   of the case, the preferential.

12          THE COURT:  Sure.  Go ahead.

13          MR. DONTZIN:  Thank you.

14          THE COURT:  Plan of distribution of the incident.

15          MR. DONTZIN:  Yes, your Honor.

16          The third factor, that is the reasonable expectations

17   of the investing public, that's the third factor, your Honor,

18   right?  And here we submit that no member of the investing

19   public would expect the loan to be considered a security

20   because it is not something they can invest it and it is not

21   transferable.  Compared to the notes at issue in Reeves which

22   the Supreme Court held were securities, in that case the notes

23   were offered and sold to a broad segment of the public.  In

24   fact, your Honor, quoting in Reeves they were distributed to

25   more than 1600 people and they were held by them.  The contrast

D2S5secA                                argument

1    to this case couldn't be any more stark.  No notes were even

2    issued in connection with the loan and no member of the public

3    was solicited to invest in connection with the loan.  So, that

4    knocks out factor three.

5            And the fourth factor, your, the lack of risk to the

6    fund also weighs strongly in our favor.  The last factor is

7    whether some factor reduces the risk of the instrument thereby

8    rendering application of the securities act unnecessary.

9            Here, the loan itself is designed to eliminate any

10   risk to the fund since it was collateralized by Mr. Falcone's

11   interest in the fund and backed by Mr. Falcone's own net worth

12   when he signed the loan agreement in his personal capacity.

13           So, this collateral argues against the loan being

14   considered a security and we rely on the Sixth Circuit case of

15   Bass v. Montgomery for that proposition.

16           Your Honor, so again, they don't meet the

17   in-connection-with requirement either for the pledge or for the

18   loan.  If you would like, your Honor, I will take you through

19   the second sort of case within a case dealing with the

20   preferential treatment claims.

21           THE COURT:  Yes, please.

22           MR. DONTZIN:  Thank you, your Honor.

23           As your Honor is now well aware, the plaintiff's

24   claims relate to a March 2009 vote for change in the redemption

25   provisions of a distinct Harbinger fund, it is Harbinger Fund

D2S5secA                              argument

1    HCP fund 1 which is not implicated in the first aspect of the

2    complaint dealing with the loan.

3            THE COURT:  The loan was from SSF, correct?

4            MR. DONTZIN:  Yes.

5            THE COURT:  The Special Situation Fund.

6            MR. DONTZIN:  That's correct, your Honor.  Absolutely.

7            And the change that was being proposed with respect to

8    the gating position --

9            THE COURT:  From 20 percent to 25 percent.

10           MR. DONTZIN:  The purpose of the change was to protect

11   investors from losses as a result of the fund having to sell

12   assets at a fire sale, at fire sale prices to meet high

13   redemptions which arose after the collapse of the financial

14   markets in 2008 when Lehman went under in September.

15           THE COURT:  Right.

16           MR. DONTZIN:  The purpose was not to provide any

17   improper benefit to the Harbinger defendants and the complaint

18   doesn't say otherwise.  In fact, the proposal also included a

19   provision giving investors the benefit of a 7 percent hurdle

20   rate they hadn't enjoyed previously so there was a high water

21   mark of 7 percent you would have to get to before the fund

22   could actually take performance fees.  So, that is the

23   backdrop.

24           Now, plaintiffs claims relate to certain side letters

25   and agreements defendants entered into with three large

D2S5secA                          argument

investors granting them preferential liquidity allegedly in

exchange for their vote in favor of the gating proposal and the

complaint does not allege that this conduct was unlawful.  To

be clear, the HCP Fund 1's governing documents permitted the

fund to grant preferential redemption treatment to investors

and the complaint itself concedes that at paragraph 85.

Because the plaintiffs can't assert claims based on the terms

of the side arrangements, they instead look to the Harbinger --

they look to the side letters and, again, it is a disclosure

issue, the failure to disclose the side deals to other

investors in the fund and to the board of directors, two guys

sitting in the Cayman Islands.  But, plaintiff's claims fail

for lack of scienter and I just want to argue two minutes on

scienter, your Honor and I will sit down.

          THE COURT:  Are you going to tell me why if I am not

investor A, B and C who have these side agreements, I am

investor D through Z, why I'm not interested in knowing that A,

B and C have different terms that are being made available to

them?

          MR. DONTZIN:  Your Honor, the fund documents -- and it

is not contested -- the fund documents absolutely permit

Harbinger to enter into side letters.  That's not in dispute.

