Crotty, P.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-16-13

ʏATES DISTRICT COURT
ʜRN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION, :
:
                              Plaintiff, :
:                    12 Civ. 5027 (PAC)
:                    ECF Case
         -against- :
:
PHILIP A. FALCONE, HARBINGER CAPITAL :
PARTNERS OFFSHORE MANAGER, L.L.C., :
HARBINGER CAPITAL PARTNERS SPECIAL :
SITUATIONS GP, L.L.C., :
:
                              Defendants. :
:
_____ :

_____

SECURITIES AND EXCHANGE COMMISSION, :
:
                              Plaintiff, :
:                    12 Civ. 5028 (PAC)
:                    ECF Case
         -against- :
:
HARBINGER CAPITAL PARTNERS LLC; :
PHILIP A. FALCONE; and PETER A. JENSON, :
:
:
                              Defendants. :
:
_____


**FINAL CONSENT JUDGMENT AS TO DEFENDANTS PHILIP A. FALCONE;
HARBINGER CAPITAL PARTNERS LLC; HARBINGER CAPITAL
PARTNERS OFFSHORE MANAGER, L.L.C.; AND HARBINGER
CAPITAL PARTNERS SPECIAL SITUATIONS GP, L.L.C.**

**WHEREAS,** the Securities and Exchange Commission ("Commission") filed a Complaint on June 27, 2012, in the civil action 12-cv-5027 (PAC) (the "5027 Action"), alleging that Defendants Philip A. Falcone ("Falcone"), Harbinger Capital Partners Offshore Manager, L.L.C. ("HCP Offshore Manager"), and Harbinger Capital Partners Special Situations GP, L.L.C. ("HCP Special Situations GP") violated Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, as a result of a "short squeeze" in which the Defendants manipulated the price and availability of a series of distressed high-yield bonds;

**WHEREAS,** the Commission filed a Complaint on June 27, 2012, in the civil action 12-cv-5028 (PAC) (the "5028 Action"), alleging that Falcone and Harbinger Capital Partners LLC ("Harbinger") violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 20(a) of the Exchange Act (solely as to Falcone), and Sections 206(1), (2) and (4) of the Investment Advisers Act of 1940 (the "Advisers Act") and Rule 206(4)-8 thereunder, as result of (a) the misappropriation of $113.2 million from a hedge fund for which Falcone and Harbinger served as investment advisers; and (b) the undisclosed offering and granting of favorable redemption and liquidity terms to certain large investors in exchange for those investors' consent to restrict redemption rights of other fund investors, and the concealment of the preferential terms from both the fund's directors and investors;

**WHEREAS,** Falcone, HCP Offshore Manager, HCP Special Situations GP and Harbinger (collectively, the "Harbinger Defendants") have executed the Consent annexed hereto and incorporated herein for the purpose of settling the Actions before the Court; and

**WHEREAS,** the Harbinger Defendants have entered general appearances; consented to the entry of this Final Judgment; admitted the allegations of the Complaints as to personal and subject matter jurisdiction; admitted the facts set forth below; and waived findings of fact and conclusions of law and any right to appeal from this Final Judgment in the Actions; and

**WHEREAS,** the Harbinger Defendants admit to the following facts:

## THE HARBINGER DEFENDANTS' ADMISSIONS

### The 5028 Action:  Overview

1.      Defendants Falcone and Harbinger (collectively, the "5028 Harbinger Defendants") engaged in the following conduct in connection with two funds they advised; · Harbinger Capital Partners Special Situation Fund ("SSF") and Harbinger Capital Partners Fund I ("HCP Fund I"): (a) Falcone improperly borrowed $113.2 million from SSF, at an interest rate less than SSF was paying to borrow money, to pay his personal tax obligation, at a time when Falcone had barred other SSF investors from making redemptions, and did not disclose the loan to investors for approximately five months; and (b) Falcone and Harbinger granted favorable redemption and liquidity terms to certain large investors in HCP Fund I who voted in favor of more restrictive redemption terms, and did not disclose certain of these arrangements to the fund's board of directors and the other fund investors.

### The Use of SSF Fund Assets

2.      On October 14, 2009, without seeking or obtaining investor consent, Falcone borrowed $113.2 million from SSF to pay Falcone's state and federal taxes.  At the time, and since late 2008, Falcone had prohibited other investors from redeeming their investments in SSF due to possible claims arising from the bankruptcy of SSF's prime broker.