It is what they're saying is somehow we had a duty to disclose

that and we had sufficient scienter to meet the standards on

the Second Circuit.  I'm only arguing the scienter point.

D2S5secA                          argument

1          THE COURT:  Okay.  Go ahead.

2          MR. DONTZIN:  Okay.  So, again, the standard set forth

3     at slide 6, your Honor, in Shields which is the strong

4     inference standard.

5          Now, as we know, your Honor, until just Monday of this

6     week plaintiffs argued that the strong inference standard

7     doesn't apply to enforcement actions brought by the SEC.  That

8     was their position until they sent a letter to the Court and we

9     got a copy.

10          THE COURT:  I got a copy of that.

11          MR. DONTZIN:  Now, there is no doubt that the Second

12     Circuit's strong inference standard plies.  Here the

13     preferential treatment claims fail to satisfy the standard in

14     Shields and plaintiffs had two ways of going about this to try

15     to meet the standard.  One, they have to show motive and

16     opportunity which they didn't do and they don't mention in

17     their opposition brief but, regardless, dealing with the second

18     prong, they both require a strong inference standard.  Let me

19     explain how the complaint fails to meet either prong of the

20     Shields test.

21          In our opening brief, your Honor, we demonstrated that

22     to satisfy the first prong, motive and opportunity, the

23     plaintiffs had to allege facts showing that the Harbinger

24     defendants benefitted in some concrete and personal way from

25     the purported fraud.  And here, of course, they can't meet that

1   standard because there are no allegations in the complaint that

2   the Harbinger defendants personally benefitted from the

3   preferential treatment scheme.  Plaintiffs have apparently

4   conceded this point, doesn't address it in the opposition

5   brief.  Instead they're relying on the second prong of the test

6   in Shields, your Honor, and that's that the complaint alleges

7   facts that constitute -- quoting -- constitute circumstantial

8   evidence --

9             THE COURT:  Strong circumstantial evidence.

10            MR. DONTZIN:  -- strong circumstantial evidence of

11   conscious misbehavior or recklessness and that is a very high

12   standard.  The Court in ECA, the Second Circuit case observed:

13   The absence of improper motive means that the strength of the

14   circumstantial allegations must be correspondingly greater.  At

15   199.

16            The Second Circuit's decision just last year in Gould

17   v. Winstar, the most recent recitation of the elements to

18   satisfy the conscious misbehavior test, and that's at slide 7,

19   your Honor.  As the Second Circuit held in Gould, to meet the

20   conscious misbehavior test a plaintiff must allege deliberate

21   illegal behavior or, said differently, a scheme that is

22   necessarily going to injure -- injure is the key, your Honor.

23   The standard for recklessness is equally high.  A plaintiff

24   must allege that the defendants have engaged in conduct that

25   was highly unreasonable representing an extreme departure from

1    the standards of ordinary care.  And the facts of Gould are

2    instructive because there I think that case was against Grant

3    Thornton, an auditor, who consciously ignored and acquiesced in

4    a fraudulent scheme by its own client and the complaints

5    allegation relating to the preferential treatment scheme fail

6    to satisfy the Gould standard.

7         If you can turn to slide 8, your Honor, I will sum up,

8    but let's tick through the factors that were articulated by

9    Gould.

10        Does the complaint allege deliberate illegal behavior?

11   No.  The complaint does not allege any facts even suggesting

12   that the Harbinger defendants' actions were illegal let alone

13   that the defendants knew that their actions were illegal.

14        Second of the three questions, your Honor:  Does the

15   complaint allege a scheme that is necessarily going to injure?

16   And, again, the answer is, no, it doesn't allege that the

17   scheme injured anyone.  In short, there is no adequate pleading

18   to demonstrate the conscious misbehavior.

19        And finally, your Honor, before I sit down, the final

20   question is does the complaint allege conduct representing an

21   extreme departure from the standards of ordinary care?  And,

22   again, the answer is no.  Instead, the complaint alleges facts

23   that we say are more akin to administrative failings than acts

24   of fraud.  The failure to seek the offshore board approval of

25   two guys in Cayman.  The failure to comply about the most

D2S5secA                          argument

favored nations provision of some investor agreement.

            There is no allegation that Mr. Falcone played any

role in connection with these administrative, virtually back

office tasks.  These administrative failures cannot, under the

teachings of Gould, it is our position, your Honor, by any

stretch of the imagination, be considered extreme departures

from the standard of care and thus the plaintiffs have failed

to meet their burden under scienter.