3.      On April 14, 2009, defendant Peter A. Jenson ("Jenson") received an email from

Falcone's personal accountants informing him that "[b]ased on current calculation Philip [Falcone] is still showing a significant balance due" of approximately $70 million on his personal taxes. By July 2009, the amount due had risen to more than $100 million.

4.       On September 4, 2009, Jenson emailed Falcone to report on discussions that Jenson had with a bank "with regard to a facility on your total assets as a potential avenue to covering the tax obligation." Jenson told Falcone that no bank would accept Falcone's hedge fund interests as collateral. As a result, Jenson proposed that Falcone proceed with appraisals of Falcone's two Manhattan townhouses and artwork, and raised the possibility of borrowing against other assets, including Falcone's interest in a National Hockey League team and an estate on the island of St. Barts.

5.       On September 15, 2009, Falcone responded to Jenson's proposal about a bank loan using Falcone's hard assets as collateral by saying "lets discuss later this week if you have some free time."

6.       Although the proposed bank loan, combined with Falcone's available cash, provided a potential avenue for Falcone to pay his personal tax obligation, Falcone did not pursue this option. Instead, Falcone directed Jenson to pursue a loan from SSF, an option Jenson presented to Falcone following discussions with another outside law firm, Sidley Austin LLP ("Sidley"). On September 15, 2009, Jenson emailed Sidley regarding the loan proposal, stating "[P]hil [Falcone] loves the idea . . . Need a term sheet asap."

7.       On October 8, 2009, Jenson emailed a 14-page PowerPoint presentation to Falcone prepared by Sidley, and asked Falcone to take a "careful read" of it. The next day, Jenson and Harbinger's in-house counsel reviewed a revised version of the PowerPoint with Falcone in a brief meeting.

8.      The PowerPoint that Falcone reviewed at the October 9 meeting–which stated the "[g]eneral [r]ule" of "[n]o borrowings by any 'insider' from any fund"–contained numerous incorrect assumptions – based on information that the law firm had been provided by Harbinger personnel – that should have demonstrated to Falcone that Sidley's legal advice could not be relied upon.  For example, the PowerPoint represented: (a) that the loan "must only be made as a 'last resort,'" when Falcone knew that he had other potential options; and (b) that the loan would be "in the best interests of the lender," when Falcone knew that SSF did not have separate representation to protect SSF's interests.

9.      Despite these red flags in the PowerPoint, Falcone asked no questions during the October 9 meeting and gave final approval for the loan transaction.

10.     After Falcone's approval, Sidley, in consultation with Jenson, finalized the loan agreement.  The interests of SSF as the lender were not represented during the negotiation and drafting of the loan agreement.  In addition, the SSF limited partnership agreement provided for an investor committee to review such related party transactions; the 5028 Harbinger Defendants failed to constitute such a committee.

11.     The Loan and Security Agreement dated October 14, 2009 (the "Loan Agreement") was signed by Falcone as borrower and Jenson, based on Falcone's approval, on behalf of SSF as the lender.  The only pledged collateral for the loan was Falcone's interest in SSF.

12.     The Loan Agreement provided that "[t]he Lender's counsel shall have provided advice to the Lender to the effect that the making of the Loan . . . would not be inconsistent with the Borrower's fiduciary obligation to the Lender."  The 5028 Harbinger Defendants, however, did not ensure that SSF as lender had separate counsel and, as a result, this provision of the Loan

Agreement was not met.

13.     The Loan Agreement also provided that the interest rate to be paid on the loan was "the higher of" (1) the Applicable Federal Rate, which at the time was 2.66 percent, plus 1 percent; or (2) "the Lender's actual cost of funds as determined by the Lender in its reasonable discretion plus one percent." At the time, SSF was paying 7 percent on an outstanding loan. Notwithstanding this fact, Falcone paid an interest rate of 3.66 percent on this loan.

14.     Falcone also knew from his review of the PowerPoint that the loan was required to be at an "[a]bove-market interest rate." It was not.

15.     The Loan Agreement also stated that the loan must be accelerated "to avoid any adverse effect" on the other SSF investors, and, upon notice to Falcone, the SSF could declare the loan immediately due and payable.

16.     The day after the execution of the Loan Agreement, $113.2 million was transferred from an SSF account, and Falcone used these funds to pay his personal tax liability.