            THE COURT:  Thank you, Mr. Dontzin.

            MR. DONTZIN:  Thank you, your Honor.

            THE COURT:  Let me ask you one question about the

loan.

            MR. DONTZIN:  Anything.

            THE COURT:  Did the SSF have independent counsel

advising on the loan to Mr. Falcone?

            MR. DONTZIN:  No, your Honor.

            THE COURT:  Checking the time?

            MR. DONTZIN:  No, your Honor.

            THE COURT:  He did not?

            MR. DONTZIN:  He did not, your Honor.

            THE COURT:  The fund did not?

            MR. DONTZIN:  Correct, your Honor.

            THE COURT:  Mr. Stoelting.

            MR. SIEVE:  Your Honor, I don't know if you want me to

go after Mr. Stoelting.  I had a couple of points on Mr. Jenson

1    I would like to make.

2              THE COURT:  I didn't mean to overlook you.  Go ahead.

3              MR. SIEVE:  Thank you, your Honor.

4              THE COURT:  It is logical that you should come in now.

5              MR. SIEVE:  Your Honor, Brian Sieve on behalf of Peter

6    Jenson.

7              I would like to make three points if I could, your

8    Honor.  One, on the substantive allegations with respect to the

9    primary violation, and that is whether the -- the SEC has

10   adequately alleged materiality and that's a separate issue from

11   the one Mr. Dontzin was arguing.  Mr. Dontzin, I think, was

12   addressing your Honor's questions dealing with whether there is

13   a duty to disclose the loan and also whether or not the

14   transactions satisfy the in-connection-with requirement of

15   Section 10b.  But, I think there is a separate argument, your

16   Honor, somewhat related but separate, which is that the loan

17   transaction itself, as a matter of law, would not be material

18   to the investors because of the lockup provision.  And that is

19   a separate legal issue, your Honor.

20             And I understand, your Honor --

21             THE COURT:  That's not really an argument that I'm

22   very disposed to.

23             MR. SIEVE:  Okay.  I would like to point out just

24   briefly, your Honor, that we think it is simple.

25             THE COURT:  Nor am I well disposed to the argument

1    that a hundred million is less than a material amount given the

2    billions that are involved.

3              MR. SIEVE:  I wasn't going to advance that argument,

4    your Honor, but if you are not disposed to that let me turn to

5    the two arguments that are specific to Mr. Jenson.

6              THE COURT:  Yes.

7              MR. SIEVE:  The first is the failure to plead specific

8    facts that give rise to an inference of scienter and, of

9    course, Mr. Jenson is in a different position than Harbinger

10   and Mr. Falcone and, of course, as your Honor knows, needs to

11   be evaluated separately.

12             THE COURT:  Yes.

13             MR. SIEVE:  And I don't want to repeat the standards

14   that Mr. Dontzin covered because I think he did a very nice job

15   of laying out what those are, but the question is whether or

16   not the SEC has satisfied its burden of alleging facts that

17   give rise to a strong inference of fraudulent intent on behalf

18   of Mr. Jenson.  And Mr. Jenson, of course, is in a different

19   situation.

20             Now there are two ways, your Honor, as you know, that

21   they can meet their burden.  First, do they allege facts that

22   Mr. Jenson had both a motive and an opportunity to commit the

23   fraud.  Motive and opportunity.  We would submit the answer to

24   that is no.

25             If you look at the complaint, there are no allegations

D2S5secA                          argument

from which your Honor can plausibly glean that he had a motive

to participate in what he understood to be a fraud.  In fact,

in their brief for the first time they raise two new theories:

They said, well, Mr. Jenson had a motive to see Harbinger

succeed.  Well, that's not pled anywhere in the complaint, your

Honor.  You can look in the complaint, it is not in there.

        Second, in their brief they said he had a motive to

curry favor with his boss.  That's not pled in the complaint,

that is just new stuff they're adding in their brief, so we

think that's obviously something you ought to be ignoring.

        The third thing they allege is that, well, he had a

motive to keep the loan secret and that's in paragraph 21 of

their complaint.  But, your Honor, that is not, as a matter of

law, an adequate allegation to meet the motive prong of the

test.  There are a host of the cases that have addressed this

including SEC v. Espuelas, and in that case what the Court said

is it is not enough to make an allegation that an employee had

a motive that was not common to every employee at the firm,

rather they have to allege something that would show that he

benefitted himself in a concrete and personal way.  And there

are absolutely no allegations in this complaint, nor is it

logical, I would submit, that Mr. Jenson was benefiting in a

concrete and personal way from participating in what is alleged

to be an illegal transaction with respect to the loan.  In

fact, to the contrary --

1              THE COURT:  His role in facilitating the transaction

2      is not enough?