17.     Five months after the loan, Falcone and Harbinger disclosed the transaction for the first time in a footnote to SSF's audited financial statements dated March 12, 2010. At that time, Falcone still owed a principal balance of approximately $98 million.

18.     On May 12, 2010, Falcone wrote to SSF investors regarding a restructuring proposal. Falcone reported that greater than 80 percent of SSF investors chose to receive distributions rather than merge with HCP Fund I. Falcone further stated that "[a]s a consequence of this vote, we are beginning the process of an orderly reduction to cash" of the SSF portfolio and that Harbinger was "assessing other sources of liquidity" for SSF. The 5028 Harbinger Defendants, however, failed to accelerate the repayment of the loan.

19.     In addition, in an email dated September 29, 2010, Falcone told an investor

representative that, among other things, the loan "was collateralized by all my holdings, essentially 14x." In actuality, the pledged collateral for the loan was limited to Falcone's interest in SSF, which was less than two times the principal amount of the loan.

20.     In the same e-mail, Falcone stated that the "[o]utside counsel structured the [loan] as an investment for the fund with terms advantageous to the fund like any other investment." However, the 5028 Harbinger Defendants did not treat the loan as a fund investment and did not disclose it to investors in monthly portfolio holdings reports for approximately five months.

21.     Falcone made his final loan repayment in March 2011, after becoming aware of the SEC's investigation.

## The Preferential Redemptions

22.      In early 2009, HCP Fund I experienced a sharp decline in assets under management. As a result of investment losses in 2008, many investors were seeking to redeem their interests.

23.     To try to stabilize the situation, Falcone and Harbinger proposed a change to the fund's "gate," which limited the amount of money that an investor could redeem on any of its quarterly redemption dates. Until March 2009, HCP Fund I had a "fund-level gate," which allowed the fund to limit redemption requests if the total redemptions sought by all investors exceeded 20 percent of the fund's total net assets on a given redemption date.

24.     In a letter dated March 9, 2009, Falcone and Harbinger sought to change this term to a more restrictive investor-level gate. The investor-level gate would limit redemptions to 25 percent of each redeeming investor's total investment in the fund per quarter, regardless of the total redemptions sought on that redemption date. The potential effect of the change from a fund-level gate to an investor-level gate would be to deny many investors the ability to access all

of their funds at the next available redemption date.

25.       The proposed change in investors' redemption rights required investor consent. As the date of the vote drew closer, there was concern that investors might not consent. A Harbinger employee emailed that she was "very concerned about the timing of these changes [because] we need a bunch of [other investors] to say yes. The [investor relations personnel] (who are always optimistic) are telling me that it will be near impossible to get the 2/3 votes offshore unless we threaten suspension .... If we don't get the votes, it will look bad."

26.       To secure consent, the 5028 Harbinger Defendants made side deals with some of their largest investors, providing those investors with preferential liquidity. These side deals were with "sponsors" – large banks and investment firms that acted as representatives and intermediaries with Falcone and Harbinger on behalf of the sponsors' clients. Harbinger made these side deals in oral agreements and side letters between Falcone and Harbinger and at least three large sponsors.

27.       In entering into these side deals, Harbinger did not disclose certain terms that would have been significant to the HCP Offshore Fund I board of directors to the HCP Offshore Fund I board of directors and failed to honor Most Favored Nation ("MFN") provisions with certain investors. In addition, the 5028 Harbinger Defendants did not disclose certain terms that would have been significant to investors to the other non-favored investors.

28.       For example, Harbinger entered into two side letters with Sponsor A, signed by Falcone, providing preferential redemption rights not available to other investors Neither agreement was approved by the board of directors, as required by the HCP Fund I documents, nor disclosed to other investors. Sponsor A-affiliated investors received approximately $65 million pursuant to the undisclosed preferential rights agreements.

**The 5027 Action:  Overview**

29.       The 5027 Action involves market conduct that occurs when a trader constricts the supply of a security with the intention of forcing settlement from short sellers at elevated prices. Defendant Falcone engaged in such conduct in connection with purchases of a series of distressed high-yield bonds issued by MAAX Holdings, Inc. ("MAAX"), through two unregistered investment managers he controls, co-Defendants HCP Offshore Manager and HCP Special Situations GP (collectively, the "5027 Harbinger Defendants").

**Early Transactions**

30.       Between April and June 2006, Falcone and the other Defendants purchased 108 million MAAX junior discount bonds (the "MAAX zips"), which constituted about 63% of the issue, for Harbinger Capital Partners Master Fund I ("Master Fund").