3              MR. SIEVE:  It is not, your Honor.

4              THE COURT:  There is a difference between the scienter

5      prong and the substantial assistance prong.  And, if you look

6      in their brief, I think they conflate the two.  The whole part

7      of their brief deals with the substantial assistance prong, in

8      other words what actions he took in order to meet the aiding

9      and abetting test.  We're not making that argument for purposes

10     of the motion to dismiss.  We certainly will later.

11             The question that faces your Honor now is are there

12     allegations that he knowingly participated in what he

13     understood to be an illegal transaction and there is no

14     sufficient allegation in that.

15             Because they haven't met the motive prong then the

16     cases say that they have to allege facts that constitute, and

17     I'm quoting:  Strong circumstantial evidence of conscious

18     misbehavior or recklessness.

19             MR. SIEVE:  Again, your Honor, there are no

20     allegations of that.

21             THE COURT:  Your point is with regard to what you

22     might call the substantive offense as opposed to aiding and

23     abetting, you are only moving against the substantive offense?

24     Aiding and abetting you are not challenging?

25             MR. SIEVE:  No, no.  I am challenging that Mr. -- I am

D2S5secA                          argument

1    challenging that, your Honor.  I am challenging the fact that

2    Mr. -- that they have not alleged that Mr. Jenson had the

3    requisite scienter for the aiding and abetting allegation.

4    That's what I'm focused on.  And the fact that Mr. Jenson is

5    situated separately and differently, obviously, from

6    Mr. Falcone and Harbinger, and they aren't alleging any facts

7    from which you could conclude, plausibly, your Honor, that

8    Mr. Jenson -- that there was strong circumstantial evidence

9    that Mr. Jenson had engaged in conscious misbehavior.

10          And, your Honor, the only thing they really focus on,

11   if you look at it -- and I'm going to admit that I don't find

12   the complaint on this score to be a model clarity, it is a

13   little confusing to me, but what they seem to be suggesting is

14   that because he allegedly gave erroneous information to Sidley,

15   you should infer that somehow he consciously was involved in

16   illegal behavior.  And, your Honor, we dispute that on a

17   variety of levels.  They don't allege that Mr. Jenson was --

18          THE COURT:  We do have to take the allegations,

19   though, in the complaint, as true.

20          MR. SIEVE:  I do.  And I do for purposes of this.

21   But, even accepting the allegation as true, if you look at the

22   totality of the complaint, all of the allegations, and you just

23   parse out what is alleged with respect to Mr. Jenson, I don't

24   think, your Honor, that they have met their burden of showing a

25   strong circumstantial evidence of conscious misbehavior.

1              THE COURT:  Thank you.

2              MR. SIEVE:  Your Honor, the last argument that I just

3    want to address briefly, and it is one that only we raise, and

4    that is the failure to comply with 9b.

5              Your Honor pointed out earlier that there are some

6    allegations with respect, I think, to Mr. Jenson, particularly

7    in paragraphs 52 through 55, that somehow he gave erroneous

8    information to the Harbinger Investor Relations folks.

9              THE COURT:  Yes.

10             MR. SIEVE:  And so that, somehow, was relayed to

11   investors.

12             But, your Honor, importantly, if you look at those

13   allegations closely, they do not satisfy 9b.  There are no

14   allegations of who the investors were, what was said, where it

15   was said, when it was said, or why the statement was

16   fraudulent.  In fact, you can search the complaint and you

17   won't find any allegation of any specific investor that they

18   allege was misled.  There is nothing in the complaint with

19   respect to affirmative allegations that were made to specific

20   investors.  All they allege, generally, is that Mr. Jenson

21   supposedly gave misleading information to the investor

22   relations people but they don't go the next step to tie it to

23   an investor.

24             So, your Honor, for that reason, we would urge that at

25   a minimum, the claims dealing with the alleged

 1   misrepresentations have to be dismissed.