31.       During the summer of 2006, Falcone heard rumors that Goldman Sachs, & Co. (the "Financial Services Firm"), a Wall Street financial services firm that provided prime brokerage services to the Master Fund, was shorting the bonds and encouraging its customers to do the same. Prime brokers provide a special group of services to certain clients, often hedge funds, including services such as securities lending, leveraged trade execution, cash management, and margin arrangements.

**Defendants' Actions**

32.       In September and October 2006, Falcone retaliated against the Financial Services Firm for shorting the MAAX Zips by causing the Master Fund and the newly created Harbinger Capital Partners Special Situations Fund ("Special Situations Fund") to purchase all of the remaining outstanding MAAX zips in the open market. (The Master Fund and the Special Situations Fund are collectively referred to hereinafter as the "Harbinger funds.")

33.     By October 24, 2006, the Harbinger funds had purchased more than the available supply of bonds—its position stood at 174 million notes in a 170 million note issue.

34.     Contemporaneously with these purchases, Falcone and the other Defendants arranged for the transfer of the 5027 Harbinger Defendants' MAAX positions from its prime brokerage accounts to a custodial account in a bank in Georgia. The principal purpose and effect of this was that it prevented the bonds from being lent out or used to cover short positions.

35.     Falcone and the other Defendants then demanded that the Financial Services Firm settle its outstanding MAAX transactions and deliver the securities it owed. Defendants did not disclose at the time that it would be virtually impossible for the Financial Services Firm to acquire any bonds to deliver, as nearly the entire supply was locked up in the Harbinger funds' custodial account and the Harbinger funds were not offering them for sale.

36.     Even though he had already purchased more than the available supply of bonds, Falcone and the other Defendants continued to cause the Harbinger funds to purchase the MAAX zips from apparent short sellers—taking the long side of short sales in the open market. By late January 2007, the Harbinger funds had acquired another 18 million MAAX notes, increasing their holdings to 113% of the issue. By this point, the Harbinger funds had purchased 22 million more bonds than had ever been issued. The total cost of the MAAX position was approximately $90.7 million.

37.     Due to Falcone's and the other Defendants' interference with the normal interplay of supply and demand, the bonds more than doubled in price during this period.

38.     In the spring of 2007, Falcone and the other Defendants ratcheted up the pressure on the Financial Services Firm by paying off the Harbinger funds' margin debt to the firm and demanding the return of any securities, including the MAAX zips, which it had borrowed. In an

effort to meet its obligations to the Harbinger funds, the Financial Services Firm bid daily for the bonds, but could not find any to purchase.

39.     In May 2007, the Financial Services Firm approached the 5027 Harbinger Defendants and asked if it had any MAAX zips to sell.  Defendants replied that the Harbinger funds had such bonds and that the Financial Services Firm could have them at the price of 100, or par, despite the fact that the bonds had been selling at a deep discount to par.  At the time of the offer, MAAX was in a dire financial condition, and the Harbinger funds were carrying the notes on its books at a price of 65.

40.     On July 31, 2007, Defendants sold a block of the Harbinger funds' MAAX zips in the open market, effecting settlement from a short seller at 95—a price that resulted from the Harbinger funds' ownership of more than 100% of the issue.   The same day, Falcone directed that the price of Harbinger funds' MAAX zip bonds be marked down from 55 so that they were carried on the funds' books at a price of 40.

41.     In late September 2007, the Financial Services Firm called Falcone to try to resolve the MAAX situation. During that conversation, Falcone claimed that a price at or above par for the MAAX bonds was reasonable and tried to induce the Financial Services Firm to buy-in the outstanding MAAX short positions at a price of 105.  At the end of the conversation, Falcone informed the Financial Services Firm—for the first time—of the material fact that the Harbinger funds had acquired more than the whole issue of the MAAX zips. This was the first time anyone outside of the 5027 Harbinger Defendants knew the size of the funds' MAAX position. Several days later, the Financial Services Firm informed Falcone that the firm could make no further bids for the MAAX zips as long as the Harbinger funds' position in the MAAX

zips was larger than the number of bonds issued.  The Financial Services Firm refused to pay the prices asked by the 5027 Harbinger Defendants.