 2              THE COURT:  Thank you very much, Mr. Sieve.

 3              MR. SIEVE:  Thank you, your Honor.

 4              THE COURT:  Mr. Stoelting?

 5              MR. STOELTING:  Thank you, your Honor.

 6         Your Honor, I will start with the in-connection-with

 7   issue which relates only to the 10b claims relating to the

 8   loan, and Zandford is the case that -- the Supreme Court case

 9   that governs here.  And, in SEC enforcement actions, as

10   Zandford held, the in-connection-with requirement should be

11   construed not technically but flexibly to effectuate its

12   remedial purposes.  And, Zandford also says, which is the test

13   here, that the securities transactions and the breaches of

14   fiduciary duty coincide and the in-connection-with here that we

15   are arguing is under the Supreme Court case in Ruben.

16   Mr. Falcone pledged his interest in SSF fund as collateral for

17   the loan.  Nobody disputes that that pledge represents the

18   purchase and sale of a security.  The only dispute is whether

19   that purchase and sale of that security was in connection with

20   a breach of fiduciary duty.

21              THE COURT:  Can you tell me, Mr. Stoelting, why you

22   think Zandford should apply here?  It is a materially different

23   case, isn't it?  I mean, it is a complete robber taking

24   advantage of an elderly man and his disabled daughter and

25   stealing everything.  I mean that -- whatever you can say about

1    this transaction, that did not happen here.

2              MR. STOELTING:  Well, the legal principle is the same,

3    the legal issue of what does in-connection-with mean, but there

4    is similarities because the facts of Zandford found that when

5    that broker went into Mr. Zandford's account and redeemed that

6    money, that each time he did that it was a breach of fiduciary

7    duty and that equates to when Mr. Falcone removed that $113

8    million from this SSF fund, that was a breach of fiduciary

9    duty.

10             THE COURT:  Well, the broker didn't have a legal

11   opinion saying it was all right, did he?

12             MR. STOELTING:  Well, we would argue that.

13             THE COURT:  Mr. Falcone did.

14             MR. STOELTING:  A legal opinion based on faulty facts

15   and misleading evidence and completely false representations

16   about what the fund was.  That lawyer, when you read his legal

17   opinion, he had -- he thought the fund was all cash.  His legal

18   opinion says this is based on my information from Mr. Jenson

19   and Harbinger that this fund is all cash.  It is based on the

20   information given to me by Jenson and Harbinger that this was

21   not a self-created problem, that it is something that he just

22   found out about, that it is something that there was no other

23   option, this is the only option in order to solve the tax

24   problem.  All of those bases of the draft memo provided by the

25   Sidley firm were not true, as we allege in the complaint, and

D2S5secA                          argument

 1  that memo was sent to Mr. Jenson, he received it, he knew that

 2  all of those were not false, he knew that it was not that --

 3  that taking the loan was not --

 4          THE COURT:  You said were not false, were not true.

 5          MR. STOELTING:  Were not true, yes, your Honor.  Thank

 6  you.

 7          He knew this was not a loan of last resort.  Jenson

 8  knew that because he had been to the bank in September and sat

 9  down with the bank and explained to them the assets that were

10  available and the bank appeared ready to put a loan together

11  for him but Mr. Falcone said no because he didn't want to

12  curtail his lifestyle by impairing his house and impairing his

13  other assets in order to cover this tax obligation.  And this

14  relates to the pledge also, and that's why the pledge is so

15  central and integral to the complaint and that's why the Ruben

16  case, under Ruben, the pledge, it is in connection with the

17  breach of fiduciary duty here.

18          The way that Mr. Falcone could achieve his goal of not

19  using his liquid assets and house and other assets to pay his

20  taxes was by dipping into the fund and using those assets, and

21  if he was going to do that he has to pledge his interest.  And

22  when you look at the legal memo, it is a draft memo that says:

23  This is all based on what you told us.  If there is anything

24  wrong in this memo, you have to correct it.  And there was

25  never any corrections.  That's what the draft memo and all

D2S5secA                              argument

1    there ever was.

2              But, when you read that draft memo you can see the

3    importance of the pledge and how important it was to the way

4    the loan was put together because it achieved Mr. Falcone's

5    goals of not using any other assets.  And the pledge was really

6    critical to the loan at all stages of it.  When you read the

7    loan agreement the defense here has put the loan agreement and

8    the audited financial statements that disclosed the loan in a

9    footnote.  You see the pledge, the importance of the pledge

10   there.  When they finally disclosed the loan in March 2010 in

11   the footnote to the financial statements, just many mentions of

12   the pledge as a critical aspect to it, that's how they

13   justified it.  That's how it was presented to investors.  Well,

14   it was no risk to you because I just pledged my interest in the

15   fund and that was more than the amount I took out.  I mean,

16   when you read defendants' brief, even they, when they talk

17   about the loan as a riskless transaction, what they talk about

18   is the pledge.