42.      On December 24, 2007, in response to the Financial Services Firm's concerns about the size of the Harbinger funds' position in the bonds, Falcone and the other Defendants directed the funds to sell 25 million face amount of MAAX zips for $0.01 per $100 face amount (for a total of $2,500) to an off-shore retail account at a brokerage firm through a trader at an inter-dealer broker. The trader, who had a longstanding relationship with Falcone, executed the trade using trading discretion he had over the off-shore account. The brokerage firms involved in the transaction did not report it. For the next year, the trader made no effort to sell the bonds in the open market. Thus, the 25 million in MAAX zips were effectively unavailable to cover short positions in the bonds. As a result, while the sale of the 25 million in MAAX zips allowed Defendants to argue that they had reduced the Harbinger funds' ownership position below the total issue of MAAX zips, the sale did not diminish the impact of their ownership of MAAX zips.

43.      At the end of the month, Falcone directed the Harbinger funds' investment adviser to write off the MAAX position as worthless. Falcone and the other Defendants, however, continued to press the Financial Services Firm to deliver the securities it owed.

44.      In the first week of January 2008, Falcone informed the Financial Services Firm that the Harbinger funds had sold some of the MAAX notes and that their ownership position was below the total issue size. Falcone refused to identify the party to whom the Harbinger funds had sold the 25 million notes or give the Financial Services Firm any details of the transaction. The Financial Services Firm resumed bidding for the notes, but again could find none to deliver.

45.     On January 11, 2008, the Financial Services Firm learned of two transactions in the MAAX zips at prices in the $60 range. In order to cover outstanding short positions, the Financial Services Firm purchased one million MAAX zips in the $60 range. When the Financial Services Firm subsequently learned that it had purchased the notes from the Harbinger funds, it became concerned that the $60 price was the product of the 5027 Harbinger Defendants' control of the position and again suspended the firm's trading in the security.

46.     Between March and November 2008, the 5027 Harbinger Defendants adjusted or cancelled all of its unsettled MAAX trades.

## Conclusion

47.     The above-described conduct by Falcone, Harbinger, HCP Offshore Manager and HCP Special Situations GP was undertaken in connection with the purchase, offer, or sale of a security.

48.     In connection with the violations described in the Harbinger Defendants' Admissions, Falcone, Harbinger, HCP Offshore Manager and HCP Special Situations GP acted recklessly.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

## I.

A.      Subject to Sections I.B, I.C, I.D and I.E below, Falcone shall be, and hereby is,

enjoined from acting as or being an associated person of any broker, dealer, investment adviser,

municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical

rating organization (each a "Regulated Entity"), as those terms are defined in Section 3 of the

Securities Exchange Act, 15 U.S.C. § 78(c), and Section 202 of the Investment Advisers Act, 15

U.S.C. § 80b-2; provided, however, that Falcone shall have the right:

   (i)      No earlier than five years after the date of this Order, to apply to the appropriate
            Self-Regulatory Organization (SRO) or, if there is none, the Commission for consent
            to associate with a Regulated Entity on such terms and conditions as the SRO or the
            Commission, as applicable, deems appropriate; and

   (ii)     Thereafter, to apply to the appropriate SRO or, if there is none, the Commission for
            consent to modify or amend the terms and conditions of association with that
            Regulated Entity.

Any such application by Falcone for permission to associate or to modify or amend the terms and

conditions of association with a Regulated Entity shall be subject to the then-applicable laws and

regulations governing the re-entry process. If such an application is granted, it shall not be a

violation of this Order for Falcone to associate with a Regulated Entity on the terms and conditions

prescribed by the SRO or Commission. Except as set out below in Sections I.B, I.C, I.D and I.E,

Falcone shall not be permitted to associate with a Regulated Entity without first obtaining consent

to associate with that Regulated Entity pursuant to this Section; consent to associate with one

Regulated Entity shall not constitute consent to associate with any other Regulated Entity.

B.      Falcone may remain an associated person of Harbinger and the entities listed on

Schedule A attached hereto (collectively, the "Harbinger Advisers"), and no other investment

adviser, as such term is defined in Section 202 of the Advisers Act; provided, however, that Falcone's association will be strictly limited as set forth in Sections I.C and I.D below.