19             On page 1 of the opening brief defendants say:  The

20   loan harmed no one.  To the contrary, the loan was fully

21   secured by Mr. Falcone's interest in the SSF.

22             And on page 6 of their brief defendants say:  The loan

23   had no downside because it was overcollaterallized by

24   Mr. Falcone's interest in the SSF.

25             So, when they want to present the loan as something

1    that was benign, they rely on the pledge.  But when it comes to

2    the in-connection-with argument, the pledge and the loan are

3    miles apart and have nothing to do with one another.

4            And just getting back to the legal test of what

5    in-connection-with requires, the most recent teaching from the

6    Second Circuit interpreting the coincide requirement in

7    Zandford and what that means is in Romano v. Kazacos and in the

8    Romano case from 2010, the Second Circuit said that the

9    coincide requirement is broad in scope, plaintiff's claims must

10   necessarily allege, necessarily involve or rest on the purchase

11   or sale of a security.

12           So, the coincide requirement is not some very onerous

13   requirement as defendants make it out to be.

14           And the Chemical Bank case that we've heard a lot

15   about today and that is discussed extensively in their briefs,

16   especially the reply briefs -- that of course was 30 years ago

17   and we're not saying that it has been overruled because no

18   court has formally overruled it, but certainly Zandford makes

19   clear that in-connection-with does not require an allegation of

20   the fraud in connection with the thing pledged.  In Chemical

21   Bank it was just a different set of facts.  It was a lawsuit

22   against an accounting firm over a blown audit by a group of

23   banks and the loan that they were suing the auditing firm about

24   was secured by a pledge made by a subsidiary and the accounting

25   firm had never accounted -- examined the books of this

D2S5secA                        argument

subsidiary so the conclusion was, well, the losses in this case
were caused by the accounting firm, not by the pledge, so
therefore the pledge was not in-connection-with.

THE COURT:  Mr. Stoelting, what is your best case or
your best argument for the proposition that you have offered
here that the loan and pledge, when made back in October of
2009, had to be disclosed?

MR. STOELTING:  It had to be disclosed based on the
Supreme Court's opinion in Capital Gains that imposed a
fiduciary duty on him.  And no one disputes that he was a
fiduciary, Harbinger was a fiduciary -- I am just reading from
Capital Gains here:  An affirmative duty of utmost good faith
and full and fair disclosure of all material facts as well as
an affirmative obligation to employ reasonable care to avoid
misleading his clients.

Now, of course it is material to the investors in the
fund that the advisor to the fund is removing -- secretly
removing $113 million from the fund when they can't take loans.
And, remember, about 60 percent of the investors in the fund
had pending redemption requests that had been backing up over
the past year.

So, if there was money that could be freed up for some
purpose, the investors would probably like to see that return
to them to fill the pending redemption requests.

So, a secret removal of $113 million is a breach of

1    Mr. Falcone's fiduciary duty to the fund and to the investors

2    and the LP agreement that Mr. Dontzin also put before the Court

3    in his opening motion in Section 2.8 provides for approval by

4    an investor committee that was never convened, never consulted,

5    no investor knew about this loan at all until it was disclosed

6    in a footnote in March, and then when it was disclosed the

7    cover up and the lies and misrepresentations about the loan and

8    the circumstances began.  And we saw them in the e-mail that

9    Mr. Jenson sent.

10           And, by the way, Mr. Jenson, sending an e-mail to

11   people in the investor relations department whose job it is to

12   communicate with investors about what is going on in the fund,

13   certainly shows an intent for them to relay those falsehoods to

14   investors.

15           THE COURT:  Mr. Stoelting, can you say a word or two

16   about preferential treatment, please?

17           MR. STOELTING:  Yes, your Honor.

18           These allegations concern side deals and the

19   similarity with the loan is that both were in breach of

20   Harbinger and Mr. Falcone's fiduciary duty to the investors to

21   affirmatively disclose all material facts and to employ

22   reasonable care to avoid misleading clients.  These allegations

23   concern side deals that Mr. Falcone and Harbinger made with

24   some of the largest investors to give them preferential

25   liquidity in return for affirmative votes on a proposal that

1    would lock up or tighten the redemption requirements.