      C.      The Harbinger Defendants shall take all actions reasonably necessary to expeditiously satisfy all pending or hereafter received redemption requests of investors in the entities listed on Schedule B attached hereto (collectively, the "Harbinger Funds"), and such steps may include the orderly disposition of the assets of the Harbinger Funds.  The Harbinger Advisers shall not raise new capital or make capital calls from existing investors.  The Harbinger Defendants' activities pursuant to Sections I.B and I.C shall be subject to the oversight of the Independent Monitor appointed pursuant to Section II.

      D.      Section I.C shall not apply to the assets of the Harbinger Funds that are subject to the jurisdiction of the United States Bankruptcy Court for the Southern District of New York in *In re: LightSquared Inc., et al.*, Case No. 12-12080 (SCC) (Bankr. S.D.N.Y.).  Accordingly, following the conclusion of the Bankruptcy Court proceedings, the disposition of the Harbinger Funds' interests in the reorganized LightSquared Inc. or such other reorganized entity shall be determined by Falcone and the Harbinger Advisers, subject to the oversight of the Independent Monitor, who shall act in the best interests of the investors of the Harbinger Funds.

      E.      Sections I.A and I.B shall not be violated solely by reason of Falcone's ownership and control of Harbinger Group Inc. ("HRG").  Accordingly, Falcone may not be an associated person of Five Island Asset Management LLC, Salus Capital Partners, LLC and Salus Capital Partners II, LLC (collectively, the "HRG Subsidiaries"), other than as a result of his ownership and control of HRG, and Falcone is therefore prohibited from engaging in any actions that would otherwise result in him being an associated person of the HRG Subsidiaries, including, but not limited to, directly or indirectly: (i) performing any management functions at the HRG Subsidiaries; or (ii) making any recommendations

regarding the purchase or sale of securities by the HRG Subsidiaries.  Within ten days of entry of the

Final Judgment, the Harbinger Defendants shall provide written notice of the Final Judgment to HRG

and the HRG Subsidiaries.

## II.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that an Independent

Monitor shall be appointed as follows:

A.        Within fifteen days of the entry of the Final Judgment, the Harbinger Defendants

shall provide the Commission with a list of five persons who are eligible and qualified to serve as

the Independent Monitor.  Within twenty one days of receiving the list of five names, the

Commission shall select one person from this list to serve as the Independent Monitor, and the

Commission shall then request that the Court issue an Order appointing the Independent Monitor;

B.        The Independent Monitor shall oversee the Harbinger Defendants' activities

referenced in Sections I.A, I.B, I.C and I.D, and shall also ensure compliance with side letters and

other obligations to investors to ensure fair and equitable treatment of all investors in the Harbinger

Funds.  The Independent Monitor shall file quarterly reports with the Court summarizing the

compliance described in the preceding sentence;

C.        In the event that the Independent Monitor believes that any Harbinger Defendant

has failed to comply with any term of this Final Judgment, the Independent Monitor shall file a

certificate of non-compliance with the Court setting forth the asserted areas of non-compliance.

The Commission then shall have the right to petition the Court to compel that Harbinger

Defendant's compliance with the terms of this Final Judgment, as described in the Independent

Monitor's certificate, or for a contempt citation.  Without prejudice to the Harbinger Defendant's

right to introduce contrary evidence during such proceedings, the Independent Monitor's certificate

of non-compliance shall be *prima facie* evidence of the Harbinger Defendants' non-compliance;

D.      The Harbinger Defendants shall cooperate with the Independent Monitor and

provide the Independent Monitor with access to all books, records and documents requested by the

Independent Monitor.  The Harbinger Defendants are jointly and severally liable for payment of

the reasonable costs, fees and expenses of the Independent Monitor incurred in connection with the

performance of the Independent Monitor's duties as specified in this Final Judgment.  The

procedure for payment of the Independent Monitor shall be established by a further order of the

Court; and

E.      The Independent Monitor shall serve for two years from the date of the entry of the

Court's Order appointing the Independent Monitor as set forth in Section II.A hereof.