2            Now, obviously there is not much more that's important

3    to an investor in a hedge fund than when he can get his money

4    out which is the redemption requirements.  And so, when

5    Mr. Falcone went to them and said we need to tighten up the

6    redemption requirements, as the complaint alleges he was

7    worried that that proposal might not pass.

8            So, what he did was secretly make deals with some

9    investors, the biggest ones, to give them preferential returns

10   in order to ensure that the vote passed.

11           THE COURT:  There is nothing wrong with the deals

12   made.

13           MR. STOELTING:  Well, there is.

14           THE COURT:  What is wrong?

15           MR. STOELTING:  He was supposed to obtain approval by

16   the board.  This was an offshore fund, they had the articles of

17   association that Mr. Dontzin has also put before the Court and

18   are incorporated into this motion, and those articles of

19   association say, in Section 27A, that only the directors in,

20   quote, their absolute discretion, can waive or modify the

21   conditions relating to redemptions for certain large and

22   strategic investors.

23           And so, if he is going to do that, he can only do it

24   with the board approval.  And he not only did not get board

25   approval, he did not even tell them or disclose the quid pro

1   quo deals that he reached with sponsors A, B and C.

2           THE COURT:  So, with respect to the arrangements that

3   he had with A, B and C, you say they were deficient for failure

4   to get board of director approval?

5           MR. STOELTING:  Well, that was part of it.

6           THE COURT:  What is the other part?

7           MR. STOELTING:  Well, he didn't tell the other

8   investors that he was -- you know, at the same time he has an

9   obligation to treat all investors the same and not to give

10  favored treatment to some.  When he sent out the letter on

11  March 9th to the investors it said:  Dear investors, I'm asking

12  you to vote on this proposal that will make it harder for you

13  to redeem money.  It will mean that when we calculate the

14  redemption requirements and when there is a cap, we're going to

15  do a fund level gate instead of the investor level gate.

16  That's a significant measure that makes it harder.

17          And so, investors receiving that proposal would think,

18  okay, well, this is fair?  Because it is going to apply to

19  everybody.  But it doesn't.  It doesn't apply to the big

20  sponsors -- A, B, C -- because he cut side deals with them.

21          Now, this part of the -- you know, there is some other

22  bad behavior here which is prior to the vote Harbinger had side

23  letters with several investors.  That was designed to sort of

24  ferret out that kind of behavior.  And what they say is if you

25  reach a better redemption term with somebody else, then I have

D2S5secA                        argument

1    to get the opportunity to get the same provisions, that's

2    called most favored nation MFN.  So, because if he honored

3    those MFN provisions it would -- everybody would then know

4    about his scheme, he just ignored them and didn't follow them.

5            So, we cite in the complaint two side letters that

6    require disclosure of the preferential redemption terms and it

7    was concealed from those investors as it was concealed from the

8    board.

9            THE COURT:  What paragraphs are those in the

10   complaint?

11           MR. STOELTING:  65.

12           And, further, there were questionnaires that investors

13   submit to the advisor Harbinger that make the same kinds of

14   questions about whether there are side deals or any other

15   arrangements with other investors and he failed to answer those

16   accurately in order to conceal the scheme.

17           THE COURT:  Mr. Stoelting, can you say a few words

18   about Mr. Jenson?

19           MR. STOELTING:  I'm sorry, your Honor.  My colleague

20   is --

21           MR. McGRATH:  Your Honor, also 65 and --

22           THE COURT:  65, 55 and 86.  Thank you.

23           MR. STOELTING:  Let me briefly address Mr. Jenson.

24           Mr. Jenson is, as alleged in the complaint, paragraphs

25   16 through 59 of the complaint, Jenson appears every step of

1    the way along this loan.  He receives the e-mail in April '09

2    from Mr. Falcone's accountant saying that Philip shows $70

3    million in taxes due.  He met with the bank on September 1,

4    2000, about a loan to pay his tax obligations.  He provided

5    financial documents to the bank showing that Mr. Falcone had

6    $55 million available to pay his loan.

7              THE COURT:  So in terms, in your view under the

8    allegations of the of the complaint, Mr. Jenson is an active

9    participant in violation of 10b-5 and 17?

10             MR. STOELTING:  He is only charged with aiding and

11   abetting the fraud by Mr. Falcone and Harbinger so he is aiding

12   and abetting the 10b violation, he is aiding and abetting the

13   Advisors' Act violation.

14             THE COURT:  All right.

15             MR. STOELTING:  But I don't think I need to run

16   through them because they're all there in paragraphs 16 to 59.