**III.**

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Harbinger

Defendants in the 5027 Action are jointly and severally liable for disgorgement of $1,667,785,

representing profits gained as a result of the conduct alleged in that Action, together with

prejudgment interest in the amount of $403,824 (as of April 1, 2013), and that the Harbinger

Defendants in the 5028 Action are jointly and severally liable for disgorgement of $4,839,789,

representing profits gained as a result of the conduct alleged in that Action, together with

prejudgment interest thereon in the amount of $609,316 (as of April 1, 2013).  Furthermore,

Falcone shall be solely responsible for a combined civil penalty in the amount of $4,000,000.00;

Harbinger shall be solely responsible for a civil penalty in the amount of $3,000,000.00; HCP

Offshore Manager shall be solely responsible for a civil penalty in the amount of $1,750,000.00;

and HCP Special Situations GP shall be solely responsible for a civil penalty in the amount of

$1,750,000.00, pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], Section 21(d) of the

Exchange Act [15 U.S.C. § 78u(d)] and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]. The Harbinger Defendants shall satisfy the obligations set forth in this paragraph by paying the amounts required of each of them as set forth above, totaling $18,020,714 to the Commission pursuant to the terms of the payment schedule set forth in Section IV. below after entry of this Final Judgment. After final payment of the above amount, the Harbinger Defendants shall not file for bankruptcy protection for at least one hundred days after the payment has cleared.

The Harbinger Defendants may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. The Harbinger Defendants may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Philip A. Falcone; Harbinger Capital Partners LLC; Harbinger Capital Partners Offshore Manager, L.L.C.; Harbinger Capital Partners Special Situations GP, L.L.C. as defendants in the Actions; and specifying that payment is made pursuant to this Final Judgment.

The Harbinger Defendants shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in these Actions. By making this payment, the Harbinger Defendants relinquish all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to a Harbinger Defendant. The

Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 45 days following entry of this Final Judgment. The Harbinger Defendants shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C. § 1961.

## IV.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Harbinger Defendants shall pay the total of disgorgement, prejudgment interest, and penalty due of $18,020,714 in four installments to the Commission according to the following schedule:

(a) $6 million within 45 days of entry of this Final Judgment;

(b) $3 million within 165 days of entry of this Final Judgment;

(c) $3 million within 255 days of entry of this Final Judgment; and

(d) $6,020,714, plus post judgment interest on the payments described in (b) through (d) pursuant to 28 U.S.C. § 1961, within 345 days of entry of this Final Judgment.

Prior to making payment described in (d), the Harbinger Defendants shall contact the staff of the Commission to ensure the inclusion of the post-judgment interest.

If any Harbinger Defendant fails to make any payment by the date agreed and/or in the amount agreed according to the schedule set forth above, all outstanding payments under this Final Judgment, including post-judgment interest, minus any payments made, shall become due and payable immediately at the discretion of the staff of the Commission without further application to the Court.

## V.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that the Consent is incorporated herein with the same force and effect as if fully set forth herein.

## VI.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that each of the Harbinger Defendants shall certify, in writing, compliance with the undertaking(s) set forth in Sections I and II of this Final Judgment on a quarterly basis, which shall coincide with the Independent Monitor's quarterly report. The certification shall identify the undertaking(s), provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and each Harbinger Defendant shall provide such evidence. Each Harbinger Defendant shall submit the certification and supporting material to Commission counsel in the 5027 Action and 5028 Action, with a copy to the Office of Chief Counsel of the Enforcement Division, no later than sixty (60) days from the date of the completion of the undertakings.

## VII.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall

retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## VIII.

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil

Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: _September 16_, 2013

_____
UNITED STATES DISTRICT JUDGE

## SCHEDULE A

### **Harbinger Advisers**

Harbinger Capital Partners II LP

Harbinger Capital Partners Offshore Manager, L.L.C.

Harbinger Capital Partners Pte. Ltd.

Harbinger Capital Partners GP, L.L.C.

Harbinger Capital Partners Special Situations GP, L.L.C.

Harbinger Capital Partners Special Situations Offshore GP, L.L.C.

Global Opportunities Breakaway GP, L.L.C.

Credit Distressed Blue Line GP, L.L.C.

Harbinger Dedicated Investor (Cayman) GP, Ltd.

**SCHEDULE B**

**<u>Harbinger Funds</u>**

Harbinger Capital Partners Fund I, L.P.

Harbinger Capital Partners Offshore Fund I, Ltd.

Harbinger Capital Partners Fund II, L.P.

Harbinger Capital Partners Offshore Fund II, Ltd.

Harbinger Capital Partners Special Situations Fund, L.P.

Harbinger Capital Partners SSF CFF, Ltd.

Harbinger Capital Partners Special Situations Offshore Fund, L.P.

Credit Distressed Blue Line Fund, L.P.

Credit Distressed Blue Line Offshore Fund, Ltd.

Global Opportunities Breakaway Fund, L.P.

Global Opportunities Breakaway, Ltd.