17             But, you know, Jenson's significant role at the time

18   of the transaction in October is to sort of massage the legal

19   cover because they knew at some point people were going to find

20   out about it and they knew they needed some legal piece of

21   paper to show people.  So, you will notice the complaint says

22   that David Sawyer, the lawyer, never spoke to Falcone, it was

23   all through Jenson.  And, you know, even when they had the big

24   sitdown with Mr. Falcone on October 9 to review the PowerPoint,

25   Sawyer wasn't there, he wasn't on the call.  And everything,

D2S5secA                          argument

1    all the information to Sawyer came through Jenson as we allege

2    in the complaint and, of course, that information is wildly

3    inaccurate.  The fund was all cash when it was a $2 billion

4    fund that was invested in all sorts of securities and that

5    Mr. Falcone had no other choice and so on.

6                THE COURT:  Thank you very much.

7                MR. STOELTING:  Your Honor, I just wanted to get on

8    the record as well because we didn't say this in our complaint,

9    but if there is any aspect of the motion to dismiss that is

10   granted, we would ask the opportunity to replead.

11               THE COURT:  Yes, sir.

12               Mr. Dontzin?

13               MR. DONTZIN:  Yes, your Honor.  Three very quick

14   points.

15               First, your Honor, we haven't heard a word with

16   respect to the preferential treatment claims about scienter.

17   Not a word.  Not today and not effectively in any of the

18   briefs.

19               Second, your Honor, we have heard a lot about breach

20   of fiduciary duty so in large respect, your Honor, I want you

21   to consider that the question is not whether or not there is a

22   breach of fiduciary duty and that's what we heard mostly from

23   Mr. Stoelting.  The question is whether there is a securities

24   law violation whether this is the proper plaintiff in this

25   action.  There may well have been a breach of fiduciary duty

1    but that's not for the SEC enforcement action.

2              And finally, your Honor, I had the benefit of the

3    general counsels here today and I misspoke and I want to make

4    sure I am clear on the record and obviously there is no

5    enforcement proceeding with respect to the general counsel who

6    was there at the time, but apparently I was not clear, your

7    Honor, that Sidley in fact represented the funds, had no

8    representation of Mr. Falcone -- represented the funds who, of

9    course, had a fiduciary duty to their investors.

10             So, effectively, Sidley was representing the best

11   interests of the investors, not Mr. Falcone at the time of the

12   representation.

13             I have nothing further, your Honor.

14             THE COURT:  Thank you very much.

15             Mr. Sieve?

16             MR. SIEVE:  Two points briefly, your Honor.

17             On the request to replead I point out under the

18   Court's local rules we did exchange letters and the rule states

19   if the plaintiff chooses not to amend in response to the

20   premotion letters that no further amendments would be allowed.

21   So, we would oppose that.

22             And secondly --

23             THE COURT:  I know that is what the letter says but

24   that's not the rule of the Second Circuit.

25             MR. SIEVE:  Thanks.  Well, we think they've had plenty

1    of opportunities.  This investigation has been going on for two

2    and a half years, your Honor.

3          The other thing I would point out, your Honor, is that

4    again, the SEC continues to conflate, in our view, the

5    substantial assistance prong and the scienter prong with

6    respect to Mr. Jenson.  Again, just to give you one example,

7    there is no allegation in the complaint nor could they make one

8    in good faith, that Mr. Jenson was aware of what they call law

9    firm B's earlier advice about the loan because he wasn't there

10   at the time and there is no allegation that he knew that.  So,

11   they suggest -- they try to suggest that somehow he was an

12   active participant when in fact we would submit that there is

13   nothing in the complaint that would, in any way, lead to the

14   strong conclusion that he understood or believed there was

15   anything unlawful about the loan.  And, in fact, if you look at

16   all the allegations in the complaint, we just do not believe

17   that they've met their burden on that score.

18         THE COURT:  Thank you very much.

19         Will somebody order a copy of the transcript so I have

20   the benefit of the oral argument?

21         MR. DONTZIN:  Yes, your Honor.  We will get that done.

22         THE COURT:  Thank you very much for the oral argument.

23   I will get to this just as quickly as I can.

24         Thank you very much.

25         THE DEPUTY CLERK:  This Court stands in recess.
                           o0o